STATE OF MINNESOTA

COUNTY OF HENNEPIN

DISTRICT COURT

FOURTH JUDICIAL DISTRICT

Teng Moua, Juan Martinez, Cheri Martinez,
Kua Vang Xiong, Maiku Thao, Cherpao Yang,
Bee Vang, Vang Pao Moua, Mailou Xiong Yang,
Vangxue Yang, Eng Thao, Choua Moua, Meshack Balira,
Ferdinand Nyambarya, VMS Inc., Richard Chang,
Lee Wong Chang, Khonekham Dejvongsa, Nouphet
Dejvongsa, Diego Cortez Dominguez, Mohamud
Egal, Mohamed Osable, Hussein Osable, Ifran Jimale,
Layla Jimale, Mohamed Jimale, Paul Bel George,
Chue Hang, Tong Thao Hang, Rexhep Krasniqi,
Tou Lor, Mai Moua Vue, Arif Metushi, Wa Her
Moua, Mee Yang, John Schroeder, Judy Schroeder,
Berhane Tesfai, Dual Cykao Thao, Xong Thao Yang,
Kou Thao, Yang Xiong, Kevin Vilavong, Chong
Xiong, Ko S. Xiong, Blia Yang, Ying Cheng, Chang
Yang, Choua Lor, Mai Blia Yang, Pang Yang, Lue
Her, for themselves and all other persons similarly
situated as franchisees of Jani-King of Minnesota, Inc.
and Jani-King International, Inc.

Plaintiffs,

vs.

Jani-King of Minnesota, Inc.,
a Texas Corporation, Jani-King
International, Inc., a Texas
Corporation, George Selman, a
Minnesota resident, and
Steve Schmidt, a Minnesota resident.

Defendants.

File No.

---

## CLASS ACTION COMPLAINT

---

Plaintiffs, for their Class Action Complaint against the Defendants, by and through their

undersigned counsel and on behalf of themselves and all others similarly situated, allege as

follows:

## I.   **INTRODUCTION**

This is an action brought by a group of individuals who used much of their respective families' savings to purchase franchises from an international franchisor and its regional sub-franchisor (collectively "franchisors") in order to pursue the American dream of becoming business owners.  Instead of achieving happiness, self-fulfillment and financial success, however, these individuals have been subjected to systemic and pervasive misrepresentations, breaches of contract, violations of the Minnesota Franchise Act, and breaches of the duty of good faith and fair dealing, among other wrongs, as more fully described below.  The franchisors purport to sell cleaning "franchises" through which these individuals can achieve their dreams, even while the franchisors know full well that they do not have sufficient business accounts to satisfy their obligations under the various franchise agreements.  Many franchisees, including the plaintiffs herein, purchased their franchises for substantial sums of money, based on promises and misrepresentations about the guaranteed amount of monthly income which the franchisors promised to provide them.  Those promises went unfulfilled and were dashed by the franchisors and the individual defendants as described herein.

In this action, the above-named plaintiffs seek to recover, for themselves and on behalf of all similarly-situated individuals, compensation and/or rescission for the unlawful violations of statutory and common law and breaches of contract, as well as for attorneys' fees and costs as provided by law.  Plaintiffs also seek certification of the class of individuals and entities who purchased other "franchises" from the defendants during the period of January 1, 2000 through June 30, 2008.

## II.    PARTIES, JURISDICTION, AND VENUE

1.      Plaintiff Teng Moua ("Teng") is an individual residing in Anoka, Minnesota. He performed cleaning services for Jani-King in Minnesota beginning in 2005. He performed cleaning services for Jani-King accounts located in Hennepin County, Minnesota. Teng purchased two franchises from the Defendants, first in late 2004 and later in mid 2005.

2.      Plaintiff Juan M. Martinez ("Martinez") is an individual residing in Minneapolis, Minnesota. He performed cleaning services for Jani-King in Minnesota beginning late in 2005. He performed cleaning services for Jani-King accounts located in Hennepin County, Minnesota. Martinez, and his sister-in-law, plaintiff Cheri Martinez, purchased a franchise from the Defendants earlier in 2005.

3.      Plaintiffs Kua Vang Xiong ("Kua") and Maiku Thao ("Maiku") are individuals residing in Lino Lakes, Minnesota. They performed cleaning services for Jani-King in Minnesota beginning late in 2005. They performed cleaning services for Jani-King accounts located in Hennepin County, Minnesota. Kua and Maiku purchased a franchise from the Defendants earlier in March 2005.

4.      Plaintiff Cherpao Yang ("Cherpao") is an individual residing in Minneapolis, Minnesota. Cherpao performed cleaning services for Jani-King in Minnesota beginning in late 2005 or early 2006. He performed cleaning services for Jani-King accounts located in Hennepin County, Minnesota. Cherpao purchased a franchise from the Defendants in or about September 2005.

5.      Plaintiffs Bee Vang and Vang Pao Moua are individuals residing in St. Paul, Minnesota who performed cleaning services for Jani-King in Minnesota beginning in mid to late

3

2005. They performed cleaning services for Jani-King accounts located in Hennepin County, Minnesota. They purchased a franchise from the Defendants in or about July 2005.

6.      Plaintiff Mailou Yang is an individual residing in North St. Paul, Minnesota. Mailou performed cleaning services for Jani-King in Minnesota beginning in 2000. She performed cleaning services for Jani-King accounts located in Hennepin County and Ramsey County, Minnesota. She purchased three different franchises from the Defendants beginning in or about 2000, 2002 and 2005.

7.      Plaintiffs Eng Thao and Choua Moua are individuals residing in Brooklyn Park, Minnesota who performed cleaning services for Jani-King in Minnesota beginning in late 2005 or early 2006. They performed cleaning services for Jani-King accounts located in Hennepin County, Minnesota. They purchased a franchise from the Defendants in or about October 2005.

8.      Plaintiffs Meshack Balira and Ferdinand Nyambarya are individuals residing in New Hope, Minnesota who performed cleaning services for Jani-King in Minnesota beginning in early 2000. They performed cleaning services for Jani-King accounts located in Hennepin and Ramsey County, Minnesota. They purchased a franchise from the Defendants in or about 2000

9.      Plaintiffs Richard Chang and Lee Wong Chang are individuals residing in Minneapolis, Minnesota who performed cleaning services for Jani-King in Minnesota beginning in late 2005. They performed cleaning services for Jani-King accounts located in Hennepin County, Minnesota. They purchased a franchise from the Defendants in or about July 2005.

10.      Plaintiffs Khonekham Dejvongsa and Nouphet Dejvongsa are individuals residing in Otsego, Minnesota who performed cleaning services for Jani-King in Minnesota beginning in late 2002 or early 2003. They performed cleaning services for Jani-King accounts located in

Hennepin County, Minnesota. They purchased a franchise from the Defendants in or about November 2002.

11.     Plaintiff Diego Cortez Dominguez ("Diego") is an individual residing in West St. Paul, Minnesota. Diego performed cleaning services for Jani-King in Minnesota beginning in mid to late 2005. He performed cleaning services for Jani-King accounts located in Hennepin County, Minnesota. Diego purchased a franchise from the Defendants in or about April 2005.

12.     Plaintiffs Mohamud Egal, Mohamed Osable, Hussein Osable, Ifran Jimale, Layla Jimale, Mohamed Jimale are individuals residing in Rochester, Minnesota who performed cleaning services for Jani-King in Minnesota beginning in 2001. They performed cleaning services for Jani-King accounts provided by defendants from within Hennepin County, Minnesota. They purchased a franchise from the Defendants in or about April 2001.

13.     Plaintiff Paul Bel George ("George") is an individual residing in Maplewood, Minnesota. George performed cleaning services for Jani-King in Minnesota beginning in early 2003. He performed cleaning services for Jani-King accounts located in Hennepin County, Minnesota. George purchased a franchise from the Defendants in or about December 2002.

14.     Plaintiff Rexhep Krasniqi is an individual currently residing in Tampa, Florida. Krasniqi performed cleaning services for Jani-King in Minnesota beginning in 2005. He performed cleaning services for Jani-King accounts located in Hennepin County, Minnesota. Krasniqi purchased a franchise from the Defendants in or about June 2005.

15.     Plaintiffs Tou Lor and Mai Moua Vue are individuals residing in Minneapolis, Minnesota who performed cleaning services for Jani-King in Minnesota beginning in mid or late 2004. They performed cleaning services for Jani-King accounts located in Hennepin County, Minnesota. They purchased a franchise from the Defendants in or about March 2004.

5

16.     Plaintiff Arif Metushi is an individual currently residing in New Brighton, Minnesota. Metushi performed cleaning services for Jani-King in Minnesota beginning in late 2005. He performed cleaning services for Jani-King accounts located in Hennepin County, Minnesota. Metushi purchased a franchise from the Defendants in or about July 2005.

17.     Plaintiffs Wa Her Moua and Mee Yang are individuals residing in St. Paul, Minnesota who performed cleaning services for Jani-King in Minnesota beginning in 2004. They performed cleaning services for Jani-King accounts located in Hennepin County, Ramsey County and Dakota County, Minnesota. They purchased a franchise from the Defendants in or about October 2003.

18.     Plaintiffs John Schroeder and Judy Schroeder are individuals residing in Columbia Heights, Minnesota who performed cleaning services for Jani-King in Minnesota beginning in 2005. They performed cleaning services for Jani-King accounts located in Hennepin County, Minnesota. They purchased a franchise from the Defendants in or about February 2005.

19.     Plaintiff Berhane Tesfai is an individual currently residing in Minneapolis, Minnesota. Tesfai performed cleaning services for Jani-King in Minnesota beginning in 1997. He performed cleaning services for Jani-King accounts located in Hennepin County and Ramsey County, Minnesota. Tesfai purchased a franchise from the Defendants in or about 1997.

20.     Plaintiffs Dual Cykao Thao and Xong Thao Yang are individuals residing in Brooklyn Park, Minnesota who performed cleaning services for Jani-King in Minnesota beginning in late 2005. They performed cleaning services for Jani-King accounts located in Hennepin County, Minnesota. They purchased a franchise from the Defendants in or about April 2005.

6

21.    Plaintiffs Kou Thao and Yang Xiong are individuals residing in St. Paul, Minnesota who performed cleaning services for Jani-King in Minnesota beginning in late 2002. They performed cleaning services for Jani-King accounts located in Hennepin County, Minnesota. They purchased a franchise from the Defendants in or about June 2002.

22.    Plaintiff Kevin Vilavong is an individual currently residing in Chanhassen, Minnesota. Vilavong performed cleaning services for Jani-King in Minnesota beginning in late 2004. He performed cleaning services for Jani-King accounts located in Hennepin County, Minnesota. Vilavong purchased a franchise from the Defendants in or about June 2004.

23.    Plaintiff Ko S. Xiong is an individual currently residing in Brooklyn Center, Minnesota. Ko performed cleaning services for Jani-King in Minnesota beginning in late 2005 or early 2006. She performed cleaning services for Jani-King accounts located in Hennepin County, Minnesota. Ko purchased a franchise from the Defendants in or about October 2005.

24.    Plaintiff Chong Xiong is an individual currently residing in Minneapolis, Minnesota. Chong performed cleaning services for Jani-King in Minnesota beginning in late 1999 or early 2000. He performed cleaning services for Jani-King accounts located in Hennepin County, Minnesota. Chong purchased a franchise from the Defendants in or about 2000.

25.    Plaintiffs Blia Yang and Ying Cheng are individuals residing in St. Paul, Minnesota who performed cleaning services for Jani-King in Minnesota beginning in early 2005. They performed cleaning services for Jani-King accounts located in Ramsey County, Minnesota and received those accounts from Jani-King's offices in Hennepin County, Minnesota. They purchased a franchise from the Defendants in or about November 2004.

26.    Plaintiffs Chang Yang and Choua Lor are individuals residing in Brooklyn Park, Minnesota who performed cleaning services for Jani-King in Minnesota beginning in 2007.

7

They performed cleaning services for Jani-King accounts located in Hennepin County, Minnesota. They purchased a franchise from the Defendants in or about December 2006.

27.     Plaintiff Mai Blia Yang is an individual currently residing in St. Paul, Minnesota. Mai Blia Yang performed cleaning services for Jani-King in Minnesota beginning in late 2005. She performed cleaning services for Jani-King accounts located in Hennepin County and Ramsey County, Minnesota. Mai Blia Yang purchased a franchise from the Defendants in or about August 2005.

28.     Plaintiffs Pang Yang and Lue Her are individuals residing in St. Paul, Minnesota who performed cleaning services for Jani-King in Minnesota beginning in late 2005. They performed cleaning services for Jani-King accounts located in Hennepin County, Minnesota. They purchased a franchise from the Defendants in or about August 2005.

29.     Each of the above-named plaintiffs (collectively referred to herein as "Plaintiffs") bring this action for themselves and on behalf of a class of individuals who purchased franchises from the defendants from and after January 1, 2000 and who have been subjected to the same tactics, schemes, and misrepresentations by the defendants as explained more fully below. Plaintiffs are representative members of a class of individuals with common questions of law and fact. Due to the number of potential plaintiffs, the joinder of each member of the class is impracticable. Plaintiffs' claims are typical of the claims of the non-named class members. Adjudication of Plaintiffs' claims will fairly and adequately protect the interests of the class.

30.     Plaintiffs and class members have experienced similar, if not identical, problems and unfair and unlawful dealings with the Defendants as described generally below and specifically described for Plaintiffs Teng, Martinez, Cheri Martinez, Kua and Maiku below. Defendants are aware of and have the information concerning the particular dates of their

8

franchise sales/purchases, training and account assignments/cancellations. Discovery will reveal more specificity regarding the circumstances of the misconduct and actions directed toward each of the Plaintiffs and other class members.

31.      Defendant Jani-King of Minnesota, Inc. ("JK Mn") is a Texas corporation with a Minnesota regional office/operations located at 5930 Shingle Creek Parkway, Brooklyn Center, Minnesota. Defendant JK Mn employs numerous individuals in the county of Hennepin, State of Minnesota. Defendant JK Mn's agent for service in Minnesota is CT Corporation, 100 S. 5th Street, #1075, Minneapolis, MN, 55402.

32.      Defendant Jani-King International, Inc. ("JK Int'l") is a Texas corporation with its principal place of business in Addison, Texas. On information and belief, JK Int'l owns and operates JK Mn for the sole purpose of selling and administering Jani-King franchises in Minnesota. Upon information and belief, JK Int'l instructs and directs many of the affairs and operations of JK Mn and by its own activities, and those performed through JK Mn, it has subjected itself to the jurisdiction of Minnesota.

33.      Both of these Defendants (together referred to as "Jani-King") are subject to the jurisdiction of this Court pursuant to Minn. Stat.§ 80C.

34.      Defendant George Selman ("Selman") is an individual and a Minnesota resident who was or is still currently employed by Jani-King as Regional Director or in various other management capacities, at all times relevant to this case. Selman materially aided in the acts, omissions and/or transactions which constitute the violations of statutory and common law as described below and is therefore liable, jointly or severally, pursuant to Minn. Stat. § 80C.17.

35.      Defendant Steve Schmidt ("Schmidt") is an individual and a Minnesota resident who was or is still currently employed by Jani-King as Assistant Operations Manager or in

9

another management capacity, at all times relevant to this case. Schmidt materially aided in the acts, omissions and/or transactions which constitute the violations of statutory and common law as described below and is therefore liable, jointly or severally, pursuant to Minn. Stat. § 80C.17.

36.     This Complaint is not based upon any federal law or any federal question. No claim for relief is made under any federal law.

37.     Venue is proper in this Court under Minn. Stat. § 542.09 in that the causes of action, or some parts thereof, arose in Hennepin County. Moreover, the Defendants reside in and/or conduct their business affairs from locations and offices within Hennepin County.

38.     Plaintiffs bring this action pursuant to Minn. R. Civ. P. Rule 23 on behalf of themselves and on behalf of the class of individuals including all persons or entities who purchased a Jani-King franchise in Minnesota at any time from 2000 to June 30, 2008.

39.     The Class is so numerous that joinder of all members is impracticable. There are several hundred members of the Class who are geographically dispersed throughout Minnesota.

40.     Plaintiffs' claims are typical of the claims of the members of the Class because Plaintiffs and all Class members were injured by the same or similar wrongful conduct of the Defendants as alleged herein.

41.     There are questions of law and fact common to the Class which predominate over any questions affecting only individual Class members. Such common questions include, but are not limited to:

(a) Whether Defendants breached the terms of their franchise agreements with the class members by failing to provide the contractually-obligated amount of business or support to the class members.

10

(b)  Whether Defendants breached the implied covenant of good faith and fair dealing by intentionally violating the franchise agreements, or by failing to make a good faith effort to comply with the terms of the franchise agreements.

(c)  Whether Defendants, by virtue of making improper earnings claims and by utilizing false and misleading statements in their franchise offerings and sales meetings, violated the Minnesota Franchise Act.

(d)  Whether Defendants' representations that induced class members to purchase franchises, and whether Defendants' actions with respect to the class members after they purchased franchises were fraudulent.

(e)  Whether Defendants, by exacting unearned fees and selling franchises to class members for substantial sums of money, has been unjustly enriched at each class members' expense.

(f)  Whether class members are entitled to recover in *quantum meruit* following Defendants' refusal to supply each class member with business, support and services as bargained for in their franchise agreements,

(g)  Whether Defendants' misleading statements, false statements, or misrepresentations to class members constitute Unlawful Practices.

(h)  Whether Defendants' false and misleading statements in their advertising materials constitute False Statements in Advertising.

42.     As the claims of the Plaintiffs are typical of the claims of the Class, and the Plaintiffs have no interests adverse to, or which irreconcilably conflict with, the interests of other members of the Class, Plaintiffs are adequate class representatives.

43.     Plaintiffs will fairly and adequately protect the interests of the Class and have
retained counsel experienced and competent in the prosecution of complex litigation and class
actions.

44.     A class action is superior to other available methods for the fair and efficient
adjudication of the controversy and substantial benefits will derive from proceeding as a class
action.  Such treatment will permit a large number of similarly situated persons to prosecute their
common claims in a single forum simultaneously, efficiently, and without the duplication of
effort and expense that numerous individual actions engender.  Class treatment also will permit
the adjudication of relatively small claims by many Class members who could not afford to
individually litigate such claims against large corporate defendants such as the ones in this
instance.  There are no difficulties likely to be encountered in the management of this class
action that would preclude its maintenance as a class action, and no superior alternative exists for
the fair and efficient group-wide adjudication of this controversy.

## III.     FACTS COMMON TO PLAINTIFFS AND CLASS OF FRANCHISEES

### A.     Jani-King's Franchise Operations and Schemes

45.     JK Int'l has sold thousands of franchises across the United States, including in
Minnesota, to individuals who in turn perform cleaning or janitorial work for various customers
who have entered into long- or short-term cleaning service accounts with Jani-King.  These
franchisees include Plaintiffs and other members of the class.

46.     JK Mn is a regional business division of JK Int'l authorized and directed to sell
franchises to Minnesota residents and to solicit and service customer cleaning accounts in and
throughout Minnesota.  JK Mn has filed and utilized a lengthy Uniform Franchise Offering

12

Circular and a standardized franchise agreement (as periodically amended). Plaintiffs have signed such franchise agreements with JK Mn ("Franchise Agreement").

47.     In order to induce Plaintiffs and the other class members into buying one of their cleaning franchises (which their agents and employees sell through a variety of high pressure sales tactics and other schemes described below), Defendants negligently and/or intentionally misrepresented that Jani-King has sufficient business to provide the guaranteed monthly income promised to Plaintiffs and the class members pursuant to their Franchise Agreements. In fact, based on information and belief, Jani-King did not at the time, and does not now, have sufficient accounts and cleaning business under contract to provide each of these Plaintiffs (and the entire class of other similarly situated Jani-King franchisees) with the promised minimum income generation each month as required by the Franchise Agreements.

48.     At the time when and after Plaintiffs and the other class members executed their Franchise Agreements, Defendants knew Jani-King did not have sufficient business and cleaning accounts under contract to satisfy the terms of Plaintiffs' franchise agreements, yet they continued to advertise and still continue to advertise the sale and purchase of cleaning franchises, solicit more and more new franchises, and enter into new franchise contracts with new franchisees. Jani-King knowingly and willfully solicited and entered into the franchise agreements with Plaintiffs which it knew or should have known that it could not perform and fulfill its obligations to them (as well as to the class members) without deploying the numerous unfair and illegal schemes described below.

49.     Defendants further misrepresented that Plaintiffs and the other class members would receive cleaning accounts that are properly and profitably bid so as to not require an inordinate and unfair number of hours of work than the income generated from those accounts.

13

Jani-King employs many sales personnel in an effort to bid cleaning jobs from prospective and existing customers, yet it instructs those same personnel to bid jobs at amounts and with projected hours (per cleaning) that it knows cannot be reasonably completed for a fair and reasonable hourly wage and profit by Plaintiffs and other franchisees. Jani-King's management and sales personnel, including Selman and Schmidt, employ unreasonable and unrealistic projections to bid accounts knowing that Jani-King will eventually offer these "underbid" accounts to franchisees who are so desperate for cleaning work that they will accept the account and will continue to clean at those accounts even though the hourly rate of pay is at or below minimum wage (especially after deducting the various royalty and finder's fees and other amounts charged by Jani-King). This gross and deliberate underbidding on Jani-King's cleaning accounts is pervasive and not unique to the accounts handled by the Plaintiffs.

50.     Additionally, Defendants misrepresented to Plaintiffs and other franchisees that they would be able to grow their businesses if they simply worked hard with the accounts they received from Jani-King. However, Jani-King did not have then, and still does not have, sufficient accounts to provide such an opportunity for Plaintiffs. For example, although Plaintiffs have called for additional account referrals, they have been told by Jani-King's management, including defendants George Selman and Steve Schmidt (and other personnel such as Tom Schellinger and George Von Brugger), that Jani-King does not have accounts available to clean. In addition, Plaintiffs are aware that there are other Jani-King franchisees that cultivate and develop their own business and customer accounts only to then have Defendants give that new business to different franchisees.

51.     The Franchise Agreement signed by these Plaintiffs is a form contract of adhesion purporting to establish the terms and conditions of engagement of Jani-King cleaning

14

franchisees. The Franchise Agreement is written exclusively in English, in highly technical and confusing language, with misleading section headings and provisions regarding waivers of important rights buried within the Franchise Agreement. The Franchise Agreement, as with all contracts executed and entered into in Minnesota, contains an implied obligation and duty to act in good faith and with fair dealings toward the Plaintiffs.

52.    The Franchise Agreement is not available in other languages, although it is commonly known to Jani-King, that Plaintiffs and other class members (as is the case with many of the franchisees to whom Jani-King has sold its franchises) have little or minimal fluency in English, especially highly technical and legal terms as found throughout the Franchise Agreement.

53.    Consequently, as Jani-King knows, it seeks to capitalize on Plaintiffs' inability to fully grasp the terms and conditions of the Franchise Agreement, whether or not they speak English. Much of the Franchise Agreement and UFOC are difficult, if not impossible, for these Plaintiffs and other class members to understand.

54.    On information and belief, Defendants intentionally target immigrants, their family members, and other non-English speaking persons such as Plaintiffs and other class members because they can more easily victimize those individuals by the various misrepresentations and other systemic legal violations described herein.   None of the Plaintiffs or other class members is able to negotiate for different terms and conditions from those appearing in the Franchise Agreement.

55.    Pursuant to these Franchise Agreements, Plaintiffs and other class members paid substantial sums of money as "franchise fees" in order to obtain cleaning business referrals and accounts.

15

56.     In exchange for these large franchise fees and other finder's fees and charges (i.e.,

for supplies and equipment), Defendants promised and guaranteed Plaintiffs and other class

members a certain level of monthly income beginning only <u>after</u> the franchisee made substantial

payments to purchase the franchises, completed Jani-King's training, and obtained what Jani-

King described as "necessary" cleaning supplies and other equipment, all of which required an

additional out-of-pocket cost sometimes soaring in the thousands of dollars.

57.     After the execution of the Franchise Agreements, however, Defendants

systematically breached and still continue to breach their obligations to Plaintiffs by not

providing or offering sufficient or adequate profitable work as promised to them from the

guaranteed level of income.   As described below in more detail, many of the Plaintiffs rarely, if

ever, receive the promised level of monthly income and most of them only receive a rate of pay

at or below minimum wage.

58.     Through various unlawful schemes involving misrepresentation, Defendants

purport to satisfy their obligations under the Franchise Agreements when Jani-King does not

have contracted business to satisfy those obligations. Through these schemes and artifices,

Defendants attempt to make it appear that it is fault of the Plaintiffs and other class members,

rather than Jani-King's, when franchisees do not receive sufficient accounts to satisfy the

guaranteed monthly income.

59.     For example, Defendants negligently and/or intentionally misrepresent the

number of hours per week or day that is required to service and perform cleaning for the

accounts offered to Plaintiffs and other class members. These misrepresentations are known by

Defendants and are used to induce Plaintiffs and other class member to accept accounts that are

then counted toward their guaranteed level of income. In many, if not all, instances, the accounts

16

Defendants offered to Plaintiffs require substantially more hours of work than Defendants represented or bid for the particular job/account. Defendants stand in a unique and confidential relationship given that they alone communicate with the customers about the bidding, the prices they charge, and the scope of cleaning work to be performed. On information and belief, Jani-King knows that its sales representatives, including, but not limited to defendants Selman and Schmidt, are bidding for cleaning work and accounts at prices and hours that are far less than what can be reasonably required to profitably clean a particular account. Indeed, on information and belief, Defendants instruct and direct the sales representatives to bid for these jobs at unreasonable and unfair amounts simply to obtain as many accounts and customers they can, in a ploy to obtain some (indeed, "any") business which Jani-King can then foist upon the backs of these Plaintiffs and other class members. Jani-King can employ this tactic because it recruits and maintains a steady stable of franchisees that are so desperate for work, even what might be unprofitable work, because they already paid thousands of dollars for franchise fees, finder's fees and equipment. Simply put, Jani-King creates an atmosphere of desperation and then purports to fulfill that despair with business it knows to be unprofitably underbid and under contract.

60.    In addition, Defendants use another ploy or tactic to offer cleaning accounts that are geographically inconvenient to one another and inconvenient to the franchisees' residences. Even though the Franchise Agreement routinely states that the "territory" for the Plaintiffs' franchises are "Anoka, Benton, Carver, Dakota, Fillmore, Hennepin, Olmsted, Ramsey, Rice, Scott, Sherburne, Stearns, Washington and Wright Counties" (which, as an aside, is another unfair ploy that allows Jani-King to claim technical compliance by offering any account to a franchisee that may be almost 100 miles away), Plaintiffs were asked and informed by Jani-King's representatives that they could obtain accounts only in close or preferred proximity to the

17

Plaintiffs' residences. Indeed, during the required training courses, Jani-King itself uses a map with a circle/radius shown of between five or ten miles to show how far away the Plaintiffs should accept business and accounts in order for them to profitably minimize travel time between accounts. Then, and only after the Franchise Agreement is signed and once the Jani-King training is completed, Defendants consistently and unfairly offer accounts to the Plaintiffs which are geographically inconvenient and well outside the preferred territory as indicated by each of the Plaintiffs. Defendants again employ this tactic knowing that they can later claim or assert that the Plaintiffs have "declined" business offered to the Plaintiff and other class members. Defendants did not inform Plaintiffs that any "declined" accounts (due to distance, location or size of account) would count towards the promised business offered under the Franchise Agreement. In fact, neither the Jani-King Franchise Agreement or UFOC disclose or describe what happens in the event that a cleaning account is offered but declined (due to travel distance, size of the account or even the time of the day being inconvenient to the particular franchisee).

61.     As a result of the above-described schemes, Jani-King wrongly and unfairly contends that it fulfilled its obligations under the Franchise Agreement with Plaintiffs by offering accounts, knowing the accounts it offered simply cannot and will not be accepted by Plaintiffs, given the geographic and time limitations which Defendants know about because they requested such information during the training and solicitation stage.

62.     Jani-King also contends that it has offered accounts and business which Plaintiffs declined, when in fact Plaintiffs never received an offer of such accounts/business from Defendants. On information and belief, Defendants employ this tactic because they know that they cannot fulfill their obligations to each franchisee, including Plaintiffs. Moreover, Jani-King

sometimes has left a voicemail message for the Plaintiffs concerning a possible new account/customer but then when the Plaintiffs call Jani-King, they were informed that the account was given to another franchisee; Jani-King still credits or counts this so-called "offer" as against the guaranteed minimum monthly income promised by Jani-King in the Franchise Agreements.

63.     Similarly, when Plaintiffs received calls from a Jani-King representative, they were provided with very little detail, if any, about the cleaning customer/account (other than the monthly income it might present). Instead, Defendants informed the Plaintiffs that the decision to accept or decline the account must be made without more information about the size of the account (i.e., a walk-through or inspection of the site) or the particular details for cleaning that offered account. If Plaintiffs do not accept the account immediately over the phone, not only have they lost the account, but Jani-King then contends that this amount of business is "declined" and Jani-King counts that amount against the initial business offering which it has contractually agreed to provide under the Franchise Agreement. By way of illustration, it is common for a Plaintiff or another class member to receive an offer to clean an account and then require a few minutes to think about time management and staffing issues before deciding whether to accept the business. However when the Plaintiff or class member calls back (as little as two minutes later, and as much as a half hour later) to accept the account, Plaintiff or class member is frequently told the account is now gone. Indeed, Plaintiffs and class members must normally accept accounts immediately over the phone – sight unseen and with no information about size or nature of the necessary cleaning for the particular account – in order to ensure those accounts are not offered to other franchisees (who are, after all, competing for the same account/business having paid their own franchise fees).

19

64.     Defendants also recycle certain accounts, especially "troubled" accounts, with and among various franchisees, including Plaintiffs, by several schemes that it employs, namely, calling several or multiple franchisees, offering the same account to each of them simultaneously. In doing so, even though they did not obtain the account, Jani-King charges Plaintiffs for that monthly amount against Jani-King's required business offerings -- only one franchisee can receive and accept the account. Jani-King also offers "troubled accounts" to multiple franchisees, knowing that the accounts are either difficult to clean or the contact person at the account customer is difficult to deal with and unreasonable so that Jani-King can later claim it fulfilled the contractual obligations for offering business to these multiple franchisees.

65.     Defendants have also violated the Franchise Agreements by taking accounts away without warning and for no justifiable and good faith reason. Also in violation of the Franchise Agreement, Defendants deprived the Plaintiffs and other class members of the opportunity to correct or challenge any *alleged* deficiencies in their performance.

66.     Another unlawful scheme which Defendants employ is to inform a Plaintiff or other class member that their account customers were dissatisfied with their work, when in fact the customers were generally, if not completely, satisfied with the cleaning work. Defendants periodically send their personnel to the accounts (without providing any notice or warning to Plaintiffs) and conducted an "inspection" of the account, knowing that they almost always can or will find something which they point out to the account customer as not living up to the "Jani-King standards" (a euphemism or code word that means very little or nothing) but they then suggest to the account customer that it can get another cleaner if the account customer simply requests so. In using this ploy, Defendants ensure that they can re-circulate an account and offer it to yet another franchisee while also simultaneously counting that account as a dissatisfied

20

customer whose business and monthly income is applied to the obligations Jani-King owed to Plaintiffs and class members.

67.     Defendants also promised to support Plaintiffs and their franchises, yet Jani-King offers the very opposite of support, i.e., frustration. On information and belief, Defendants inform accounts that they know the account customers are too busy to inspect the franchisees' work, so Jani-King will perform the inspections for them. Defendants then use this opportunity to point out supposedly-neglected cleaning areas to the account person and then will use these "deficiencies" to convince the account customer to switch franchise owners for a "better" cleaning crew. Defendants use this maneuver so as churn that particular account/business to another franchisee, and therefore, make it appear that they have "fulfilled" their franchise obligations to two or more franchises at the same time.

68.     After using these tactics to take accounts away from Plaintiffs, Defendants then offer those accounts to other franchisees so that Jani-King can count that account toward that franchisee's monthly guarantee. In this way, Defendants churn the accounts they have, in order to make it appear that it has satisfied its Franchise Agreements with Plaintiffs.

69.     Jani-King has not performed or satisfied the terms of Plaintiffs' Franchise Agreement. They have not offered sufficient account revenue (free from misrepresentations and other unlawful actions) and Defendants have switched accounts away from Plaintiffs without justification or warning and without the opportunity to cure any deficiencies. Jani-King has not refunded any of Plaintiffs' franchise fees nor have they paid any penalties as outlined in Plaintiffs' Franchise Agreement for their failure to meet their obligations to Plaintiffs under the Franchise Agreement.

70.     Indeed, despite their failure to provide sufficient business revenue for Plaintiffs, Jani-King still requires Plaintiffs to continue making payments on their franchise fees and finders fees, billing them for these payments, even when Plaintiffs have received no further cleaning work from Jani-King.

71.     In addition, Jani-King deducted excessive fees from the payments made to the Plaintiffs under the Franchise Agreement.

72.     On information and belief, Defendants significantly and unreasonably underbid cleaning contracts with its customers.  Plaintiffs are then forced (by virtue of Defendants' pressure tactics) to accept these heavily-underbid accounts because the alternative is to have that business charged against their contractual rights.  As a result of this underbidding, Plaintiffs receive far less pay for their work than the fair value of their services and far less pay than they were promised on an hourly and monthly basis.  This underbidding also requires Plaintiffs to clean large accounts in short periods of time, making it nearly or practically impossible to meet the cleaning requirements of the account.  Consistent with the above described schemes, Defendants then conduct their inspections and point out insufficient cleaning to an account customer and ask that a new franchisee take over for the existing franchisee

73.     Contrary to its representations, Jani-King does not promote franchise growth.  Several Plaintiffs and franchisees have obtained new cleaning accounts on their own only to have Defendants assign those accounts to other franchisees and/or extract significant fees from them for "negotiating" the contract with the new customer.

74.     Through all these means and others described below, Jani-King misrepresented the nature of its relationship with the Plaintiffs.  Plaintiffs were treated more like "employees" than "franchisees", and certainly received few, if any, of the legal rights and protections afforded

employees under law.  For example, Jani-King withholds or charges each of the Plaintiffs and

other class members whenever the assigned account does not pay the bill or invoice for cleaning

services even though Jani-King is responsible for generation, collection and sending the invoice.

In several of these instances, Plaintiffs have later learned that payment was actually made by the

account/customer even though Jani-King charged the franchisee for "non-payment," also known

as or called a "chargeback."

75.     Through Jani-King's various schemes and tactics described above, the UFOC

provided to Plaintiffs contains a number of misrepresentations.  First and foremost, Jani-King

represented that 100% of the Minnesota franchisees received or were offered their initial

Finder's Fee Business during the required period.  In fact, based on the circumstances for these

Plaintiffs, it appears Jani-King rarely, if ever, actually offers the required/guaranteed minimum

business to the franchisees under the Franchise Agreement.  Therefore, the UFOC's percentages

are untrue and misleading.

**B.     Relationship between Jani-King and Teng Moua.**

76.     Plaintiff Teng Moua purchased a franchise from Jani-King on or about November

29, 2004.  Teng paid $18,050 to Jani-King as the franchise fee with a promise that he would

receive $6,000 in monthly income from cleaning accounts provided or referred to them by Jani-

King.  Later, in mid 2005, Teng purchased a second franchise from his brother (Khoua Lord) and

assumed the monthly financing obligations to Jani-King of who had previously paid

77.     Teng attended and completed the Jani-King training program and purchased the

required equipment by early 2005.  As is the normal course and practice, Defendants asked him

about the geographic areas where he preferred to work, to which Teng explained that he wanted

to be offered accounts in Minneapolis.

23

78.     In or about July 19, 2005, Teng received a written communication from Jani-King purporting to show that it had met its obligation under the Franchise Agreement to provide a guaranteed monthly income of $6,000/month. Many of the accounts listed by Jani-King were new or completely unknown to Teng as he had not been contacted or spoken to Jani-King personnel about the offered business. Jani-King requested Teng sign and acknowledge these offerings. On information and belief, Jani-King sent a similar letter to other Plaintiffs and class members, many of which contained inaccurate or untrue "offerings" as Jani-King contended.

79.     After Teng challenged Jani-King about the letter and its list, Jani-King set him a copy of handwritten notes that reflect many "offerings" that he had declined, including several more accounts which he had not heard about or received information.

80.     At or around the 12-month time period when Jani-King was required to provide Teng with business offerings, he noticed Jani-King's tactic and attitude toward him changed for the negative. For example, after not providing any inspections for more than nine months, Jani-King sent Mike Moriarity to inspect the Logan Real Estate Group account. Contrary to its obligation to act in good faith and its promises of providing support for Teng, Moriarity proceeded to convince the account contact person to request a new cleaner and for Jani-King to take the account away from Teng. Jani-King's actions were a breach of the Franchise Agreement and in direct violation of its promises for support and opportunity to cure any deficiencies in performance under the UFOC.

81.     A similar circumstance or situation occurred with other accounts Teng serviced or cleaned called Bunzl Papercraft and Edge Advertising. Although Teng had largely received satisfactory, if not above average, evaluations for his cleaning work, after Jani-King personnel contacted these account customers and suggested to them that Teng was not cleaning to the

24

"Jani-King standards," each time Teng had the account taken away from him and given to another Jani-King franchisee. Not coincidentally, these "customer-problem" situations arose only after the 12-month guaranteed business and, on information and belief, occurred because Jani-King needed the accounts to offer to other franchisees to whom it made promises about new business.

82.     When Teng went to discuss these situations with management, he was verbally accosted and threatened by Jani-King's employee, Michael Moriarity, and defendant Selman who went so far as to lock Teng in one of the Edge Advertising's offices. Teng felt intimidated and physically and emotionally threatened by Jani-King's actions.

83.     On information and belief, Jani-King knows exactly the dates and amounts "owed" to each franchisee (such as Teng and the other Plaintiffs) and once those obligations are met (or appear to be fulfilled), Jani-King begins to employ one or more of the schemes described above in order to churn the business to a new franchisee. Meetings are held in Jani-King's office to discuss which franchisees need to have their business removed or terminated (to be offered to another franchisee). On information and belief, some, if not all, of the tactics and schemes described herein occur in response or correlation to where the particular franchisee (such as Teng) fits in the initial business offering period.

**C.     Relationship between Jani-King and Juan and Cheri Martinez.**

84.     Plaintiffs Juan and Cheri Martinez purchased a franchise from Jani-King on or about March 30, 2005. The Martinezes paid $6,000 to Jani-King as their franchise fee with a promise that they would receive $2,000 in monthly income from cleaning accounts provided or referred to them by Jani-King.

25

85.     The Martinezes attended and completed the Jani-King training program and purchased the required equipment by or in August 2005. As is the normal course and practice, Defendants asked them as to the geographic areas where they preferred to work, to which the Martinezes explained that they wanted to be offered accounts in Minneapolis.

86.     In or about September 2005, Steve Schmidt contacted Juan Martinez and offered him two cleaning accounts, one of which was LSI Corporation and another of which was Black Box Resale in Brooklyn Park. The monthly billings for LSI was $1,839/month but Jani-King did not provide Juan Martinez with any more information about the scope of the cleaning work or the size of the job before he was asked to "accept" this offered business. Likewise, although Jani-King informed Juan Martinez about the amount of monthly billing for the Black Box location in Brooklyn Park ($1,506/month), it did not inform Juan Martinez about the scope of the cleaning work or the size of the job before he was asked to "accept" this account for cleaning.

87.     Having just paid thousands of dollars and having purchased expensive cleaning equipment, Juan Martinez accepted these two accounts sight unseen as Defendants intended. After a brief walk-through with Steve Schmidt, the Martinezes began cleaning at these two accounts in early October, 2005. The Martinezes discovered that cleaning the LSI account took three people three hours each day to clean this account. The amount Jani-King charged for cleaning at LSI was grossly underbid for the work and time needed to properly clean the account. Likewise, once they began cleaning the Black Box Resale location in Brooklyn Park, the Martinezes discovered that they needed five people to work for 6-7 hours each day to properly clean this account. The amount Jani-King charged for cleaning this Black Box location was grossly underbid (it had used one person working for 4.11 hours when in fact it took approximately 30-35 hours each day to properly clean the account on a daily basis).

26

88.     Jani-King also provided a third account to the Martinezes (JDS Marketing in Hamel, Minnesota) but they did not wish to accept this account because it was too small ($195) and was too far away from their preferred location (and only once a week). When the Martinezes tried to decline this account, Steve Schmidt threatened to take away the other two larger accounts (Black Box and LSI). Therefore, in order to keep Defendants happy, the Martinezes agreed to also clean this small and inconvenient account.

89.     In mid October, 2005, Steve Schmidt contacted Juan Martinez and informed him to return the keys for all three of these accounts because allegedly the customers were unhappy with the cleaning work. Defendants did not provide any written notice of what aspects of the cleaning were being complained about nor did it provide 72 hours notice of the opportunity to cure any real or perceived problems. Schmidt simply instructed Martinez to stop cleaning (at all three accounts) and return the keys.

90.     On information and belief, there were never any customer complaints made by the Black Box account or the JDS Marketing account. Schmidt simply chose to punish the Martinezes by taking away those accounts for what he perceived to be problems at the LSI account.

91.     To date, Jani-King has not offered to replace any of the business it took away from the Martinezes in October 2005. Defendants did not act in good faith or deal fairly with the Martinezes when it removed them from all three accounts, even if there was a real or perceived problem at LSI. Defendants failed to provide any of the promised support and also failed to properly train the Martinezes in a manner to provide the services it promised to teach them.

92.     The Martinezes did not discover that Defendants had failed to act in good faith or fairly with them and that Defendants refused to provide the support that had been promised until

October 2005.   Furthermore, Jani-King's refusal to pay back any of the promised business or

provide additional business to the Martinezes is a breach of the Franchise Agreement and a

violation of the Minnesota Franchise Act about which they did not discover until October 2005.

Until October 2005, Defendants prevented the Martinezes from discovering the facts that are the

basis of this action.   The Martinezes could not have, through the use of reasonable diligence,

discovered these facts prior to October 2005.

**D.     Relationship between Jani-King and Kua Vang Xiong and Maiku Thao.**

93.     Plaintiffs Kua Vang Xiong and Maiku Thao purchased a franchise from Jani-King

on or about March 29, 2005.  They paid $20,800 to Jani-King as their franchise fee with a

promise that they would receive $7,000 in monthly income from cleaning accounts provided or

referred to them by Jani-King.

94.     Kua and Maiku attended and completed the Jani-King training program and

purchased the required equipment by or in May 2005.  As is the normal course and practice,

Jani-King's representatives asked them as to the geographic areas where they preferred to work,

to which Kua and Maiku explained that they wanted to be offered accounts in or around the Lino

Lakes/Forest Lake and North St. Paul areas.

95.     By July 2005, Defendants had not contacted them with any business referrals and

so Kua and Maiku stopped by the Jani-King office to inquire about cleaning accounts.  They

spoke with Sue Swenson, a Jani-King representative with whom they had dealt in the execution

of the Franchise Agreement and to whom they had given their $20,800 payment.  After they told

Sue that they were extremely anxious about getting business referred to them, Sue checked on

the computer system and informed Kua and Maiku that it showed them as not having responded

to any of the pages sent to their Jani-King pager.  This news came as a complete surprise to Kua

and Maiku because they had not yet received any phone calls or pages from Jani-King – when they showed the pager to Sue Swenson, she agreed that there were no phone calls or pages registered on the pager. As a result, Kua requested a new pager.

96. Shortly thereafter, in August 2005, Jani-King's Dan Czeck contacted Kua and Maiku about an account in south Minneapolis for them. Desperate for any business, and even though the account was well outside the area they had indicated to Jani-King was their preference, Kua and Maiku accepted the account. They also did so even though Jani-King's representatives told them during the training that they could walk through the prospective account before accepting the account. Jani-King's Czeck told them very little about the account other than the location (south Minneapolis) and the amount of monthly business ($1,244/month).

97. The account in south Minneapolis turned out to be St. John's Lutheran Church which also operates a day care center. After working on this account, Kua and Maiku discovered that this account took two people more than three hours to clean each time. Jani-King bid the account cleaning to take 4.1 hours (instead of the 6+ hours it actually took). Thus, Kua and Maiku discovered in the fall of 2005 that the account was grossly underbid for the work and time needed to properly clean the account.

98. Kua and Maiku cleaned the St. John's Lutheran Church until mid January 2006 when they received word that someone at the church had complained to George Selman about their cleaning. Once they learned about this complaint, Kua arranged for a walk-through inspection with another Jani-King representative (Dan Czeck) and a representative from the church who pointed out what she believed were the problems or issues with the cleaning. Czeck told Kua that the items she was complaining about were not covered under the contract between Jani-King and the church and that the church was in a bad condition as a whole (due to reasons

29

other than the cleaning). Czeck agreed that Jani-King would transfer the account to another franchisee but that Kua and Maiku would receive a credit for this account transfer toward their monthly offered business. On information and belief, Jani-King did not provide them with additional business to replace this St. John's Lutheran Church.

99.     Around the same time as they were contacted about the St. John's Lutheran Church, Jani-King also contacted Kua and Maiku about another account, an apartment building for $1,244 a month. Because this account was located in Shakopee, Minnesota (which was far outside the preferred geographic area that they informed Jani-King about during their training), Kua and Maiku declined this account. No one, during this call or at any time, explained to Kua and Maiku that any business or account they declined (for the unreasonable distance it caused them to travel) would nonetheless count toward the minimum business obligations which Jani-King offered to them. Kua and Maiku did not discover that Jani-King contended that this account, which they rightfully declined, counted toward their minimum business offering until they were sent a letter from Jani-King in late October 2005. Indeed, it was not until they received this letter in late October or early November 2005 that Kua and Maiku first learned that there were at least four other accounts that Jani-King contended they had "declined" when in fact, Defendants never spoke with them or offered these accounts to them (ostensibly Jani-King takes the position that when Kua and Maiku did not respond to the pager calls (which Sue Swenson agreed were not registered on the pager), those accounts still counted toward the minimum business offering obligations under the Franchise Agreement).

100.     In early September 2005, Steve Schmidt contacted Kua and Maiku about another account to be cleaned; this one was a day care facility in Fridley. Kua and Maiku accepted this account and began to clean the Children's World. Shortly thereafter, they realized that this

account was also underbid as it took both of them more than four hours to clean the account (calculating the number of hours it took each month to clean and the amount charged by Jani-King, Kua and Maiku made less than $7/hour (before payment of the royalty and other fees to Jani-King).

101.     On top of that, in early February 2006, Kua learned that Jani-King sent another one of its franchisees (name believed to be Jim) to strip and wax the floors (which was "extra work" and beyond the contracted work). When Kua confronted Steve Schmidt about this, all he replied was that the customer needed the work to be done. Schmidt did not explain why Kua and Maiku had not been asked and indeed, the customer ended up complaining about the stripping and waxing done by "Jim" who returned a second time and he even used Kua and Maiku's equipment. After this, Kua and Maiku asked to trade in this account for another replacement account and while their request was honored, Defendants punished them by charging $450 for "floorwork" charges associated with this stripping and waxing and deducted this amount from their monthly payment.

102.     In early October 2005, Jani-King's Dan Czeck contacted Kua one morning about another account, a bar in downtown Minneapolis for which Jani-King charged $1,193/month. Kua explained to Czeck that he first wanted to speak with his wife about this account (because it was 7 days a week and required cleaning in the early morning hours after the bar closed). When Kua called back in the early afternoon on the same day, Czeck informed Kua that they offered the account to another franchisee. Czeck did not inform Kua that this account (which they did not "decline" but rather "accepted") would still count toward the minimum business offering that Jani-King was obligated to provide them under the Franchise Agreement. In fact, it was not until they received a letter from Jani-King in late October or early November 2005 that Kua and

31

Maiku discovered that Jani-King considered the bar account (Mackenzie) to be one that they had "declined." This was false and untrue.

103.     In late October 2005, Kua and Maiku received another account, this time a restaurant in Fridley. The account was also underbid as it took Kua and Maiku (together) approximately 5 hours to clean seven days a week. Using the $1,201 monthly income for this account, Kua and Maiku again earned less than $6.00 per hour (before royalties and fees for Jani-King).

104.     In November 2005, Kua and Maiku received a very large account to clean, an office building in Richfield. Although the account was outside their preferred territory, they opted to accept it because they had not yet received the full $7,000/month of business from Jani-King and they had paid more than $20,000 for this franchise. After cleaning this account for several weeks, Kua and Maiku came to realize that this account was also underbid – it took them far more than the 21.82 hours which Jani-King had projected as the amount of time for one person to clean (Kua and Maiku employed others to help them clean this large account).

105.     Kua and Maiku cleaned this particular account (Guardian Companies) for approximately nine months and everything was going well. They received mostly 8's and 9's on the contact evaluation forms (on a scale up to 10) from the customer's account contact person (Lori Mercer). Indeed, in the comments section of her May 2006 report, Ms. Mercer stated: "Things are going great!  Thank you – Kua."

106.     However, in August 2006, right around the time Kua and Mai had reached the end of their twelve month's worth of guaranteed monthly business, Defendants sent Tom Schellinger to conduct an inspection of the Guardian account. Immediately, but not coincidentally, the tone and relationship between Ms. Mercer and Kua and Maiku changed for the worse. In her contact

evaluation dated August 30, 2006, Ms. Mercer gave them a "2" (out of 10) for their cleaning.
On or about September 6, 2006, Kua and Maiku were instructed to return the keys for Guardian
to the Jani-King office and to cease all cleaning there. Although they repeatedly tried to speak
with Ms. Mercer, she refused to return their calls. On information and belief, Jani-King's
personnel, including but not limited to, Tom Schellinger, had unfairly and unreasonably
convinced Guardian to seek and ask for a replacement for Kua and Maiku; on information and
belief, Jani-King did so because it needed to be able to offer this business to another franchisee
(at a time when it did not have enough business under contract to fulfill its obligations to other
and new franchisees).

107.    To date, Jani-King has not offered any additional business or cleaning accounts to
Kua and Maiku.

108.    Kua and Maiku did not discover that Defendants had failed to act in good faith or
fairly with them and that Defendants refused to provide the support that had been promised until
October 2005. Furthermore, Jani-King's refusal to pay back any of the promised business or
provide additional business to Kua and Maiku is a breach of the Franchise Agreement and a
violation of the Minnesota Franchise Act about which they did not discover until October 2005.
Until October 2005, Defendants prevented Kua and Maiku from discovering the facts that are the
basis of this action. Kua and Maiku could not have, through the use of reasonable diligence,
discovered these facts prior to October 2005.

**E.    Relationship between Jani-King and Cherpao Yang.**

109.    Plaintiff Cherpao Yang purchased a franchise from Jani-King on or about
September 12, 2005. He paid $3,000 to Jani-King as the franchise fee with a promise that he

33

would receive $1,000 in monthly income from cleaning accounts provided or referred by Jani-King.

110.    Cherpao Yang attended and completed the Jani-King training program and purchased the required equipment by or in December 2005. As is the normal course and practice, Jani-King's representatives asked about the geographic areas where he preferred to work, to which Cherpao Yang explained that he wanted to be offered accounts in or around the north Minneapolis and northern suburbs area.

111.    Cherpao Yang received two accounts, Luther Brookdale and Applebee's in Brookdale. However, in or about July 2007, Luther Brookdale consolidated its operations and Cherpao Yang was not given the new account at the new location. When he asked Jani-King about this and why he wasn't given the chance to move with the account (which was moving to a nearby location), Jani-King's Steve Schmidt told Cherpao's son (Chang Yang), that Jani-King did not think that Cherpao was doing a good cleaning job at the Applebee's account. This was a fabrication as Cherpao had notified the account (and Jani-King) that Applebee's kept asking him to do extra cleaning (outside the scope of the contract terms) but that Steve Schmidt kept telling Cherpao that he had to do as the customer requested (without payment of any additional or extra work). In doing so, Jani-King breached its obligations to act in good faith and with fair dealings toward its franchisee, Cherpao Yang.

112.    As it was, the account which Jani-King's Schmidt was discussing already was an underbid account, as it took 2 people more than 3 hours per night to clean (7 days a week). Again, as with other franchisees, Cherpao received almost or less than minimum wage after payment of Jani-King's fees and other charges.

**F.    Relationship between Jani-King and Bee Vang and Vang Pao Moua.**

113.    Plaintiffs Bee Vang and Vang Pao Moua purchased a franchise from Jani-King on or about July 26, 2005. They paid $6,000 to Jani-King as the franchise fee with a promise that they would receive $2,000 in monthly income from cleaning accounts provided or referred by Jani-King.

114.    Bee Vang and Pao Moua attended and completed the Jani-King training program and purchased the required equipment by or in September 2005. As is the normal course and practice, Jani-King's representatives asked about the geographic areas where they preferred to work, to which Bee and Pao explained that they wanted to be offered accounts in or around the St. Paul area.

115.    One of the initial business they were offered was the Rocco Altobelli account in Woodbury and they quickly developed a great relationship with the customer (Kim). After cleaning this account for a period of time (longer than twelve months), Jani-King informed Bee Vang that Rocco Altobelli wanted their keys back. When Bee Vang spoke with Kim about why she wanted them to return their keys, all she said was that "something better came along and we decided to go with it." On information and belief, Jani-King enticed Rocco Altobelli to change cleaners away from Bee Vang and Pao Moua because it had used the Rocco Altobelli account to fulfill its initial business offering to them and now wanted to move the account to someone else (in order to meet Jani-King's obligations to another franchisee). After all, Kim told Bee Vang that Jani-King's operations manager asked her whether Rocco Altobelli wanted him to find a new person to clean.

116.    This was not the only account which Jani-King frustrated or did not provide good faith and support as it had promised in the training and franchise offering circular. For example,

35

in another account (Newport St. Paul Cold Storage), Jani-King did nothing to support Bee Vang and Pao Moua when they complained that their supplies and equipment were being used by the customer's employees, including the use of a mop to clean up eggs. As one of Jani-King's managers (George Von Brugger) explained it, "I would suggest you [Bee and Pao] keep trying to clean up the messes" which the customer's employees kept making. To add insult to injury, this account was grossly underbid as it took 3-4 people more than 2 hours to clean, 5 days each week. With only $874 in monthly gross billings, this left Bee Vang and Pao Moua with almost or less than minimum wage after payment of the Jani-King fees and charges.

117.    Jani-King also did not act in a manner to protect the business or accounts it offered to Bee Vang and Pao Moua. One of those accounts was IBS which moved locations in August 2007 but Jani-King did not even try to keep this account under contract – when Bee Vang asked about this possibility, the account's contact person (Bob Weigel) stated that the Jani-King's operations managers have their favorite franchisees and he did not enjoy working with these managers.

**G.    Relationship between Jani-King and Mai Lou Xiong Yang.**

118.    Plaintiff Mai Lou Xiong Yang purchased a franchise from Jani-King on or about October 28, 2005.

119.    Mai Lou received an account called Fat Boys to clean but this account was underbid as it took four people more than 4 hours to clean, 7 days each week. As with other franchisees, this resulted in Mai Lou receiving almost or less than minimum wage for this cleaning work after payments to Jani-King for its fees and other charges. On top of that, Jani-King charged back to Mai Lou, claiming that Jani-King had not received payment from Fat Boys and, therefore, under the contract, any uncollected payments from customers were charged back

36

against the franchisee's account. Mai Lou spoke with the contact person at Fat Boys (Joe last name unknown) and has obtained copies of the check remittances showing that Fat Boys in fact made the payments to Jani-King.

120.     This was not the only instance in which Jani-King's personnel was not honest in their dealings with Mai Lou. For example, at another account (Northern Technologies), Jani-King informed her to return the keys when the customer was moving to a new location. When she asked the account person about this, Mai Lou was informed that the account wanted to keep her as the cleaning but that Jani-King wanted to place a new cleaner in that account at its new location. A similar situation happened at ABC after two of Jani-King's managers, Tom Schlesinger and George Von Brugger, inspected the location and claimed to have found a spider in the dust mop.

121.     Many of the accounts which Mai Lou received from Jani-King were underbid and provided her with less than minimum wage (after payment of Jani-King's fees). Among these underbid accounts were ABC, Kaneb Pipe, St. Paul Curling Club, Penner, Graffic Traffic, and Northern Technologies.

### H.     Relationship between Jani-King and Eng Thao and Choua Moua.

122.     Plaintiffs Eng Thao and Choua Moua purchased a franchise from Jani-King on or about October 28, 2005. They paid $20,662.50 to Jani-King as the franchise fee with a promise that they would receive $6,000 in monthly income from cleaning accounts provided or referred by Jani-King.

123.     Eng Thao and Choua Moua attended and completed the Jani-King training program and purchased the required equipment by or in December 2005. As is the normal course and practice, Jani-King's representatives asked about the geographic areas where they

preferred to work, to which Eng and Choua explained that they wanted to be offered accounts in or around the Minneapolis area. One of the accounts which Jani-King offered them was an American Legion in Excelsior/Minnetonka which was too far away from their desired cleaning area but for which they felt they had to accept because they were getting no other referrals (and had paid a lot of money to Jani-King).

**I.    Relationship between the Other Plaintiffs and Jani-King.**

124.    The other Plaintiffs named herein have experienced many of the same or similar wrongs and unlawful conduct on the part of the Defendants. Rather than describe and detail each and every one of their circumstances, Plaintiffs repeat and reallege the above and the general allegations as it pertains to their own franchises. For example, most, if not all, of the Plaintiffs have experienced underbidding of their accounts by Jani-King; most, if not all, of the Plaintiffs have not received the promised/guaranteed amount of initial business offerings; most, if not all, of the Plaintiffs have had accounts taken away from them without satisfactory explanation and unfair and wrongful interference by Jani-King; most, if not all, of the Plaintiffs received UFOC's which contained misleading and untrue information; most, if not all, of the Plaintiffs have experienced the lack of support and bad faith directed at them by Jani-King. These are but a short list of the more egregious actions and misconduct of Jani-King as more fully described above.

## COUNT I

### Breach of Contract

(As to Defendant Jani-King of Minnesota)

Plaintiffs incorporate paragraphs 1-124 as if fully set forth herein.

125.    As set forth above, Jani-King made various promises and covenants and reached agreements with Plaintiffs, including, but not limited to the following:

(a)    That Jani-King would provide Plaintiffs with a certain amount of cleaning business income each month based on the amount of their franchise payment.

(b)    That Jani-King would provide support and assistance to Plaintiffs' franchise, as well as ongoing inspection and monitoring services.

(c)    That Jani-King would provide Plaintiffs with a reasonable time period to correct any deficiencies in his cleaning performance prior to contacting the account holder.

126.    Jani-King materially breached its promises, covenants and agreements with Plaintiffs as described and set forth above by, among other things, failing to perform as it represented, promised and agreed.

127.    As a direct and proximate result of Jani-King's material breaches of its agreements with Plaintiffs, Plaintiffs have been damaged in an amount in excess of $50,000.

## COUNT II

### Breach of Implied Covenant of Good Faith and Fair Dealing

Plaintiffs incorporate paragraphs 1-127 as if fully set forth herein.

128.    Implied within the contracts and agreements between Jani-King and Plaintiffs is a duty of good faith and fair dealing which requires that each party to the agreement do nothing

destructive of the other's rights and reasonable expectations to benefit from the contracts or to obstruct the other's fair and reasonable performance of and under the contracts.

129.     This implied covenant also requires honesty and the observance of reasonable commercial standards of fair dealing in the trade in the parties' performance of their business dealings arising out of their contracts.

130.     Defendants' actions and inactions, including but not limited to the following acts, constitute a breach of the implied covenant of good faith in fair dealing:

(a)     Offering accounts to Plaintiffs that would require the franchisee to clean at a time of the day that Defendants knew the franchisee was unavailable to clean. This conduct occurred despite Defendants' assurances to the franchisees that they would not require them to clean during these time periods.

(b)     Contacting account customers and directing or inducing them, both intentionally and indirectly, to make complaints about Plaintiffs' performance of their cleaning services, in exchange for which Defendants would then replace the franchisee performing the cleaning with a new franchisee, and in some instances at a reduced rate.

(c)     Defendants knowingly and intentionally offered more than one account to many Plaintiffs for the same period of time during the day (overlapping accounts), these accounts being in such divergent geographic locations so as to make acceptance of both accounts impossible. Defendants then counted the refused account(s) against the Plaintiffs' contractually guaranteed monthly business amount.

(d)     Failing to make reasonable bids for the amount of work and time necessary to perform the contracted-for work or forced Plaintiffs to perform cleaning work beyond the scope of the contract for little or no additional consideration and payment.

131.     As a direct and proximate result of Defendants' actions, as laid out above and in the statement of facts, Plaintiff' ability to satisfy the terms of the franchise agreement and realize the purported benefits thereof were unreasonably frustrated and obstructed by Defendants' violation of the implied covenant of good faith and fair dealing between them.

132.     Jani-King materially breached its implied covenant of good faith and fair dealings with Plaintiffs as described and set forth above.

133.     As a direct and proximate result of Jani-King's material breaches of its implied covenant within its agreements with Plaintiffs, Plaintiffs have been damaged in an amount in excess of $50,000.

### COUNT III

### Violation of the Minnesota Franchise Act

Plaintiffs incorporate paragraphs 1-133 as if fully set forth herein.

134.     Jani-King sold Plaintiffs franchise opportunities as defined by the Minnesota Franchise Act, Minn. Stat. § 80C.01 *et seq*.

135.     Jani-King is a franchisor as defined by the Minnesota Franchise Act, Minn. Stat.§ 80.01, subd. 6.

136.     The Minnesota Franchise Act governs the relationship between the parties because each Plaintiff bought franchises located in Minnesota, and each franchise was sold by Defendants in Minnesota. Minn. Stat. § 80C.19, subd. 1.

137.     The Minnesota Franchise Act establishes an "anti-waiver" provision, which provision specifies that any purported waiver of rights under the Act (i.e. contractual choice of law clause) is void. Minn. Stat. § 80C.21.

41

138.     It is unlawful under the Minnesota Rules promulgated pursuant to the Minnesota

Franchise Act by the Minnesota Department of Commerce for a franchisor to make or cause to

be made any statement or representation that is contrary to any disclosure made in the public

offering statement.  Minn. Rule 2860.45000(B)(1).

139.     It is also unlawful under the Minnesota Franchise Act § 80C.13, subd. 2., for a

franchisor to:

> offer or sell a franchise in this state by means of any written or oral communication
> which includes an untrue statement of a material fact or which omits to state a material
> fact necessary in order to make the statements made, in light of the circumstances under
> which they were made, not misleading.

140.     Defendants, in connection with the offer and sale of the franchises, made written

and oral untrue statements of material fact and omitted to state material facts necessary in order

to make those statements not misleading, in violation of Minn. Stat. § 80C.13, subd. 2, as further

outlined in the above-described statement of facts.  For example and not exhaustively, Jani-King

informed Plaintiffs that they could accept or decline accounts, but did not tell them that by

declining such accounts, the declined accounts count towards the Plaintiffs' initial business

offering.  They further told the Plaintiffs that they would have an opportunity to cure any

deficiencies in their work before the account is taken from them.  Instead, Plaintiffs received

calls from Defendants and other Jani-King representatives and were informed that their work at

certain accounts was deficient and that the account person has already signed a document

transferring that account to another franchisee without any opportunity to cure.  Defendants

further prohibited the Plaintiffs from contacting or speaking with that account person to

understand why the account was taken.  Defendants made other misstatements and misleading

statements to Plaintiffs, both in the UFOC and in their meetings and dealings with Plaintiffs.

141. Jani-King also made untrue statements in its UFOC about the percentage of franchisees who received an offer of initial business as set forth above.

142. Jani-King failed to fully disclosed or provide sufficient details of the litigation history and settlements reached between it and other franchisees.

143. Plaintiffs only recently have learned or discovery, on or after July 20, 2005, these violations of The Minnesota Franchise Act and, therefore, their causes of action are deemed to have commenced within the applicable three-year statute of limitations.

144. As a direct and proximate result of Defendants' untrue statements of material fact in violation of Minn. Stat. § 80C.13, subd. 2, (as described above and in the statement of facts) and general violations of Minn. Stat. § 80C.01 et seq., Plaintiffs are entitled to rescission of the franchise agreement contracts and to recover from Defendants their damages in an amount not yet determined, but which is reasonably estimated to exceed $50,000

## COUNT IV

### Fraud/Misrepresentation

Plaintiffs incorporate paragraphs 1-144 as if fully set forth herein.

145. The representations and conduct of Defendants, including but not limited to those set forth in Plaintiffs' statement of facts, were made with the intention that Plaintiffs rely on them in making their decision as to whether they should become and remain Jani-King franchisees, operate Jani-King franchises, and pay considerable Jani-King franchise and other fees.

146. In reliance on the representations made to them by Defendants, Plaintiffs became Jani-King franchisees, paid initial and ongoing franchise and other fees to Jani-King, expended significant sums of money to purchase equipment and other required items to operate their

43

franchises, and expended significant time, money and effort in opening and operating their Jani-King franchise.

147.    The representations made by or on behalf of Defendants as set forth above were false, or omitted to state information necessary to not make them misleading.

148.    Plaintiffs were deceived by the misrepresentations and omissions of Defendants set forth above. For example, Defendants represented to Plaintiffs that they would provide them with monthly business ($7,000 per month for Kua and Maiku, and $2,000 per month for the Martinezes) based on the amount of franchise fees paid. However, Defendants knew or should have known that they did not have a sufficient amount of business to satisfy those obligations to Plaintiffs and all other franchisees. Many of the other Plaintiffs experienced similar, if not identical problems and could only have received far less than what they were promised in guaranteed income.

149.    Additionally, Defendants represented to the Plaintiffs that Plaintiffs would have an opportunity to cure any flaws in their cleaning within a certain time period, but instead, Defendants would specifically point out flaws to the account people and remove that account from the Plaintiffs without giving them the promised opportunity to cure.

150.    Defendants represented that Plaintiffs would be able to earn as much income as a doctor, and further represented that income potential for Plaintiffs was limited only by Plaintiffs' desire and ability to work hard. Defendants represented to Plaintiffs that Defendants would provide account support to Plaintiffs, such support to include periodic inspection, account referrals, account bidding services, and opportunities to cure alleged defective cleaning, among other things. Defendants represented to Plaintiffs that Defendants would refrain from offering accounts that they knew were not serviceable by the specific Plaintiffs for reasons such as time

44

conflicts with other jobs, distance from Plaintiff's home/other work cites, or due to religious beliefs. All of these representations were made to induce the Plaintiffs into purchasing a Jani-King franchise.

151.    Plaintiffs reasonably relied upon the statements and representations of Defendants in making their decision as to whether they should become and remain Jani-King franchisees, operate Jani-King franchises, and pay considerable franchise fees, equipment fees and other fees to Jani-King.

152.    Defendants have committed intentional and/or negligent misrepresentation in their representations to the Plaintiffs, as described above, in violation of the common law of Minnesota.

153.    As a direct and proximate result of Defendants' misrepresentations and omissions, Plaintiffs have incurred substantial past and continuing damage, including, without limitation, the franchise, royalty and other fees paid to Jani-King and others; start-up and ongoing costs, and lost profits, among other damages. Plaintiffs are entitled to recover direct and consequential damages from Defendants in an amount not yet determined, but which is reasonably estimated to be in excess of $50,000.

## COUNT V

### Unjust Enrichment

Plaintiffs incorporate paragraphs 1-153 as if fully set forth herein.

154.    Through the conduct described above, Defendants have been unjustly enriched under the common law of Minnesota.

155.    Defendants, in order to induce Plaintiffs to enter into a franchise relationship with Jani-King and to pay initial and ongoing franchise and other fees, made representations and

promises to Plaintiffs, including but not limited to those set forth in Plaintiffs' statement of facts above, and failed to disclose material information to Plaintiffs.

156.    Plaintiffs reasonably relied upon Defendants' promises and conduct in deciding to become and remain Jani-King franchisees, and Plaintiffs would not have become and remained Jani-King franchisees and paid the franchise fees and other amounts to Jani-King and others, absent Defendants' above stated promises, misrepresentations and conduct.

157.    Defendants have received a substantial financial benefit as a result of Plaintiffs becoming franchisees, and Plaintiffs would not have become and would not have remained Jani-King franchisees, and paid the franchise fees and other amounts to Jani-King and others, absent Defendants' above-stated untrue promises and other misconduct.

158.    Defendants have received a substantial financial benefit as a result of Plaintiffs becoming and remaining Jani-King franchisees, including substantial and ongoing franchise and other fees, as well as receipt of all benefits arising out of Plaintiffs' investments to own and operate Jani-King franchises.

159.    Based on their conduct and statements to Plaintiffs, Defendants are estopped from acting in a manner inconsistent with their promises and previous conduct and from denying that their promises and conduct are valid and enforceable parts of the agreements with Plaintiffs.

160.    As a direct and proximate result of Defendants' actions, misconduct and other failures to honor their promises and agreements, Plaintiffs have suffered past and continuing damages in an amount not yet determined, but which is reasonably believed to be in excess of $50,000.

## COUNT VI

### Quantum Meruit

Plaintiffs incorporate paragraphs 1-160 as if fully set forth herein.

161.     Plaintiffs have paid valuable consideration to Jani-King in order to receive services from Jani-King and to perform services for Jani-King.  Plaintiffs have neither received from Jani-King the fair value of their services from Jani-King nor have they received from Jani-King the fair value for the consideration provided by Plaintiffs to Jani-King.  Plaintiffs are thus entitled to recover in *quantum meruit* pursuant to the common law of Minnesota.

162.     Plaintiffs purchased franchises from Jani-King for several purported benefits, including, but not limited to, the right to use the Jani-King name, the right to use the Jani-King cleaning method, the expectancy of receiving business accounts (and the revenues flowing therefrom) from Jani-King, and the expectancy of receiving administrative and operational support from Defendants.

163.     In exchange for accepting Plaintiffs' substantial franchise fees and various other fees, Jani-King agreed to provide the Plaintiffs with the above-mentioned benefits, including, but not limited to, providing administrative and operational support to the franchisees and supplying each franchisee with accounts valued at a predetermined minimum monthly amount.

164.     Jani-King charged, and continues to charge, franchise and other fees from Plaintiffs without conferring the agreed-upon benefit to Plaintiffs.  Plaintiffs have not received the fair value for their investments and services.

165.     Additionally, Defendants habitually underbid accounts offered and accepted by Plaintiffs and other franchisees to the point that Plaintiffs have and/or continue to perform work for Jani-King for less than minimum wage.  Plaintiffs are not receiving the fair value for the

47

work they are performing for Jani-King. If Plaintiffs decline an account because it is bid too low, the account still gets charged against them.

166.     As a direct and proximate result of Jani-King's actions, misconduct and other failures to honor its promises and agreements, Plaintiffs have been denied the fair value for their work performed for, and the consideration paid to, Jani-King and have, therefore, suffered past and continuing damages in an amount not yet determined, but which is reasonably believed to be in excess of $50,000.

## COUNT VII

### Unlawful Practices

Plaintiffs incorporate paragraphs 1-166 as if fully set forth herein.

167.     Jani-King offered to sell merchandise and other intangible property to Plaintiffs.

168.     Jani-King made several material misrepresentations, false statements, misleading statements and/or omissions attendant to its advertising, offering, negotiating and sale of franchises to Plaintiffs, including, but not limited to:

(a)     Jani-King represented that Plaintiffs would be able to earn as much income as a doctor.

(b)     Jani-King represented that income potential for Plaintiffs was limited only by Plaintiffs' desire and ability to work hard.

(c)     Jani-King represented to Plaintiffs that Jani-King would provide account support to Plaintiffs, such support to include periodic inspection, account referrals, account bidding services, and opportunities to cure alleged defective cleaning, among other things.

(d)     Jani-King represented to several Plaintiffs that Jani-King would refrain from

offering accounts that Jani-King knew were not serviceable by the specific

Plaintiffs for reasons such as time conflicts with other jobs, distance from

Plaintiffs' home/other work cites, and/or due to religious beliefs.

169.     In making these offers to sell merchandise and other intangible property, Jani-

King used and employed fraud, false pretenses, false promises, misrepresentations, misleading

statements, and/or deceptive practices in an attempt to induce Plaintiffs' into buying Jani-King

franchises and cleaning equipment and supplies.

170.     This behavior constitutes Unlawful Practices and is in violation of Minn. Stat. §

325F.69, subd. 1.

171.     Minn. Stat. § 8.31 subd. 3a, known as the Private Attorney General Statute,

provides that "any person injured by a violation of any of the laws referred to in subdivision 1

may bring a civil action to recover damages, together with costs and disbursements, including

costs of investigation and reasonable attorney's fees, and receive other equitable relief as

determined by the court."

172.     Subdivision 1 of Minn. Stat. § 8.31, the Private Attorney General Statute, lists

Minn. Stat. § 325F.69 as one of the statutes providing for a private cause of action.

173.     Plaintiffs are entitled to recover actual damages, costs, disbursements, attorney's

fees, investigatory expenses and other equitable relief as determined by the court as a result of

Jani-King's Unlawful Practices.

174.     As a direct and proximate result of Jani-King's Unlawful Practices, Plaintiffs have

suffered past and continuing damages in an amount not yet determined, but which is reasonably

believed to be in excess of $50,000.

## COUNT VIII

### False Statement in Advertising

Plaintiffs incorporate paragraphs 1-174 as if fully set forth herein.

175.     Jani-King, in an attempt to induce members of the public into purchasing its products and franchises, including franchise rights and cleaning equipment and supplies, published, circulated, made, disseminated or placed before the public, in newspapers and other publications, including circulars, pamphlets and programs, advertisements for its products.

176.     These advertisements, published with the intent to induce members of the public into buying Jani-King products, contained material assertions, representations and/or statements of fact which were untrue, deceptive and/or misleading.

177.     This behavior constitutes a False Statement in Advertising and is in violation of Minn. Stat. § 325F.67.

178.     Subdivision 1 of Minn. Stat. § 8.31, the Private Attorney General Statute, lists Minn. Stat. § 325F.67 as one of the statutes providing a private cause of action.

179.     Plaintiffs are entitled to recover actual damages, costs, disbursements, attorney's fees, investigatory expenses and other equitable relief as determined by the court as a result of Jani-King's False Statements in Advertising.

180.     As a direct and proximate result of Jani-King's False Statements in Advertising, Plaintiffs have suffered past and continuing damages in an amount not yet determined, but which is reasonably believed to be in excess of $50,000.

## COUNT IX

### Unjust Enrichment

Plaintiffs incorporate paragraphs 1-180 as if fully set forth herein.

181.    Jani-King has been unjustly enriched for the cleaning services provided by the Plaintiffs which have a value far in excess of the amount(s) which Plaintiffs received from Jani-King.

182.    Jani-King charged, and continues to charge, franchise and other fees from Plaintiffs without conferring the agreed-upon benefit to Plaintiffs.  Plaintiffs have not received the fair value for their services or their investments.

183.    Jani-King should be required to disgorge or reimburse the Plaintiffs for all amounts it has been unjustly enriched by, which amounts are currently not known but believed to be in excess of $50,000.

## JURY DEMAND

Plaintiffs request a trial by jury on all their claims and pray for this Complaint to be certified as a Class Action.

WHEREFORE, Plaintiffs request that this Court enter the following relief:

1.    Damages attributable to Defendants' statutory and common law violations;

2.    Statutory enhancement of damages as allowed by law;

3.    Declaratory and injunctive relief, requiring Defendants to cease their illegal practices,

4.    Rescission of the written contracts between Jani-King and the Plaintiffs, in whole or in part; and

5.    Any other relief to which the Plaintiffs may be entitled.

51

Dated: 7/14/08

Respectfully submitted,

FOLEY & MANSFIELD, P.L.L.P.

By

Thomas W. Pahl (#243012)
Jamie L. Habeck (#308328)
Christopher C. Grecian (#0387693)
Attorneys for Plaintiffs
250 Marquette Avenue, Suite 1200
Minneapolis, MN 55401
(612) 338-8788 phone
(612) 338-8690 fax

## Acknowledgement

I, the undersigned, hereby acknowledge that I am familiar with the terms of Minn. Stat. § 549.211, and that costs, disbursements and reasonable attorney and witness fees may be awarded to the opposing party pursuant to Subd. 2 thereof, in the event a party or an attorney acts in bad faith; asserts a claim or defense that is frivolous and that is costly to another party; asserts an unfounded position solely to delay the order and course of the proceedings or to harass; or commits a fraud upon the Court.