## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Teng Moua, Juan Martinez, Cheri
Martinez, Kua Vang Xiong, Maiku Thao,
Cherpao Yang, Bee Vang, Vang Pao
Moua, Mailou Xiong Yang, Vangxue
Yang, Eng Thao, Choua Moua, Meshack
Balira, Ferdinand Nyambarya, VMS Inc.,
Richard Chang, Lee Wong Chang,
Khonekham Dejvongsa, Nouphet
Dejvongsa, Diego Cortez Dominguez,
Mohamud Egal, Mohamed Osable, Hussein
Osable, Ifran Jimale, Layla Jimale, Mohamed
Jimale, Paul Bel George, Chue Hang, Tong
Thao Hang, Rexhep Krasniqi, Tou Lor, Mai
Moua Vue, Arif Metushi, Wa Her Moua,
Mee Yang, John Schroeder, Judy Schroeder,
Berhane Tesfai, Dual Cykao Thao, Xong Thao
Yang, Kou Thao, Yang Xiong, Kevin Vilavong,
Chong Xiong, Ko S. Xiong, Blia Yang, Ying
Cheng, Chang Yang, Choua Lor, Mai Blia
Yang, Pang Yang, Lue Her, for themselves
and all other persons similarly situated as
franchisees of Jani-King of Minnesota, Inc.
and Jani-King International, Inc.

No. 08-CV-4942 ADM/JSM
Class Action

**PLAINTIFFS' FIRST AMENDED**
**CLASS ACTION COMPLAINT**

Plaintiffs,

v.

Jani-King of Minnesota, Inc., a Texas
Corporation, Jani-King International, Inc.,
a Texas Corporation, George Selman, a
Minnesota resident, and Steve Schmidt,
a Minnesota resident.

Defendants.

Plaintiffs, for their First Amended Class Action Complaint against the Defendants, by and

1

through their undersigned counsel and on behalf of themselves and all others similarly situated,

allege as follows:

## I.   **INTRODUCTION**

This is an action brought by a group of individuals who used much of their respective

families' savings to purchase franchises from an international franchisor and its regional sub-

franchisor (collectively "franchisors") in order to pursue the American dream of becoming

business owners. Instead of achieving happiness, self-fulfillment and financial success, however,

these individuals have been subjected to systemic and pervasive breaches of contract, violations

of the Minnesota Franchise Act, and breaches of the duty of good faith and fair dealing, among

other wrongs, as more fully described below. The franchisors purport to sell cleaning

"franchises" through which these individuals can achieve their dreams, even while the

franchisors know full well that they do not have sufficient business accounts to satisfy their

obligations under the various franchise agreements. Many franchisees, including the plaintiffs

herein, purchased their franchises for substantial sums of money, based on promises about the

guaranteed amount of monthly income which the franchisors promised to provide them. Those

promises went unfulfilled and were dashed by the franchisors and the individual defendants as

described herein.

In this action, the above-named plaintiffs seek to recover, for themselves and on behalf of

all similarly-situated individuals, compensation and/or rescission for the unlawful violations of

statutory and common law and breaches of contract, as well as for attorneys' fees and costs as

provided by law. Plaintiffs also seek certification of the class of individuals and entities who

purchased other "franchises" from the defendants during the period of January 1, 2000 through

June 30, 2008.

2

## II.   PARTIES, JURISDICTION, AND VENUE

1.      Plaintiff Teng Moua ("Teng") is an individual residing in Anoka, Minnesota. He performed cleaning services for Jani-King in Minnesota beginning in 2005. He performed cleaning services for Jani-King of Minnesota accounts located in Hennepin County, Minnesota. Teng purchased two franchises from Jani-King of Minnesota, first in late 2004 and later in mid 2005.

2.      Plaintiff Juan M. Martinez ("Martinez") is an individual residing in Minneapolis, Minnesota. He performed cleaning services for Jani-King in Minnesota beginning late in 2005. He performed cleaning services for Jani-King of Minnesota accounts located in Hennepin County, Minnesota. Martinez, and his sister-in-law, plaintiff Cheri Martinez, purchased a franchise from Jani-King of Minnesota earlier in 2005.

3.      Plaintiffs Kua Vang Xiong ("Kua") and Maiku Thao ("Maiku") are individuals residing in Lino Lakes, Minnesota. They performed cleaning services for Jani-King in Minnesota beginning late in 2005. They performed cleaning services for Jani-King of Minnesota accounts located in Hennepin County, Minnesota. Kua and Maiku purchased a franchise from Jani-King of Minnesota earlier in March 2005.

4.      Plaintiff Cherpao Yang ("Cherpao") is an individual residing in Minneapolis, Minnesota. Cherpao performed cleaning services for Jani-King in Minnesota beginning in late 2005 or early 2006. He performed cleaning services for Jani-King of Minnesota accounts located in Hennepin County, Minnesota. Cherpao purchased a franchise from Jani-King of Minnesota in or about September 2005.

5.      Plaintiffs Bee Vang and Vang Pao Moua are individuals residing in St. Paul, Minnesota who performed cleaning services for Jani-King in Minnesota beginning in mid to late

3

2005. They performed cleaning services for Jani-King of Minnesota accounts located in Hennepin County, Minnesota. They purchased a franchise from Jani-King of Minnesota in or about July 2005.

6.      Plaintiff Mailou Yang is an individual residing in North St. Paul, Minnesota. Mailou performed cleaning services for Jani-King in Minnesota beginning in 2000. She performed cleaning services for Jani-King of Minnesota accounts located in Hennepin County and Ramsey County, Minnesota. She purchased three different franchises from Jani-King of Minnesota beginning in or about 2000, 2002 and 2005.

7.      Plaintiffs Eng Thao and Choua Moua are individuals residing in Brooklyn Park, Minnesota who performed cleaning services for Jani-King in Minnesota beginning in late 2005 or early 2006. They performed cleaning services for Jani-King of Minnesota accounts located in Hennepin County, Minnesota. They purchased a franchise from Jani-King of Minnesota in or about October 2005.

8.      Plaintiffs Meshack Balira and Ferdinand Nyambarya are individuals residing in New Hope, Minnesota who performed cleaning services for Jani-King in Minnesota beginning in early 2000. They performed cleaning services for Jani-King of Minnesota accounts located in Hennepin and Ramsey County, Minnesota. They purchased a franchise from Jani-King of Minnesota in or about 2000

9.      Plaintiffs Richard Chang and Lee Wong Chang are individuals residing in Minneapolis, Minnesota who performed cleaning services for Jani-King in Minnesota beginning in late 2005. They performed cleaning services for Jani-King of Minnesota accounts located in Hennepin County, Minnesota. They purchased a franchise from Jani-King of Minnesota in or about July 2005.

4

10. Plaintiffs Khonekham Dejvongsa and Nouphet Dejvongsa are individuals residing in Otsego, Minnesota who performed cleaning services for Jani-King in Minnesota beginning in late 2002 or early 2003. They performed cleaning services for Jani-King of Minnesota accounts located in Hennepin County, Minnesota. They purchased a franchise from Jani-King of Minnesota in or about November 2002.

11. Plaintiff Diego Cortez Dominguez ("Diego") is an individual residing in West St. Paul, Minnesota. Diego performed cleaning services for Jani-King in Minnesota beginning in mid to late 2005. He performed cleaning services for Jani-King of Minnesota accounts located in Hennepin County, Minnesota. Diego purchased a franchise from Jani-King of Minnesota in or about April 2005.

12. Plaintiffs Mohamud Egal, Mohamed Osable, Hussein Osable, Ifran Jimale, Layla Jimale, Mohamed Jimale are individuals residing in Rochester, Minnesota who performed cleaning services for Jani-King in Minnesota beginning in 2001. They performed cleaning services for Jani-King of Minnesota accounts located in Hennepin County, Minnesota. They purchased a franchise from Jani-King of Minnesota in or about April 2001.

13. Plaintiff Paul Bel George ("George") is an individual residing in Maplewood, Minnesota. George performed cleaning services for Jani-King in Minnesota beginning in early 2003. He performed cleaning services for Jani-King of Minnesota accounts located in Hennepin County, Minnesota. George purchased a franchise from Jani-King of Minnesota in or about December 2002.

14. Plaintiff Rexhep Krasniqi is an individual currently residing in Tampa, Florida. Krasniqi performed cleaning services for Jani-King in Minnesota beginning in 2005. He

5

performed cleaning services for Jani-King accounts located in Hennepin County, Minnesota. Krasniqi purchased a franchise from Jani-King of Minnesota in or about June 2005.

15.     Plaintiffs Tou Lor and Mai Moua Vue are individuals residing in Minneapolis, Minnesota who performed cleaning services for Jani-King in Minnesota beginning in mid or late 2004. They performed cleaning services for Jani-King of Minnesota accounts located in Hennepin County, Minnesota. They purchased a franchise from Jani-King of Minnesota in or about March 2004.

16.     Plaintiff Arif Metushi is an individual currently residing in New Brighton, Minnesota. Metushi performed cleaning services for Jani-King in Minnesota beginning in late 2005. He performed cleaning services for Jani-King of Minnesota accounts located in Hennepin County, Minnesota. Metushi purchased a franchise from Jani-King of Minnesota in or about July 2005.

17.     Plaintiffs Wa Her Moua and Mee Yang are individuals residing in St. Paul, Minnesota who performed cleaning services for Jani-King in Minnesota beginning in 2004. They performed cleaning services for Jani-King of Minnesota accounts located in Hennepin County, Ramsey County and Dakota County, Minnesota. They purchased a franchise from Jani-King of Minnesota in or about October 2003.

18.     Plaintiffs John Schroeder and Judy Schroeder are individuals residing in Columbia Heights, Minnesota who performed cleaning services for Jani-King in Minnesota beginning in 2005. They performed cleaning services for Jani-King of Minnesota accounts located in Hennepin County, Minnesota. They purchased a franchise from Jani-King of Minnesota in or about February 2005.

19.      Plaintiff Berhane Tesfai is an individual currently residing in Minneapolis, Minnesota. Tesfai performed cleaning services for Jani-King in Minnesota beginning in 1997. He performed cleaning services for Jani-King of Minnesota accounts located in Hennepin County and Ramsey County, Minnesota. Tesfai purchased a franchise from Jani-King of Minnesota in or about 1997.

20.      Plaintiffs Dual Cykao Thao and Xong Thao Yang are individuals residing in Brooklyn Park, Minnesota who performed cleaning services for Jani-King in Minnesota beginning in late 2005. They performed cleaning services for Jani-King of Minnesota accounts located in Hennepin County, Minnesota. They purchased a franchise Jani-King of Minnesota in or about April 2005.

21.      Plaintiffs Kou Thao and Yang Xiong are individuals residing in St. Paul, Minnesota who performed cleaning services for Jani-King in Minnesota beginning in late 2002. They performed cleaning services for Jani-King of Minnesota accounts located in Hennepin County, Minnesota. They purchased a franchise from Jani-King of Minnesota in or about June 2002.

22.      Plaintiff Kevin Vilavong is an individual currently residing in Chanhassen, Minnesota. Vilavong performed cleaning services for Jani-King in Minnesota beginning in late 2004. He performed cleaning services for Jani-King of Minnesota accounts located in Hennepin County, Minnesota. Vilavong purchased a franchise from Jani-King of Minnesota in or about June 2004.

23.      Plaintiff Ko S. Xiong is an individual currently residing in Brooklyn Center, Minnesota. Ko performed cleaning services for Jani-King in Minnesota beginning in late 2005 or early 2006. She performed cleaning services for Jani-King of Minnesota accounts located in

7

Hennepin County, Minnesota. Ko purchased a franchise from Jani-King of Minnesota in or about October 2005.

24.     Plaintiff Chong Xiong is an individual currently residing in Minneapolis, Minnesota. Chong performed cleaning services for Jani-King in Minnesota beginning in late 1999 or early 2000. He performed cleaning services for Jani-King of Minnesota accounts located in Hennepin County, Minnesota. Chong purchased a franchise from Jani-King of Minnesota in or about 2000.

25.     Plaintiffs Blia Yang and Ying Cheng are individuals residing in St. Paul, Minnesota who performed cleaning services for Jani-King in Minnesota beginning in early 2005. They performed cleaning services for Jani-King of Minnesota accounts located in Ramsey County, Minnesota and received those accounts from Jani-King of Minnesota's offices in Hennepin County, Minnesota. They purchased a franchise from Jani-King of Minnesota in or about November 2004.

26.     Plaintiffs Chang Yang and Choua Lor are individuals residing in Brooklyn Park, Minnesota who performed cleaning services for Jani-King in Minnesota beginning in 2007. They performed cleaning services for Jani-King of Minnesota accounts located in Hennepin County, Minnesota. They purchased a franchise from Jani-King of Minnesota in or about December 2006.

27.     Plaintiff Mai Blia Yang is an individual currently residing in St. Paul, Minnesota. Mai Blia Yang performed cleaning services for Jani-King in Minnesota beginning in late 2005. She performed cleaning services for Jani-King of Minnesota accounts located in Hennepin County and Ramsey County, Minnesota. Mai Blia Yang purchased a franchise from Jani-King of Minnesota in or about August 2005.

8

28.     Plaintiffs Pang Yang and Lue Her are individuals residing in St. Paul, Minnesota who performed cleaning services for Jani-King in Minnesota beginning in late 2005. They performed cleaning services for Jani-King of Minnesota accounts located in Hennepin County, Minnesota. They purchased a franchise from Jani-King of Minnesota in or about August 2005.

29.     Each of the above-named plaintiffs (collectively referred to herein as "Plaintiffs") bring this action for themselves and on behalf of a class of individuals who purchased franchises from Jani-King of Minnesota from and after January 1, 2000 and who have been subjected to the same tactics, schemes, and misrepresentations by omission of the defendants as explained more fully below. Plaintiffs are representative members of a class of individuals with common questions of law and fact. Due to the number of potential plaintiffs, the joinder of each member of the class is impracticable. Plaintiffs' claims are typical of the claims of the non-named class members. Adjudication of Plaintiffs' claims will fairly and adequately protect the interests of the class.

30.     Plaintiffs and class members have experienced similar, if not identical, problems and unfair and unlawful dealings with the Defendants as described generally below and specifically described for Plaintiffs Teng, Martinez, Cheri Martinez, Kua and Maiku below. Defendants are aware of and have the information concerning the particular dates of their franchise sales/purchases, training and account assignments/cancellations. Discovery will reveal more specificity regarding the circumstances of the misconduct and actions directed toward each of the Plaintiffs and other class members.

31.     Defendant Jani-King of Minnesota, Inc. ("Jani-King of Minnesota") is a Texas corporation with a Minnesota regional office/operations located at 5930 Shingle Creek Parkway, Brooklyn Center, Minnesota. Defendant Jani-King of Minnesota employs numerous individuals

in the county of Hennepin, State of Minnesota. Defendant Jani-King of Minnesota's agent for service in Minnesota is CT Corporation, 100 S. 5th Street, #1075, Minneapolis, MN, 55402.

32.    Defendant Jani-King International, Inc. ("Jani-King International") is a Texas corporation with its principal place of business in Addison, Texas. On information and belief, Jani-King International owns and operates Jani-King of Minnesota for the sole purpose of selling and administering Jani-King franchises in Minnesota. Upon information and belief, Jani-King International instructs and directs many of the affairs and operations of Jani-King of Minnesota and by its own activities, and those performed through Jani-King of Minnesota, it has subjected itself to the jurisdiction of Minnesota.

33.    Both of these Defendants (together referred to as "Jani-King") are subject to the jurisdiction of this Court pursuant to Minn. Stat.§ 80C.

34.    Defendant George Selman ("Selman") is an individual and a Minnesota resident who was or is still currently employed by Jani-King of Minnesota as Regional Director or in various other management capacities, at all times relevant to this case. Selman materially aided in the acts, omissions and/or transactions which constitute the violations of statutory and common law as described below and is therefore liable, jointly or severally, pursuant to Minn. Stat. § 80C.17.

35.    Defendant Steve Schmidt ("Schmidt") is an individual and a Minnesota resident who was or is still currently employed by Jani-King of Minnesota as Assistant Operations Manager or in another management capacity, at all times relevant to this case. Schmidt materially aided in the acts, omissions and/or transactions which constitute the violations of statutory and common law as described below and is therefore liable, jointly or severally, pursuant to Minn. Stat. § 80C.17.

36.     This Complaint is not based upon any federal law or any federal question. No claim for relief is made under any federal law.

37.     Venue is proper in this Court under Minn. Stat. § 542.09 in that the causes of action, or some parts thereof, arose in Hennepin County. Moreover, the Defendants reside in and/or conduct their business affairs from locations and offices within Hennepin County.

38.     Plaintiffs bring this action pursuant to Minn. R. Civ. P. Rule 23 on behalf of themselves and on behalf of the class of individuals including all persons or entities who purchased a Jani-King franchise in Minnesota at any time from 2000 to June 30, 2008.

39.     The Class is so numerous that joinder of all members is impracticable. There are several hundred members of the Class who are geographically dispersed throughout Minnesota.

40.     Plaintiffs' claims are typical of the claims of the members of the Class because Plaintiffs and all Class members were injured by the same or similar wrongful conduct of the Defendants as alleged herein.

41.     There are questions of law and fact common to the Class which predominate over any questions affecting only individual Class members. Such common questions include, but are not limited to:

(a)  Whether Jani-King of Minnesota breached the terms of their franchise agreements with the class members by failing to provide the contractually-obligated amount of business or support to the class members.

(b)  Whether Jani-King of Minnesota breached the implied covenant of good faith and fair dealing by intentionally violating the franchise agreements, or by failing to make a good faith effort to comply with the terms of the franchise agreements.

11

(c)   Whether Jani-King International and Jani-King of Minnesota, by virtue of making improper earnings claims and by utilizing false and misleading statements of omission in their franchise offerings and sales meetings, violated the Minnesota Franchise Act.

(d)   Whether Defendants' representations and their omissions induced class members to purchase franchises, and whether Defendants' actions with respect to the class members after they purchased franchises were fraudulent in omitting the facts and required disclosures.

(e)   Whether Jani-King of Minnesota, and indirectly through its parent company, Jani-King International, by exacting unearned fees and selling franchises to class members for substantial sums of money, has been unjustly enriched at each class members' expense.

(f)   Whether class members are entitled to recover in *quantum meruit* following Defendants' refusal to supply each class member with business, support and services as bargained for in their franchise agreements,

(g)   Whether Defendants' false and misleading statements and omissions in their advertising materials and specifically, their Uniform Offering Circulars, constitute False Statements in Advertising.

42.   As the claims of the Plaintiffs are typical of the claims of the Class, and the Plaintiffs have no interests adverse to, or which irreconcilably conflict with, the interests of other members of the Class, Plaintiffs are adequate class representatives.

43.   Plaintiffs will fairly and adequately protect the interests of the Class and have retained counsel experienced and competent in the prosecution of complex litigation and class actions.

12

44.     A class action is superior to other available methods for the fair and efficient adjudication of the controversy and substantial benefits will derive from proceeding as a class action. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions engender. Class treatment also will permit the adjudication of relatively small claims by many Class members who could not afford to individually litigate such claims against large corporate defendants such as the ones in this instance. There are no difficulties likely to be encountered in the management of this class action that would preclude its maintenance as a class action, and no superior alternative exists for the fair and efficient group-wide adjudication of this controversy.

## III.    FACTS COMMON TO PLAINTIFFS AND CLASS OF FRANCHISEES

### A.     Jani-King's Franchise Operations and Schemes

45.     Jani-King International has sold thousands of franchises across the United States, including in Minnesota, to individuals who in turn perform cleaning or janitorial work for various customers who have entered into long- or short-term cleaning service accounts with Jani-King International, by and through its various subsidiary corporations or business divisions. These franchisees include Plaintiffs and other members of the class.

46.     Jani-King of Minnesota is a regional business division of Jani-King International authorized and directed to sell franchises to Minnesota residents and to solicit and service customer cleaning accounts in and throughout Minnesota. Jani-King of Minnesota has filed and utilized a lengthy Uniform Franchise Offering Circular ("UFOC") and a standardized franchise agreement (as periodically amended). Plaintiffs have signed such franchise agreements with Jani-King of Minnesota ("Franchise Agreement").

13

47.    Upon information and belief, Jani-King International has created and provided a common business model to all of its regional business divisions, including Jani-King of Minnesota. This common business model provides oversight, instruction and direction to the regional business divisions, including Jani-King of Minnesota, to act in the manners complained of herein.

48.    Upon information and belief, some of the money collected by Jani-King of Minnesota from franchisees, including but not limited to some or all of the initial franchise fees, advertising fees, finders fees, royalty fees, advertizing fees and other fees, was paid to Jani-King International.

49.    In order to induce Plaintiffs and the other class members into buying one of their cleaning franchises (which their employees sell through a variety of high pressure sales tactics and other schemes described below), Jani-King of Minnesota and its representatives negligently and/or intentionally misrepresented by omission that Jani-King of Minnesota had sufficient business to provide the guaranteed monthly income promised to Plaintiffs and the class members pursuant to their Franchise Agreements. In fact, based on information and belief, Jani-King of Minnesota did not at the time, and does not now, have sufficient accounts and cleaning business under contract to provide each of these Plaintiffs (as well as the entire class of other similarly situated Jani-King franchisees) with the promised minimum income generation each month as required by the Franchise Agreements.

50.    At the time when and after Plaintiffs and the other class members executed their Franchise Agreements, Jani-King International, Jani-King of Minnesota and their representatives knew Jani-King of Minnesota did not have sufficient business and cleaning accounts under contract to satisfy the terms of Plaintiffs' franchise agreements, yet they continued to advertise

14

and still continue to advertise the sale and purchase of cleaning franchises, solicit more and more

new franchises, and enter into new franchise contracts with new franchisees. Jani-King

International, Jani-King of Minnesota and their representatives knowingly and willfully solicited

and entered into the franchise agreements with Plaintiffs which it knew or should have known

that it could not perform and fulfill its obligations to them (as well as to the class members)

without deploying the numerous unfair and illegal schemes described below.

      51.     Jani-King International, Jani-King of Minnesota and their representatives further

misrepresented that Plaintiffs and the other class members would receive cleaning accounts that

are properly and profitably bid so as to not require an inordinate and unfair number of hours of

work than the income generated from those accounts. Jani-King of Minnesota employs many

sales personnel in an effort to bid cleaning jobs from prospective and existing customers, yet it

instructs those same personnel to bid jobs at amounts and with projected hours (per cleaning) that

it knows cannot be reasonably completed for a fair and reasonable hourly wage and profit by

Plaintiffs and other franchisees. Jani-King of Minnesota's management and sales personnel,

including Selman and Schmidt, employ unreasonable and unrealistic projections to bid accounts

knowing that Jani-King of Minnesota will eventually offer these "underbid" accounts to

franchisees who are so desperate for cleaning work that they will accept the account and will

continue to clean at those accounts even though the hourly rate of pay is at or below minimum

wage (especially after deducting the various royalty and finder's fees and other amounts charged

by Jani-King of Minnesota). This gross and deliberate underbidding on Jani-King of

Minnesota's cleaning accounts is pervasive and not unique to the accounts handled by the

Plaintiffs. No one from Jani-King of Minnesota ever disclosed to any of these Plaintiffs, before

15

they executed their Franchise Agreements, that it employed such underbidding tactics to obtain business and cleaning accounts.

52.     Additionally, Jani-King of Minnesota and its representatives misrepresented to Plaintiffs and other franchisees that they would be able to grow their businesses if they simply worked hard with the accounts they received from Jani-King of Minnesota. However, Jani-King of Minnesota did not have then, and still does not have, sufficient accounts to provide such an opportunity for Plaintiffs. For example, although Plaintiffs have called for additional account referrals, they have repeatedly been told by Jani-King of Minnesota's management, including defendants George Selman and Steve Schmidt (and other personnel such as Tom Schellinger and George Von Brugger), that Jani-King of Minnesota does not have accounts available for them to clean. In addition, Plaintiffs are aware that there are other Jani-King franchisees who cultivated and developed their own business and customer accounts only to then have Jani-King of Minnesota and its representatives give that new business to different franchisees. Plaintiffs were not told these facts or this information before they executed their Franchise Agreements.

53.     The UFOC provided to the State of Minnesota and the Plaintiffs and other class members by Jani-King of Minnesota and its representatives contain numerous misrepresentations by omission, including, but not limited to the following:

> i. "We will offer you the right to perform the services under the terms of commercial cleaning contracts with a cumulative total amount of Initial Business identified in the Plan you select, within the period of time shown as the 'Initial Offering Period.'" 2001 UFOC, page 3.

> ii. "The Initial Franchise Fee is not refundable and is fully earned by us when paid, unless we do not offer you the full amount of the Initial Business within the time frame allocated for the Plan purchased. If we fail to offer you the right to provide service under contracts with cumulative total initial gross monthly billings equal to the value of the Initial Business for your Plan within the Initial Offering Period described in Item 11, we will

16

refund an amount equal to 3 times the amount of Initial Business not offered to you, less any amount you owe us." 2001 UFOC, page 23.

iii. "If a Finder's Fee credit is due to you, we will apply the proper amount of credit to Finder's Fees on new business, but no cash refunds will be issued to you." 2001 UFOC, page 30.

iv. "We will assist you in the development of your own marketing and sales efforts. Preparation of proposals (bids) or assistance in determining price and development of cleaning schedules, as long as such services are performed without traveling, are not considered part of the negotiations, so no Finder's Fees are charged for that assistance." 2001 UFOC, page 30.

v. "In order to promote full compliance with all Jani-King performance standards and policies, we will charge you a $50 Complaint Fee if you do not comply with the time frames allotted for initial response or corrective action to a customer complaint or other performance deficiency, and our staff must respond to the client. If at any time, whether through a complaint or inspection, we discover a deficiency in performance at an account you clean, we have 4 hours to make contact with you (attempting to contact you a minimum of once each hour) and report the complaint to you." 2001 UFOC, page 32.

vi. "After you open your business we will: 1. Offer you the right to provide service under signed commercial cleaning and/or maintenance contracts that in total would provide a minimum in gross monthly billings in an amount defined as the "Initial Business" in the Franchise Summary of the Franchise Agreement." 2001 UFOC, page 42.

vii. "These accounts will be bid at production rates within industry standards." 2001 UFOC, page 42. This misrepresentation is omitted from subsequent UFOCs but was verbally assured during the Plaintiffs' training sessions with Jani-King of Minnesota.

viii. "We will make a good faith effort to secure accounts and offer you the right to perform the services as soon as possible, but we will have the total period to offer the Initial Business under each plan, and we are not obligated to offer any portion of the Initial Business before the end of that time." 2001 UFOC, page 43.

ix. "Under either of the situations where you decline an offer of an account or an account cancels at no fault of yours, we are relieved of our time obligation regarding the Initial Offering Period for that amount of gross monthly billings, however, we will at some point in the future, offer you

17

the right to perform services on that amount of contract billings without Finder's Fees." 2001 UFOC, page 43.

x. "If we are unable to secure and offer you the full amount of Initial Business within the time frame allocated for the Initial Offering Period, an amount equal to 3 times the amount of Initial Business not offered to you will be refunded." 2001 UFOC, page 44.

xi. "If an account cancels at no fault of yours before you service the account for 12 full months, the full gross monthly billing value of that account will be replaced within a reasonable period of time by another account, at no additional cost to you." 2001 UFOC, page 44.

xii. "After you open your business we will: Provide you with marketing and technical assistance, and consultation and advice on operating procedures. We will continue to provide appropriate assistance and guidance until you have been offered business that generates gross monthly billing as required by the plan purchased. This guidance will, at our discretion, be furnished in our operating manuals, bulletins or other written materials and/or during telephone consultation, electronic mail, training programs, meetings, conferences and/or personal consultations at our office or at a mutually convenient place." 2001 UFOC, page 44.

xiii. "After you open your business we will: Perform periodic quality control visits to each location under your care. During these visits we will inspect and evaluate the quality of the cleaning services you are providing for the client. We will make recommendations on how to correct deficiencies, improve techniques, and enhance the efficiency of those services. We will have an operations representative available to answer routine questions or to assist you with problems during normal business hours." 2001 UFOC, page 45.

xiv. "Throughout the term of the Franchise Agreement, we will offer you sales, marketing and technical assistance, and consultation and advice on operating procedures." 2001 UFOC, page 45.

xv. "We will not solicit and account that you are currently servicing in an effort to interfere with your relationship with that client." 2001 UFOC, page 49. This misrepresentation is omitted from subsequent UFOCs.

xvi. "If at any time, whether through complaint or inspection, we discover a deficiency in performance concerning an account you service, and you do not cure the deficiency within the time stated in our policies and procedures or the notice provided to you, we have the right to suspend or

18

terminate your authority to service that account, or all of your accounts."
2001 UFOC, page 49.

   xvii. "We may also solicit additional business from customers where you are
providing service. If the additional services contracted for are for a
facility where you are currently providing service, we will offer you the
right to provide service for the appropriate Finder's Fee." 2001 UFOC,
page 49. The 2002 UFOC and all subsequent UFOCs add the phrase "and
if you are proving acceptable service" prior to the "we will offer..."
portion of the second sentence of this misrepresentation. The 2002 UFOC
also substitutes the word "may" for "will."

   xviii. "We do have an option to transfer any of your accounts if you fail to
comply with the Franchise Agreement or our policies and procedures
within 72 hours after we give you notice of non-compliance, you fail to
perform the cleaning services as required for a cumulative number of 5
days within a 90 day period, a customer asks for a transfer or cancellation,
or you service any customer other than as a bona fide Jani-King
franchise." 2001 UFOC, page 57.

   xix. "Under the terms of the Franchise Agreement, we agree to secure and
offer you the opportunity to service signed commercial cleaning and/or
maintenance contracts that in total would provide a minimum in gross
monthly billings in an amount defined as the 'Initial Business.' These
contracts will be secured and offered within the number of days identified
in the Franchise Summary of the Franchise Agreement as the 'Initial
Offering Period.'" 2001 UFOC, page 57.

54.     Subsequent UFOCs contain substantively identical statements and fraudulent

omissions to those detailed in paragraphs 54 above unless otherwise noted.

55.     On information and belief, Jani-King International and Jani-King of Minnesota

prepare, authorize, submit and publish the various UFOCs at issue in this action.

56.     The Franchise Agreement signed by these Plaintiffs is a form contract of adhesion

purporting to establish the terms and conditions of engagement of Jani-King cleaning franchisees.

The Franchise Agreement is written exclusively in English, in highly technical and confusing

language, with misleading section headings and provisions regarding waivers of important rights

buried within the Franchise Agreement. The Franchise Agreement, as with all contracts executed

and entered into in Minnesota, contains an implied obligation and duty to act in good faith and with fair dealings toward the Plaintiffs.

57.     The Franchise Agreement is not available in other languages, although it is commonly known to Jani-King International and Jani-King of Minnesota, that Plaintiffs and other class members (as is the case with many of the franchisees to whom Jani-King of Minnesota has sold its franchises) have little or minimal fluency in English, especially highly technical and legal terms as found throughout the Franchise Agreement.

58.     Consequently, as Jani-King International and Jani-King of Minnesota know, the Franchise Agreement seeks to capitalize on Plaintiffs' inability to fully grasp the terms and conditions of the Franchise Agreement, whether or not they speak English. Much of the Franchise Agreement and UFOC are difficult, if not impossible, for these Plaintiffs and other class members to understand.

59.     On information and belief, Jani-King of Minnesota intentionally targets immigrants, their family members, and other non-English speaking persons such as Plaintiffs and other class members because it can more easily victimize those individuals by the various misrepresentations and other systemic legal violations described herein. None of the Plaintiffs or other class members is able to negotiate for different terms and conditions from those appearing in the Franchise Agreement.

60.     Pursuant to these Franchise Agreements, Plaintiffs and other class members paid substantial sums of money as "franchise fees" in order to obtain cleaning business referrals and accounts.

61.     In exchange for these large franchise fees and other finder's fees and charges (i.e., for supplies and equipment), Jani-King of Minnesota and its representatives promised and

guaranteed Plaintiffs and other class members a certain level of monthly income beginning only
after the franchisee made substantial payments to purchase the franchises, completed Jani-King's
so-called specialized training, and obtained what Jani-King of Minnesota described as
"necessary" cleaning supplies and other equipment, all of which required an additional out-of-
pocket cost sometimes soaring in the thousands of dollars.

62.     After the execution of the Franchise Agreements, however, Jani-King of
Minnesota systematically breached and still continues to breach their obligations to Plaintiffs by
not providing or offering sufficient or adequate profitable work as promised to them from the
guaranteed level of income.   As described below in more detail, many of the Plaintiffs rarely, if
ever, received the promised level of monthly income and most of them only receive a rate of pay
at or below minimum wage.

63.     Through various unlawful schemes involving misrepresentation by omission, Jani-
King of Minnesota and its representatives purport to satisfy the obligations under the Franchise
Agreements when Jani-King of Minnesota does not have contracted business to satisfy those
obligations.  Through these schemes and artifices, Jani-King of Minnesota and its representatives
attempt to make it appear that the Plaintiffs are at fault, rather than Jani-King's fault, when
franchisees do not receive sufficient accounts to satisfy the guaranteed monthly income.

64.     For example, Jani-King of Minnesota and its representatives negligently and/or
intentionally misrepresent the number of hours per week or day that is required to service and
perform cleaning for the accounts offered to Plaintiffs and other class members.  These
misrepresentations are known by Jani-King of Minnesota and its representatives to be false and
are used to induce Plaintiffs and other class member to accept accounts that are then counted
toward their guaranteed level of income.  In many, if not all, instances, the accounts offered to

21

Plaintiffs require substantially more hours of work than Jani-King of Minnesota and its representatives represented or bid for the particular job/account. Jani-King of Minnesota and its representatives stand in a unique and confidential relationship given that they alone communicate with the customers about the bidding, the prices they charge, and the scope of cleaning work to be performed. On information and belief, Jani-King of Minnesota knows that its sales representatives and employees, including, but not limited to defendants Selman and Schmidt, are bidding for cleaning work and accounts at prices and hours that are far less than what can be reasonably required to profitably clean a particular account. Indeed, on information and belief, Jani-King of Minnesota, as counseled by Jani-King International, instruct and direct the sales representatives to bid for these jobs at unreasonable and unfair amounts simply to obtain as many accounts and customers they can, in a ploy to obtain some (indeed, "any") business which Jani-King of Minnesota can then foist upon the backs of these Plaintiffs and other class members. Jani-King of Minnesota can employ this tactic because it recruits and maintains a steady stable of franchisees that are so desperate for work, even what might be unprofitable work, because they already paid thousands of dollars for franchise fees, finder's fees and equipment. Simply put, Jani-King of Minnesota creates an atmosphere of desperation and then it purports to fulfill that despair with business which it knows to be unprofitably underbid and under contract. No one from Jani-King of Minnesota disclosed these facts or schemes to Plaintiffs before they executed their Franchise Agreements.

65.    In addition, Jani-King of Minnesota and its representatives use another ploy or tactic to offer cleaning accounts that are geographically inconvenient to one another and inconvenient to the franchisees' residences. Even though the Franchise Agreement routinely states that the "territory" for the Plaintiffs' franchises are "Anoka, Benton, Carver, Dakota,

22

Fillmore, Hennepin, Olmsted, Ramsey, Rice, Scott, Sherburne, Stearns, Washington and Wright Counties" (which, as an aside, is another unfair ploy that allows Jani-King to claim technical compliance by offering any account to a franchisee that may be almost 100 miles away), Plaintiffs were asked and informed by Jani-King of Minnesota's representatives that they could obtain accounts only in close or preferred proximity to the Plaintiffs' residences. Indeed, during the Jani-King required training courses, Jani-King of Minnesota's employees, including but not limited to, Steve Schmidt, George Selman, Sue Swenson, Mike Moriarity, George Von Brugger and Tom Schellinger used a local Twin Cities map with a circle/radius shown of between five or ten miles to show how far away the Plaintiffs should accept business and accounts in order for them to profitably minimize travel time between accounts. Then, and only after the Franchise Agreement is signed and once the Jani-King training is completed, Jani-King of Minnesota and its representatives consistently and unfairly offer accounts to the Plaintiffs which are geographically inconvenient and well outside the preferred territory as indicated by each of the Plaintiffs. Jani-King of Minnesota and its representatives again employ this tactic knowing that they can later claim or assert that the Plaintiffs "declined" business offered to the Plaintiff and other class members. Jani-King of Minnesota and its representatives did not inform Plaintiffs that any "declined" accounts (due to distance, location or size of account) would nonetheless count towards the promised business offered under the Franchise Agreement. In fact, neither the Jani-King Franchise Agreement or UFOC disclose or describe what happens in the event that a cleaning account is offered but declined (due to travel distance, size of the account or even the time of the day being inconvenient to the particular franchisee).

        66.      As a result of the above-described schemes, Jani-King of Minnesota wrongly and unfairly contends that it fulfilled its obligations under the Franchise Agreement with Plaintiffs by

offering accounts, knowing the accounts it offered simply cannot and will not be accepted by
Plaintiffs, given the geographic and time limitations which Jani-King of Minnesota and its
representatives know about because they requested such information during the training and
solicitation stage.

67.     Jani-King of Minnesota and its representatives also contends that it has offered
accounts and business which Plaintiffs declined, when in fact Plaintiffs never received an offer of
such accounts/business from them.  On information and belief, Jani-King of Minnesota and its
representatives employ this tactic because they know that they cannot fulfill their obligations to
each franchisee, including Plaintiffs.  Moreover, Jani-King of Minnesota employees sometimes
have left a voicemail message for the Plaintiffs concerning a possible new account/customer but
then when the Plaintiffs return the call, they are informed that the account was given to another
franchisee; Jani-King of Minnesota still credits or counts this so-called "offer" as against the
guaranteed minimum monthly income promised by Jani-King of Minnesota in the Franchise
Agreements.  No one from Jani-King of Minnesota disclosed these facts or schemes to Plaintiffs
before they executed their Franchise Agreements.

68.     Similarly, when Plaintiffs received calls from a Jani-King of Minnesota
representative, they were provided with very little detail, if any, about the cleaning
customer/account (other than the monthly income it might present).  Instead, Jani-King of
Minnesota often informed the Plaintiffs that the decision to accept or decline the account must be
made without more information about the size of the account (i.e., a walk-through or inspection
of the site) or the particular details for cleaning that offered account.  If Plaintiffs do not accept
the account immediately over the phone, not only have they lost the account, but Jani-King of
Minnesota then contends that this amount of business is "declined" and Jani-King of Minnesota

24

counts that amount against the initial business offering which it has contractually agreed to provide under the Franchise Agreement. By way of illustration, it is common for a Plaintiff or another class member to receive an offer to clean an account and then require a few minutes to think about time management and staffing issues before deciding whether to accept the business. However when the Plaintiff or class member calls back (as little as two minutes later, and as much as a half hour later) to accept the account, Plaintiff or class member is frequently told the account is now gone. Indeed, Plaintiffs and class members must normally accept accounts immediately over the phone – sight unseen and with no information about size or nature of the necessary cleaning for the particular account – in order to ensure those accounts are not offered to other franchisees (who are, after all, competing for the same account/business having paid their own franchise fees). No one from Jani-King of Minnesota disclosed these facts or schemes to Plaintiffs before they executed their Franchise Agreements.

69.     Jani-King of Minnesota also recycles certain accounts, especially "troubled" accounts, with and among various franchisees, including Plaintiffs, by several schemes that they employ, namely, calling several or multiple franchisees, offering the same account to each of them simultaneously. In doing so, even though only one franchisee obtains the account, Jani-King of Minnesota charges each franchisee contacted for that monthly amount against Jani-King of Minnesota's required business. Jani-King of Minnesota also offers "troubled accounts" to multiple franchisees, knowing that the accounts are either difficult to clean or the contact person at the account customer is difficult to deal with and unreasonable so that Jani-King of Minnesota can later claim it fulfilled the contractual obligations for offering business to these multiple franchisees. No one from Jani-King of Minnesota disclosed these facts or schemes to Plaintiffs before they executed their Franchise Agreements.

25

70.    Jani-King of Minnesota also violated the Franchise Agreements by taking accounts away without warning and for no justifiable and good faith reason. Also in violation of the Franchise Agreement, Jani-King of Minnesota deprived the Plaintiffs and other class members of the opportunity to correct or challenge any *alleged* deficiencies in their performance.

71.    Another unlawful scheme which Jani-King of Minnesota employs is to inform a Plaintiff or other class member that their account customers were dissatisfied with their work, when in fact the customers were generally, if not completely, satisfied with the cleaning work. Jani-King of Minnesota periodically sent its personnel to the accounts (without providing any notice or warning to Plaintiffs) and conducted an "inspection" of the account, knowing that they almost always can or will find something which they point out to the account customer as not living up to the "Jani-King standards" (a euphemism or code word that means very little or nothing) but they then suggest to the account customer that it can get another cleaner if the account customer simply requests so. In using this ploy, Jani-King of Minnesota ensures that they can re-circulate an account and offer it to yet another franchisee while also simultaneously counting that account as a dissatisfied customer whose business and monthly income is applied to the obligations Jani-King of Minnesota owed to Plaintiffs and class members. No one from Jani-King of Minnesota disclosed these facts or schemes to Plaintiffs before they executed their Franchise Agreements.

72.    Jani-King of Minnesota also promised to support Plaintiffs and its franchises, yet Jani-King of Minnesota offers the very opposite of support, i.e., frustration. On information and belief, Jani-King of Minnesota informs accounts that they know the account customers are too busy to inspect the franchisees' work, so Jani-King of Minnesota will perform the inspections for them. Jani-King of Minnesota then uses this opportunity to point out supposedly-neglected

26

cleaning areas to the account person and then will use these "deficiencies" to convince the account customer to switch franchise owners for a "better" cleaning crew. Jani-King of Minnesota uses this maneuver so as churn that particular account/business to another franchisee, and therefore, make it appear that they have "fulfilled" their franchise obligations to two or more franchises at the same time. No one from Jani-King of Minnesota disclosed these facts or schemes to Plaintiffs before they executed their Franchise Agreements.

73.     After using these tactics to take accounts away from Plaintiffs, Jani-King of Minnesota then would offer those accounts to other franchisees so that Jani-King of Minnesota can count that account toward that franchisee's monthly guarantee. In this way, Jani-King of Minnesota churns the accounts they have in order to make it appear that it has satisfied its Franchise Agreements with Plaintiffs. No one from Jani-King of Minnesota disclosed these facts or schemes to Plaintiffs before they executed their Franchise Agreements.

74.     Jani-King of Minnesota has not performed or satisfied the terms of Plaintiffs' Franchise Agreement. They have not offered sufficient account revenue (free from misrepresentations and other unlawful actions) and Jani-King of Minnesota switched accounts away from Plaintiffs without justification or warning and without the opportunity to cure any deficiencies. Jani-King of Minnesota has not refunded any of Plaintiffs' franchise fees nor have they paid any penalties as outlined in Plaintiffs' Franchise Agreement for their failure to meet their obligations to Plaintiffs under the Franchise Agreement.

75.     Indeed, despite their failure to provide sufficient business revenue for Plaintiffs, Jani-King of Minnesota still requires Plaintiffs to continue making payments on their franchise fees and finders fees, billing them for these payments, even when Plaintiffs have received no further cleaning work from Jani-King of Minnesota.

76.    In addition, Jani-King of Minnesota deducted excessive fees from the payments made to the Plaintiffs under the Franchise Agreement.

77.    On information and belief, Jani-King of Minnesota significantly and unreasonably underbid cleaning contracts with its customers. Plaintiffs are then forced (by virtue of Jani-King of Minnesota's pressure tactics) to accept these heavily-underbid accounts because the alternative is to have that business charged against their contractual rights. As a result of this underbidding, Plaintiffs receive far less pay for their work than the fair value of their services and far less pay than they were promised on an hourly and monthly basis. This underbidding also requires Plaintiffs to clean large accounts in short periods of time, making it nearly or practically impossible to meet the cleaning requirements of the account. Consistent with the above described schemes, Jani-King of Minnesota then conducts their inspections and points out insufficient cleaning to an account customer and asks that a new franchisee take over for the existing franchisee

78.    Contrary to its representations in the UFOC, Jani-King of Minnesota does not promote franchise growth for Plaintiffs. Several Plaintiffs and franchisees have obtained new cleaning accounts on their own only to have Jani-King of Minnesota and its representatives assign those accounts to other franchisees and/or extract significant fees from them for "negotiating" the contract with the new customer.

79.    Through all these means and others described below, Jani-King of Minnesota misrepresented the nature of its relationship with the Plaintiffs. Plaintiffs were treated more like "employees" than "franchisees", and certainly received few, if any, of the legal rights and protections afforded employees under law. For example, Jani-King of Minnesota withholds or charges each of the Plaintiffs and other class members whenever the assigned account does not

28

pay the bill or invoice for cleaning services even though Jani-King of Minnesota is responsible for business generation, sending of invoices, collection and accounting services. In several of these instances, Plaintiffs have later learned that payment was actually made by the account/customer even though Jani-King of Minnesota charged the franchisee for "non-payment," also known as or called a "chargeback."

80.     Through Jani-King of Minnesota's various schemes and tactics described above, the UFOC provided to Plaintiffs contains a number of misrepresentations by omission. First and foremost, Jani-King of Minnesota represented that 100% of the Minnesota franchisees received or were offered their initial Finder's Fee Business during the required period. In fact, based on the circumstances for these Plaintiffs, it appears Jani-King of Minnesota rarely, if ever, actually provides the required/guaranteed minimum business to the franchisees under the Franchise Agreement. Therefore, the UFOC's percentages and promises are untrue and misleading in that they omitted material facts and information as described herein.

**B.     Relationship between Jani-King and Teng Moua.**

81.     Plaintiff Teng Moua purchased a franchise from Jani-King of Minnesota and specifically employee Sue Swenson on or about November 29, 2004. On or before that date, Teng received a Jani-King of Minnesota UFOC. He relied upon the statements in the UFOC in reaching the decision to purchase a Jani-King franchise as well as verbal statements to the same effect by Ms. Swenson.

82.     Teng paid $18,050 to Jani-King of Minnesota as the franchise fee with a promise that he would receive $6,000 in monthly income from cleaning accounts provided or referred to him by Jani-King of Minnesota. Later, in mid 2005, Teng purchased a second franchise from his

29

brother (Khoua Lord) and assumed the monthly financing obligations to Jani-King of Minnesota whom Khoua Lord had previously agreed to pay.

83. Teng attended and completed the Jani-King of Minnesota training program and purchased the required equipment by early 2005. As is the normal course and practice, Jani-King of Minnesota employees at this training and orientation session including Sue Swenson, Steve Schmidt, Tom Schellinger and George Von Brugger, asked him about the geographic areas where he preferred to work, to which Teng explained that he wanted to be offered accounts in Minneapolis, Minnesota.

84. In or about July 19, 2005, Teng received a written communication from Jani-King of Minnesota employee Tom Schellinger purporting to show that it had met its obligation under the Franchise Agreement to provide a guaranteed monthly income of $6,000/month. Many of the accounts listed by Tom Schellinger were new or completely unknown to Teng as he had not been contacted or spoken to any Jani-King of Minnesota personnel about the offered business. Tom Schellinger requested Teng sign and acknowledge these offerings. On information and belief, Tom Schellinger or other Jani-King of Minnesota employees sent similar letters to each of the other Plaintiffs and class members, many of which contained inaccurate or untrue "offerings." Shortly after his receipt of this letter, Teng became aware of some of the facts and schemes described herein to the effect that Jani-King of Minnesota had violated the Minnesota Franchise Act.

85. After Teng challenged Jani-King of Minnesota employee Tom Schellinger about the letter and his list, Tom Schellinger sent a copy of handwritten notes that reflect many "offerings" that Teng allegedly declined, including several more accounts which Teng had not heard about or received information on.

30

86.     At or around the expiration of the 12-month time period when Jani-King of Minnesota was required to provide Teng with business offerings, he noticed Jani-King of Minnesota's tactics and attitude toward him changed for the negative. For example, after not providing any inspections for more than nine months, Jani-King of Minnesota sent an employee named Mike Moriarityto inspect the Logan Real Estate Group account. Contrary to Jani-King of Minnesota's obligation to act in good faith and its numerous promises about providing support for Teng, Moriarity proceeded to convince the account contact person to request a new cleaner and to allow Jani-King of Minnesota, through Mike Moriarity, to take the account away from Teng. Jani-King of Minnesota's actions were a breach of the Franchise Agreement and in direct violation of its promises and representations about support and the opportunity to cure any deficiencies in performance under the UFOC.

87.     A similar circumstance or situation occurred with other accounts Teng serviced or cleaned called Bunzl Papercraft and Edge Advertising. Teng largely received satisfactory, if not above average, evaluations for his cleaning work at these locations. However, on dates currently not known by Teng but in the possession of Jani-King of Minnesota, Jani-King of Minnesota employees Tom Schellinger, George Selman and Mike Moriarity contacted the account person at Edge Advertising and suggested that Teng was not cleaning to the "Jani-King standards," the result of which was that Teng had the account taken away from him and given to another Jani-King franchisee. Similarly, Jani-King of Minnesota employee Steve Schmidt contacted the account person at Bunzl Papercraft and suggested that Teng was not cleaning to the "Jani-King standards," the result of which was that Teng had the account taken away from him and given to another Jani-King franchisee. Not coincidentally, these "customer-problem" situations arose only after the 12-month guaranteed initial business period and, on information and belief,

31

occurred because Jani-King of Minnesota needed the accounts to offer to other franchisees to whom it made promises about new business.

88.     When Teng went to discuss these situations with management, he was verbally accosted and threatened by Jani-King of Minnesota employees Michael Moriarity and George Selman who went so far as to lock Teng in one of the Edge Advertising's offices. Teng felt intimidated and physically and emotionally threatened by the actions of these Jani-King of Minnesota employees.

89.     On information and belief, Jani-King of Minnesota knows exactly the dates and amounts "owed" to each franchisee (such as Teng and the other Plaintiffs) and once those obligations are met (or appear to be fulfilled), Jani-King of Minnesota and its representatives, including George Selman and its Operations Managers, begin to employ one or more of the schemes described above in order to churn the business to a new franchisee. Meetings are held in Jani-King of Minnesota's office to discuss which franchisees need to have their business removed or terminated (to be offered to another franchisee). On information and belief, some, if not all, of the tactics and schemes described herein occur in response or correlation to where the particular franchisee (such as Teng) fits in the initial business offering period. Teng did not discover that Jani-King of Minnesota failed to act in good faith or deal fairly with him and that Jani-King of Minnesota refused to provide the support that had been promised until at least after July 19, 2005. Until after July 19, 2005, Jani-King of Minnesota prevented Teng from discovering all the facts which are the basis of this action. Teng could not have, through the use of reasonable diligence, discovered these facts before July 19, 2005.

32

C.    **Relationship between Jani-King and Juan and Cheri Martinez.**

90.    Plaintiffs Juan and Cheri Martinez purchased a franchise from Jani-King of Minnesota employee Sue Swenson on or about March 30, 2005. On or before that date, the Martinezes received a Jani-King of Minnesota UFOC. They relied upon the statements made by Sue Swenson and the statements in the UFOC in reaching the decision to purchase a Jani-King franchise.

91.    The Martinezes paid $6,000 to Jani-King of Minnesota as their franchise fee with a promise that they would receive $2,000 in monthly income from cleaning accounts provided or referred to them by Jani-King of Minnesota.

92.    The Martinezes attended and completed the Jani-King of Minnesota training program and purchased the required equipment by or in August 2005. As is the normal course and practice, during the training and orientation session, Jani-King of Minnesota employees Sue Swenson and Steve Schmidt asked them as to the geographic areas where they preferred to work, to which the Martinezes explained that they wanted to be offered accounts in Minneapolis.

93.    In or about September 2005, Steve Schmidt contacted Juan Martinez and offered him two cleaning accounts, one of which was LSI Corporation and another of which was Black Box Resale in Brooklyn Park. The monthly billings for LSI was $1,839/month but Steve Schmidt would not provide Juan Martinez with any more information about the scope of the cleaning work or the size of the job before he was asked to "accept" this offered business. Likewise, although Steve Schmidt informed Juan Martinez about the amount of monthly billing for the Black Box location in Brooklyn Park ($1,506/month), he would not inform Juan Martinez about the scope of the cleaning work or the size of the job before he had to "accept" this account for cleaning.

33

94.     Having just paid thousands of dollars and having purchased expensive cleaning equipment, Juan Martinez accepted these two accounts sight unseen as Steve Schmidt and Jani-King of Minnesota intended. After a brief walk-through with Steve Schmidt, the Martinezes began cleaning at these two accounts in early October, 2005. The Martinezes discovered that cleaning the LSI account took three people three hours each day to clean this account. The amount Jani-King of Minnesota charged for cleaning at LSI was grossly underbid for the work and time needed to properly clean the account. Likewise, once they began cleaning the Black Box Resale location in Brooklyn Park, the Martinezes discovered that they needed five people to work for 6-7 hours each day to properly clean this account. The amount which Jani-King of Minnesota charged for cleaning this Black Box location was grossly underbid (it had used one person working for 4.11 hours when in fact it took approximately 30-35 hours each day to properly clean the account on a daily basis).

95.     Steve Schmidt of Jani-King of Minnesota also offered a third account to the Martinezes (JDS Marketing in Hamel, Minnesota) but they did not wish to accept this account because it was too small ($195/month), was too far away from their preferred location, and only required cleaning once a week. When the Martinezes tried to decline this account, Steve Schmidt threatened to take away the Martinezes other two larger accounts (Black Box and LSI). Therefore, under this threat and in order to keep Steve Schmidt and Jani-King of Minnesota happy, the Martinezes agreed to also clean this small and inconvenient account.

96.     In mid October 2005, Steve Schmidt contacted Juan Martinez and informed him to return the keys for all three of these accounts because allegedly the customers were unhappy with the cleaning work. Steve Schmidt or Jani-King of Minnesota did not provide any written notice of what aspects of the cleaning were being complained about nor were the Martinezes provided

34

with 72 hours notice for the opportunity to cure any real or perceived problems. Schmidt simply instructed Martinez to stop cleaning (at all three accounts) and return the keys. At or after this time, and upon these actions by Steve Schmidt and Jani-King of Minnesota, the Martinezes became aware of some of the facts and schemes described herein to the effect that Jani-King of Minnesota had violated the Minnesota Franchise Act.

97.     On information and belief, there were never any customer complaints made by the Black Box account or the JDS Marketing account. Schmidt simply chose to punish the Martinezes by taking away those accounts for what he perceived to be problems at the LSI account.

98.     To date, Jani-King of Minnesota and Steve Schmidt have not offered to replace any of the business they took away from the Martinezes in October 2005. Jani-King of Minnesota and Steve Schmidt did not act in good faith or deal fairly with the Martinezes when they removed the Martinezes from all three of their accounts, even if there was a real or perceived problem at LSI. Jani-King of Minnesota and Steve Schmidt failed to provide any of the promised support and also failed to properly train the Martinezes in a manner to provide the services it promised to teach them.

99.     The Martinezes did not discover that Jani-King of Minnesota and Steve Schmidt failed to act in good faith or deal fairly with them and that Jani-King of Minnesota and Steve Schmidt refused to provide the support that had been promised until at least October 2005. Furthermore, Jani-King of Minnesota and Steve Schmidt's refusal to pay back any of the promised business or provide additional business to the Martinezes is a breach of the Franchise Agreement and a violation of the Minnesota Franchise Act about which they did not discover until at least October 2005. Until October 2005, Jani-King of Minnesota prevented the

35

Martinezes from discovering all the facts which are the basis of this action. The Martinezes could not have, through the use of reasonable diligence, discovered these facts prior to October 2005.

**D.     Relationship between Jani-King and Kua Vang Xiong and Maiku Thao.**

100.     Plaintiffs Kua Vang Xiong and Maiku Thao purchased a franchise from Jani-King of Minnesota employee Sue Swenson on or about March 29, 2005. On or before that date, Kua Vang Xiong and Maiku Thao received a Jani-King of Minnesota UFOC. They relied upon the statements made by Sue Swenson and the statements in the UFOC in reaching the decision to purchase a Jani-King franchise.

101.     Kua Vang Xiong and Maiku Thao paid $20,800 to Jani-King of Minnesota as their franchise fee with a promise that they would receive $7,000 in monthly income from cleaning accounts provided or referred to them by Jani-King of Minnesota.

102.     Kua and Maiku attended and completed the Jani-King training program and purchased the required equipment by or in May 2005. As is the normal course and practice, during the training and orientation session, Jani-King of Minnesota employees Sue Swenson and George Selman asked Kua and Maiku as to the geographic areas where they preferred to work, to which they explained that they wanted to be offered accounts in or around the Lino Lakes/Forest Lake and North St. Paul areas.

103.     By July 2005, Jani-King of Minnesota had not contacted them with any business referrals and so Kua and Maiku stopped by the Jani-King office to inquire about cleaning accounts. They again spoke with Sue Swenson, a Jani-King representative with whom they had dealt in the execution of the Franchise Agreement and to whom they had given their $20,800 payment. After they explained how they were extremely anxious about getting business referred

36

to them, Sue checked on the computer system and informed Kua and Maiku that it showed them as not having responded to any of the pages sent to their Jani-King pager. This news came as a complete surprise to Kua and Maiku because they had not yet received any phone calls or pages from any Jani-King of Minnesota employee. When they showed the pager to Sue Swenson, she agreed that there were no phone calls or pages registered on the pager. As a result, Kua requested a new pager. Nevertheless, the accounts "offered" to Kua and Maiku when their pager was inoperable remained listed as accounts offered and declined on their initial business offering sheet.

104.    Shortly thereafter, in August 2005, Jani-King of Minnesota employee Dan Czeck contacted Kua and Maiku about an account in south Minneapolis for them. Desperate for any business after they paid so much money to Jani-King of Minnesota, and even though the account was well outside the area which they had indicated to Sue Swenson and George Selman as their preference, Kua and Maiku accepted the account. They also did so even though Jani-King of Minnesota employees Steve Schmidt and George Von Brugger told them during the training and orientation session that they could walk through prospective accounts before accepting them. Dan Czeck told Kua and Maiku very little about the account other than the location (south Minneapolis) and the amount of monthly business ($1,244/month).

105.    The cleaning account in south Minneapolis offered to Kua and Maiku turned out to be St. John's Lutheran Church which also operates a day care center. After working on this account, Kua and Maiku discovered that this account took two people more than three hours to clean each time. Jani-King of Minnesota account representative Matt Leaf bid the account cleaning to take 4.1 hours/day total, rather than the 6+ hours it actually took each day. Thus, Kua

37

and Maiku discovered in the fall of 2005 that the account was grossly underbid for the work and time needed to properly clean the account.

106.     Kua and Maiku cleaned the St. John's Lutheran Church until mid January 2006 when they received word that someone at the church had complained to George Selman about their cleaning.  Once they learned about this complaint, Kua arranged for a walk-through inspection with a Jani-King of Minnesota employee (Dan Czeck) and a representative from the church who pointed out what she believed were the problems or issues with the cleaning.  Czeck told Kua that the items she was complaining about were not covered under the church's contract with Jani-King of Minnesota and that the church was in a bad condition as a whole (due to reasons other than the cleaning Kua and Maiku were performing).  Czeck agreed that Jani-King of Minnesota would transfer the account to another franchisee but that Kua and Maiku would receive a credit for this account transfer toward their monthly offered business.  On information and belief, Dan Czeck and Jani-King of Minnesota did not provide Kua and Maiku with any additional business to replace this St. John's Lutheran Church.

107.     Around the same time as they were contacted about the St. John's Lutheran Church, Steve Schmidt also contacted Kua and Maiku about another account, an apartment building for $1,244 a month.  Because this account was located in Shakopee, Minnesota (which was far outside the preferred geographic area which they had informed George Selman and Sue Swenson about during their training), Kua and Maiku declined this account.  No one from Jani-King of Minnesota, during this call or at any time, explained to Kua and Maiku that any business or account they declined (especially for the unreasonable distance it caused them to travel) would nonetheless count toward the minimum business obligations which Jani-King of Minnesota offered to them.  Kua and Maiku did not discover that Jani-King of Minnesota employee Tom

38

Schellinger contended that this account, which they rightfully and justifiably declined, counted toward their minimum business offering until they were sent a letter from Tom Schellinger in late October 2005. Indeed, it was not until they received this letter in late October or early November 2005 that Kua and Maiku first learned that there were also at least four other accounts which Schellinger contended they "declined" when in fact, neither Dan Czech, Steve Schmidt, or any other Jani-King of Minnesota employee ever spoke with Kua and Maiku or offered these accounts to them (ostensibly because Jani-King of Minnesota takes the position that when Kua and Maiku did not respond to the pager calls (which Jani-King of Minnesota's own employee Sue Swenson agreed were not registered on the pager), those accounts still counted toward the minimum business offering obligations under the Franchise Agreement). It was at or after this time that Kua and Maiku became aware of some of the facts and schemes described herein to the effect that Jani-King of Minnesota had violated the Minnesota Franchise Act.

108.     In early September 2005, Steve Schmidt contacted Kua and Maiku about another account to be cleaned; this one was a day care facility in Fridley. Kua and Maiku accepted this account and began to clean the Children's World. Shortly thereafter, they realized that this account was also underbid as it took them more than four hours to clean the account (calculating the number of hours it took each month to clean and the amount charged by Jani-King of Minnesota, Kua and Maiku made less than $7/hour (before their payment of the royalty and other fees to Jani-King of Minnesota). After deducting the payment of fees to Jani-King of Minnesota, Kua and Maiku received an amount equal to, if not less than federal minimum wage per hour worked.

109.     On top of that, in early February 2006, Kua learned that Steve Schmidt sent another franchisee (name believed to be Jim) to strip and wax the floors (which was "extra work"

39

and beyond the contracted work). When Kua confronted Steve Schmidt about this, all he replied was that the customer needed the work to be done. Schmidt did not explain why Kua and Maiku had not been asked and indeed, the customer ended up complaining about the stripping and waxing done by "Jim" who returned a second time and even used Kua and Maiku's equipment. After this, Kua and Maiku asked to trade in this account for another replacement account and while their request was honored, Schmidt and Jani-King of Minnesota punished them by charging $450 for "floorwork" charges associated with this stripping and waxing and deducted this amount from their monthly payment.

110.    In early October 2005, Jani-King of Minnesota's Dan Czeck contacted Kua one morning about another account, a bar in downtown Minneapolis for which Jani-King of Minnesota charged $1,193/month. Kua explained to Czeck that he first wanted to speak with his wife about this account (because the account involved cleaning 7 days a week and cleaning in the early morning hours after the bar closed). When Kua called back in the early afternoon on the same day, Czeck informed Kua that they offered the account to another franchisee. Czeck did not inform Kua that this account (which they did not "decline" but rather "accepted") would still count toward the minimum business offering that Jani-King of Minnesota was obligated to provide them under the Franchise Agreement. In fact, it was not until they received a letter from Jani-King of Minnesota employee Tom Schellinger in late October or early November 2005 that Kua and Maiku discovered that Jani-King of Minnesota and Schellinger considered the bar account (Mackenzie) to be one that Kua and Maiku had "declined." This statement was false and untrue.

111.    In late October 2005, Kua and Maiku received another account, this time a restaurant in Fridley. The account was also underbid as it took Kua and Maiku (together)

approximately 5 hours to clean seven days a week. Using the $1,201 monthly income for this account, Kua and Maiku again earned less than $6.00 per hour (before royalties and fees for Jani-King of Minnesota).

112.    In November 2005, Kua and Maiku received a very large account to clean, an office building in Richfield. Although the account was outside their preferred territory, they opted to accept it because they had not yet received the full $7,000/month of business from Jani-King of Minnesota and they had paid more than $20,000 for this franchise to Jani-King of Minnesota. After cleaning this account for several weeks, Kua and Maiku came to realize that this account was also underbid – it took them far more than the 21.82 hours which Jani-King of Minnesota's George Selman projected as the amount of time for one person to clean (Kua and Maiku employed others to help them clean this large account).

113.    Kua and Maiku cleaned this particular account (Guardian Companies) for approximately nine months and everything was going well. They received mostly 8's and 9's on the contact evaluation forms (on a scale up to 10) from the customer's account contact person (Lori Mercer). Indeed, in the comments section of her May 2006 report, Ms. Mercer stated: "Things are going great! Thank you – Kua."

114.    However, in August 2006, right around the time Kua and Maiku had reached the end of their twelve month's worth of guaranteed monthly business, Jani-King of Minnesota employee Tom Schellinger conducted an inspection of the Guardian account. Immediately, but not coincidentally, the tone and relationship between the Guardian contact person Ms. Mercer and Kua and Maiku changed for the worse. In her contact evaluation dated August 30, 2006, Ms. Mercer gave them a "2" (out of 10) for their cleaning. On or about September 6, 2006, Kua and Maiku were instructed by Jani-King of Minnesota employee Wes Ortega to return the keys for

41

Guardian to the Jani-King of Minnesota office and to cease all cleaning there. Although they repeatedly tried to speak with Ms. Mercer, she refused to return their calls. On information and belief, Jani-King of Minnesota personnel, including but not limited to, Tom Schellinger, had unfairly and unreasonably convinced Guardian to seek and ask for a replacement for Kua and Maiku; on information and belief, Wes Ortega and Tom Schellinger did so because Jani-King of Minnesota needed to be able to offer this large account to another franchisee (at a time when it did not have enough business under contract to fulfill its obligations to other and new franchisees).

115.     To date, neither Jani-King of Minnesota nor George Selman has offered any additional business or cleaning accounts to Kua and Maiku.

116.     Kua and Maiku did not discover that Jani-King of Minnesota failed to act in good faith or deal fairly with them and that Jani-King of Minnesota refused to provide the support that had been promised until October 2005. Furthermore, Jani-King of Minnesota employees George Selman and Tom Schellinger's refusal to pay back any of the promised business or provide additional business to Kua and Maiku is a breach of the Franchise Agreement and a violation of the Minnesota Franchise Act about which they did not discover until at the earliest in October 2005. Until October 2005, Defendants prevented Kua and Maiku from discovering the facts that form the basis of this action. Kua and Maiku could not have, through the use of reasonable diligence, discovered these facts prior to October 2005.

**E.     Relationship between Jani-King and Cherpao Yang.**

117.     Plaintiff Cherpao Yang purchased a franchise from Jani-King of Minnesota employee Sue Swenson on or about September 12, 2005. On or before that date, Cherpao Yang received a Jani-King of Minnesota UFOC. He relied upon the statements in the UFOC in

42

reaching the decision to purchase a Jani-King franchise as well as statements to the same effect by Ms. Swenson.

118.     Cherpao Yang paid $3,000 to Jani-King of Minnesota as the franchise fee with a promise that he would receive $1,000 in monthly income from cleaning accounts provided or referred by Jani-King of Minnesota.

119.     Cherpao Yang attended and completed the Jani-King training program and purchased the required equipment by or in December 2005. As is the normal course and practice, during the training and orientation session, Jani-King of Minnesota's employee Steve Schmidt asked about the geographic areas where he preferred to work, to which Cherpao Yang explained that he wanted to be offered accounts in or around the north Minneapolis and northern suburbs area.

120.     After completing the training and purchasing the equipment, Cherpao Yang received two accounts, Luther Brookdale and Applebee's in Brookdale, from Jani-King of Minnesota. However, in or about July 2007, Luther Brookdale consolidated its operations and Cherpao Yang was not given the new account at the new location. When he asked Steve Schmidt about this and why he wasn't given the chance to move with the account (which was simply moving to another but nearby location), Schmidt told Cherpao's son (Chang Yang), that he did not think that Cherpao was doing a good cleaning job at the Applebee's account. This statement was a fabrication as Cherpao had notified the account (and Steve Schmidt) that Applebee's kept asking him to do extra cleaning (outside the scope of the contract terms) but that Steve Schmidt kept telling Cherpao that he had to do the extra cleaning as the customer requested (without payment of any additional or extra work). In doing so, Jani-King of Minnesota breached its obligations to act in good faith and with fair dealings toward its franchisee, Cherpao Yang.

43

121.    As it turned out, the account which Jani-King's Schmidt was discussing (Applebee's) was an underbid account because it took 2 people more than 3 hours per night to clean (7 days a week). Again, as with other franchisees, Cherpao received almost or less than minimum wage after payment of Jani-King of Minnesota's fees and other charges.

**F.    Relationship between Jani-King and Bee Vang and Vang Pao Moua.**

122.    Plaintiffs Bee Vang and Vang Pao Moua purchased a franchise from Jani-King of Minnesota employee Sue Swenson on or about July 26, 2005. On or before that date, Bee Vang and Vang Pao Moua received a Jani-King of Minnesota UFOC. They relied upon the statements made by Sue Swenson and the statements in the UFOC in reaching the decision to purchase a Jani-King of Minnesota franchise.

123.    Bee Vang and Vang Pao Moua  paid $6,000 to Jani-King of Minnesota as the franchise fee with a promise that they would receive $2,000 in monthly income from cleaning accounts provided or referred by Jani-King of Minnesota.

124.    Bee Vang and Pao Moua attended and completed the Jani-King training program and purchased the required equipment by or in September 2005. As is the normal course and practice, during the training and orientation session, Jani-King of Minnesota employees George Von Brugger and Steve Schmidt asked about the geographic areas where they preferred to work, to which Bee and Pao explained that they wanted to be offered accounts in or around the St. Paul area.

125.    One of the initial business they were offered was the Rocco Altobelli account in Woodbury and they quickly developed a great relationship with the customer (Kim). After cleaning this account for a period of time (longer than twelve months), a Jani-King of Minnesota employee, either George Von Brugger or Brad Kaye, informed Bee Vang that Rocco Altobelli

wanted their keys back. When Bee Vang spoke with Kim about why she wanted them to return their keys, all she said was that "something better came along and we decided to go with it." On information and belief, Jani-King of Minnesota employees George Von Brugger or Brad Kaye enticed Rocco Altobelli to change cleaners away from Bee Vang and Pao Moua because Jani-King of Minnesota had fully used the Rocco Altobelli account to fulfill its initial business offering to them and now it wanted to move the account to someone else (in order to meet Jani-King of Minnesota's obligations to another franchisee). After all, Kim told Bee Vang that George Von Brugger or Brad Kaye asked her whether Rocco Altobelli wanted him to find a new person to clean.

126.    This was not the only account which Jani-King of Minnesota frustrated or did not provide good faith and support as it had promised in the training and franchise offering circular. For example, in another account (Newport St. Paul Cold Storage), Jani-King of Minnesota's George Von Brugger did nothing to support Bee Vang and Pao Moua when they complained to him that their supplies and equipment were being used by the customer's employees, including the use of a mop to clean up eggs. Indeed, George Von Brugger explained, "I would suggest you [Bee and Pao] keep trying to clean up the messes" which the customer's employees kept making on site. To add insult to injury, this account was grossly underbid as it took 3-4 people more than 2 hours to clean, 5 days each week. With only $874 in monthly gross billings, this left Bee Vang and Pao Moua with almost or less than minimum wage after payment of the Jani-King of Minnesota fees and charges.

127.    Jani-King of Minnesota and George Von Brugger also did not act in a manner to protect the business or accounts it offered to Bee Vang and Pao Moua. One of those accounts was IBS which moved locations in August 2007 but George Von Brugger did not even try to

keep this account under contract – when Bee Vang asked about this possibility, the account's contact person (Bob Weigel) stated that George Von Brugger has his "favorite" franchisees and that he (Bob Weigel) did not enjoy working with George Von Brugger.

128.     Bee Vang and Pao Moua did not discover that Jani-King of Minnesota failed to act in good faith or deal fairly with them and that Jani-King of Minnesota refused to provide the support that had been promised until at least after October 2005. Until at least October 2005, Jani-King of Minnesota prevented Bee Vang and Pao Moua from discovering all the facts which are the basis of this action. Bee Vang and Pao Moua could not have, through the use of reasonable diligence, discovered these facts prior to October 2005.

G.     **Relationship between Jani-King and Mai Lou Xiong Yang.**

129.     Plaintiff Mai Lou Xiong Yang purchased a franchise from Jani-King of Minnesota employee Sue Swenson on or about October 28, 2005.  On or before that date, Mai Lou Xiong Yang received a Jani-King of Minnesota UFOC.  She relied upon the statements in the UFOC in reaching the decision to purchase a Jani-King franchise.

130.     Mai Lou received an account called Fat Boys to clean but this account was underbid as it took four people more than 4 hours to clean, 7 days each week. As with other franchisees, this resulted in Mai Lou receiving almost or less than minimum wage for this cleaning work after payments to Jani-King of Minnesota for its fees and other charges. On top of that, Jani-King of Minnesota and Steve Schmidt charged back to Mai Lou, claiming that Jani-King of Minnesota had not received payment from Fat Boys and, therefore, under the contract, any uncollected payments from customers were charged back against the franchisee's account. Mai Lou spoke with the contact person at Fat Boys (Joe whose last name is currently unknown)

and has since obtained copies of the check remittances showing that Fat Boys in fact made the payments to Jani-King of Minnesota.

131.    This was not the only instance in which Jani-King of Minnesota's personnel were not honest or fair in their dealings with Mai Lou. For example, at another account (Northern Technologies), Jani-King of Minnesota's George Selman informed her to return the keys because the customer was moving to a new location. When she asked the account person about this, Mai Lou was informed that the account wanted to keep her as the cleaning but that George Selman wanted to place a new cleaner in that account at its new location. A similar situation happened at ABC after two of Jani-King's managers, Tom Schlesinger and George Von Brugger, inspected the location and claimed to have found a spider in the dust mop.

132.    Many of the accounts which Mai Lou received from Jani-King of Minnesota were underbid and provided her with less than minimum wage (after payment of Jani-King of Minnesota's fees). Among these underbid accounts were ABC, Kaneb Pipe, St. Paul Curling Club, Penner, Graffic Traffic, and Northern Technologies.

133.    Mai Lou did not learn or become aware of the facts or circumstances surrounding these breaches of their Franchise Agreement and violations of the Minnesota Franchise Act until months after she signed her Franchise Agreement and began working with Jani-King of Minnesota, i.e., after October 2005.

134.    Mai Lou did not discover that Jani-King of Minnesota failed to act in good faith or deal fairly with her and that Jani-King of Minnesota refused to provide the support that had been promised until at least October 2005. Until October 2005, Jani-King of Minnesota prevented Mai Lou from discovering all the facts which are the basis of this action. Mai Lou could not have, through the use of reasonable diligence, discovered these facts prior to October 2005.

47

### H.   Relationship between Jani-King and Eng Thao and Choua Moua.

135.   Plaintiffs Eng Thao and Choua Moua purchased a franchise from Jani-King of Minnesota employee Sue Swenson on or about October 28, 2005. On or before that date, Eng Thao and Choua Moua received a Jani-King of Minnesota UFOC. They relied upon the statements made by Sue Swenson and the statements in the UFOC in reaching the decision to purchase a Jani-King franchise.

136.   Eng Thao and Choua Moua paid $20,662.50 to Jani-King of Minnesota as the franchise fee with a promise that they would receive $6,000 in monthly income from cleaning accounts provided or referred by Jani-King of Minnesota.

137.   Eng Thao and Choua Moua attended and completed the Jani-King training program and purchased the required equipment by or in December 2005. As is the normal course and practice, during this training and orientation session, Jani-King of Minnesota employees Steve Schmidt and Mike Moriarity asked about the geographic areas where they preferred to work, to which Eng and Choua explained that they wanted to be offered accounts in or around the Minneapolis area. One of the accounts which Mike Moriarity offered them was an American Legion in Excelsior/Minnetonka which was too far away from their desired cleaning area but for which they felt they had to accept because they were getting no other referrals (and had paid a lot of money to Jani-King of Minnesota).

138.   Eng Thao and Choua Moua did not learn or become aware of the facts or circumstances surrounding these breaches of their Franchise Agreement and violations of the Minnesota Franchise Act until months after they signed the Franchise Agreement and began working with Jani-King of Minnesota, i.e., after October 2005.

48

I.     **Relationship between the Other Plaintiffs and Jani-King.**

139.    The other Plaintiffs named herein have experienced many of the same or similar wrongs and unlawful conduct on the part of the Defendants. Rather than describe and detail each and every one of their circumstances, Plaintiffs repeat and reallege the above and the general allegations as it pertains to their own franchises. For example, most, if not all, of the Plaintiffs have experienced underbidding of their accounts by Jani-King; most, if not all, of the Plaintiffs have not received the promised/guaranteed amount of initial business offerings; most, if not all, of the Plaintiffs have had accounts taken away from them without satisfactory explanation and unfair and wrongful interference by Jani-King; most, if not all, of the Plaintiffs received UFOC's which contained the same misleading and untrue information; most, if not all, of the Plaintiffs have experienced the lack of support and bad faith directed at them by Jani-King. These are but a short list of the more egregious actions and misconduct of Jani-King of Minnesota as more fully described above. As to the material omissions described above, no one from Jani-King of Minnesota described the facts or schemes before the Plaintiffs executed their Franchise Agreements.

140.    Upon information and belief, and except as qualified herein, many of the above-named plaintiffs purchased their Jani-King franchises on or after July 17, 2005 and, therefore, their claims under the Minnesota Franchise Act are timely as a matter of course. As to the plaintiffs who purchased a franchise prior to that date, the following are the facts surrounding their discovery of the misrepresentations and omissions amounting to the Minnesota Franchise Act violations:

> (a) Khonekham and Nouphet Dejvongsa had an account taken from them without cause or warning in 2004. Jani-King of Minnesota refused to replace the improperly taken account

with additional business. By the end of the summer 2005, the Dejvongsas were no longer cleaning for Jani-King of Minnesota and they have not been offered any accounts since that time. At or after the end of the summer 2005, and upon Jani-King's refusal to restore the improperly taken account, the Dejvongsas became aware of some of the facts and schemes described herein to the effect that Jani-King of Minnesota had violated the Minnesota Franchise Act.

(b) Diego Cortes was offered his first account to clean on or after July 19, 2005; therefore the acts that constitute the violation of the Franchise Act (i.e., underbidding of accounts) were not discovered until or after that date.

(c) Mohammed Egal, Mohamed Osable, Hussein Osable, Ifran Jimale, Layla Jimale and Mohamed Jimale had an account taken from them in the summer of 2006 by Steve Schmidt without any opportunity to cure any alleged defect. The acts that constitute the violation of the Minnesota Franchise Act were not discovered until that time or later.

(d) Rexhep Krasniqi purchased his franchise on June 24, 2005. Mike Moriarity, who began working for Jani-King of Minnesota in June or July of 2005, tried for over a year to take several accounts from him. Due to events of Jani-King of Minnesota's own doing (they failed to bill the accounts on time, which led to delayed payment to Rex, which led to him being unable to pay his employees on time, which led to them not cleaning the accounts for a short period of time), Moriarity was finally able to take the accounts from Rex. These acts that constitute the violation of the Minnesota Franchise Act were not discovered until such time as the accounts were improperly taken, which was approximately one year after Mike Moriarity began working of Jani-King of Minnesota.

(e) Tou Lor and Mai Moua Vue cleaned an account, starting in May 2005 for 1.5 to 2 years before it was improperly taken from them without reason or the opportunity to cure. The acts that constitute the violation of the Minnesota Franchise Act were not discovered until the time that account was improperly taken.

(f) Wa Her Moua received his initial business sign-off sheet in August 2005. He refused to sign the sheet because the

50

accounts listed as 'declined' were never offered to him.
These acts constitute the violation of the Minnesota Franchise
Act and were not discovered until August 2005.

(g) John and Judy Schroeder had their accounts improperly taken
from them in October 2007. Jani-King of Minnesota failed to
provide them with the contracted support to retain these
accounts and also failed to replace the lost accounts. These
acts constitute the violation of the Minnesota Franchise Act
and were not discovered until October 2007.

(h) In July 2005, Kou Thao and Yang Xiong sent a letter to Jani-
King of Minnesota requesting that their money be returned
because Jani-King of Minnesota never offered them the Initial
Business as agreed upon by the parties. On July 27, 2005,
Jani-King of Minnesota responded to Kou and Yang and
replied that they were allegedly offered seven accounts but
had declined them. Kou and Yang were never offered these
accounts by Jani-King of Minnesota, and it was upon or after
receiving the July 27, 2005 letter that Kou and Yang became
aware of some of the facts and schemes described herein to
the effect that Jani-King of Minnesota had violated the
Minnesota Franchise Act.

(i) Dual Cykao Thao and Xong Thao Yang had two accounts
improperly taken without reason or the opportunity to cure in
October 2007. These acts constitute the violation of the
Minnesota Franchise Act and were not discovered until
October 2007.

(j) Kevin Vilavong cleaned an account without incident or
complaint for three years. Jani-King of Minnesota never
inspected the account during the three years. In early 2007,
however, Jani-King of Minnesota inspected the account, and
shortly thereafter Kevin started getting complaints, even
though the level of cleaning remained consistent. Mike
Moriarity used these 'manufactured' complaints to pressure
Kevin into turning in the account, which he did in July 2007.
These acts constitute the violation of the Minnesota Franchise
Act and were not discovered until 2007.

(k) Chong Xiong was driven out of the business in the early part
of 2007 due to Jani-King of Minnesota's lack of support and
failure to offer him accounts to clean. At or after this time,
and upon Jani-King of Minnesota's failure to support Chong

51

and offer cleaning accounts to him, Chong Xiong became aware of some of the facts and schemes described herein to the effect that Jani-King of Minnesota had violated the Minnesota Franchise Act.

(l) Blia Yang and Ying Cheng purchased their franchise in November 2004. They were offered accounts between March 2005 and July 29, 2005. At some point after July 29, 2005, Blia Yang and Ying Cheng received an initial business fulfillment letter from Jani-King of Minnesota which improperly listed accounts as being declined, even though there were not declined by Blia Yan and Ying Cheng. At this time, they discovered the facts to support their violation of the Minnesota Franchise Act claim.

## COUNT I

### Breach of Contract

(As to Defendant Jani-King of Minnesota)

Plaintiffs incorporate paragraphs 1-140 as if fully set forth herein.

141.    As set forth above, Jani-King of Minnesota made various promises and covenants and reached agreements with Plaintiffs, including, but not limited to the following:

(a)    That Jani-King of Minnesota would provide Plaintiffs with a certain amount of cleaning business income each month based on the amount of their franchise payment.

(b)    That Jani-King of Minnesota would provide support and assistance to Plaintiffs' franchise, as well as ongoing inspection and monitoring services.

(c)    That Jani-King of Minnesota would provide Plaintiffs with a reasonable time period to correct any deficiencies in his cleaning performance prior to contacting the account holder.

52

142.     Jani-King of Minnesota materially breached its promises, covenants and agreements with Plaintiffs as described and set forth above by, among other things, failing to perform as it represented, promised and agreed.

143.     As a direct and proximate result of Jani-King of Minnesota's material breaches of its agreements with Plaintiffs, Plaintiffs have been damaged in an amount in excess of $50,000.

**COUNT II**

**<u>Breach of Implied Covenant of Good Faith and Fair Dealing</u>**

(As to Defendant Jani-King of Minnesota)

Plaintiffs incorporate paragraphs 1-143 as if fully set forth herein.

144.     Implied within the contracts and agreements between Jani-King of Minnesota and Plaintiffs is a duty of good faith and fair dealing which requires that each party to the agreement do nothing destructive of the other's rights and reasonable expectations to benefit from the contracts or to obstruct the other's fair and reasonable performance of and under the contracts.

145.     This implied covenant also requires honesty and the observance of reasonable commercial standards of fair dealing in the trade in the parties' performance of their business dealings arising out of their contracts.

146.     The actions and inactions of Jani-King of Minnesota and its representatives, including but not limited to the following acts, constitute a breach of the implied covenant of good faith in fair dealing:

      (a)     Offering accounts to Plaintiffs that would require the franchisee to clean at a time of the day that Jani-King of Minnesota and its representatives knew the franchisee was unavailable to clean. This conduct occurred despite Jani-King of Minnesota's and its

53

representatives' assurances to the franchisees that they would not require them to clean during these time periods.

        (b)    Contacting account customers and directing or inducing them, both intentionally and indirectly, to make complaints about Plaintiffs' performance of their cleaning services, in exchange for which Jani-King of Minnesota and its representatives would then replace the franchisee performing the cleaning with a new franchisee, and in some instances at a reduced rate.

        (c)    Jani-King of Minnesota and its representatives knowingly and intentionally offered more than one account to many Plaintiffs for the same period of time during the day (overlapping accounts), these accounts being in such divergent geographic locations so as to make acceptance of both accounts impossible. Jani-King of Minnesota and its representatives then counted the refused account(s) against the Plaintiffs' contractually guaranteed monthly business amount.

        (d)    Failing to make reasonable bids for the amount of work and time necessary to perform the contracted-for work or forced Plaintiffs to perform cleaning work beyond the scope of the contract for little or no additional consideration and payment.

    147.    As a direct and proximate result of Jani-King of Minnesota's actions, as laid out above and in the statement of facts, Plaintiffs' ability to satisfy the terms of the franchise agreements and realize the purported benefits thereof were unreasonably frustrated and obstructed by Jani-King of Minnesota's violation of the implied covenant of good faith and fair dealing between them.

    148.    Jani-King of Minnesota materially breached its implied covenant of good faith and fair dealings with Plaintiffs as described and set forth above.

149.    As a direct and proximate result of Jani-King of Minnesota's material breaches of its implied covenant within its agreements with Plaintiffs, Plaintiffs have been damaged in an amount in excess of $50,000.

## COUNT III

### Violation of the Minnesota Franchise Act

(As to Jani-King of Minnesota, George Selman and Steve Schmidt)

Plaintiffs incorporate paragraphs 1-149 as if fully set forth herein.

150.    Jani-King of Minnesota sold Plaintiffs franchise opportunities as defined by the Minnesota Franchise Act, Minn. Stat. § 80C.01 *et seq.*

151.    Jani-King of Minnesota is a franchisor as defined by the Minnesota Franchise Act, Minn. Stat.§ 80.01, subd. 6.

152.    The Minnesota Franchise Act governs the relationship between the parties because each Plaintiff bought a franchise or franchises located in Minnesota, and each franchise was sold by Jani-King of Minnesota in Minnesota.  Minn. Stat.  § 80C.19, subd. 1.

153.    The Minnesota Franchise Act establishes an "anti-waiver" provision, which provision specifies that any purported waiver of rights under the Act (i.e. contractual choice of law clause) is void.  Minn. Stat.  § 80C.21.

154.    It is unlawful under the Minnesota Rules promulgated pursuant to the Minnesota Franchise Act by the Minnesota Department of Commerce for a franchisor to make or cause to be made any statement or representation that is contrary to any disclosure made in the public offering statement.  Minn. Rule 2860.45000(B)(1).

155.    It is also unlawful under the Minnesota Franchise Act § 80C.13, subd. 2., for a franchisor to:

55

offer or sell a franchise in this state by means of any written or oral
communication which includes an untrue statement of a material fact
or which omits to state a material fact necessary in order to make the
statements made, in light of the circumstances under which they were
made, not misleading.

156.    As described above, Defendants Jani-King of Minnesota, George Selman and

Steve Schmidt, in connection with the offer and sale of the franchises, made written and oral

untrue statements of material fact and omitted to state material facts necessary in order to make

those statements not misleading in violation of Minn. Stat. § 80C.13, subd. 2, as further outlined

in the above-described statement of facts.  For example and not exhaustively, Jani-King of

Minnesota and its representatives informed Plaintiffs that they could accept or decline accounts,

but did not tell them that by declining such accounts, the declined accounts also count towards

the Plaintiffs' initial business offering.  They further told the Plaintiffs that they would have an

opportunity to cure any deficiencies in their work before the account is taken from them.  Instead,

Plaintiffs received calls from Jani-King of Minnesota and its representatives and were informed

that their work at certain accounts was deficient and that the account person has already signed a

document transferring that account to another franchisee without any opportunity to cure.  Jani-

King of Minnesota and its representatives further prohibited the Plaintiffs from contacting or

speaking with that account person to understand why the account was taken.  Jani-King of

Minnesota and its representatives made other misleading statements to Plaintiffs, both in the

UFOC and in their meetings and dealings with Plaintiffs.  The material omissions are also

described above in greater detail in that neither Jani-King of Minnesota, nor George Selman or

Steve Schmidt informed the Plaintiffs of the omitted material facts.

157.    Jani-King of Minnesota also made untrue statements in its UFOC about the

percentage of franchisees who received an offer of initial business as set forth above.

56

158.     Jani-King of Minnesota failed to fully disclose or provide sufficient details of the litigation history and settlements reached between it and other franchisees.

159.     As alleged above, Plaintiffs only recently have learned or discovered, on or after July 17, 2005, these violations of the Minnesota Franchise Act and, therefore, their causes of action are deemed to have commenced within the applicable three-year statute of limitations.

160.     As a direct and proximate result of Defendants' untrue statements of material fact and material omissions in violation of Minn. Stat. § 80C.13, subd. 2, (as described above and in the statement of facts) and general violations of Minn. Stat. § 80C.01 et seq., Plaintiffs are entitled to rescission of the franchise agreement contracts and to recover from Defendants their damages in an amount not yet determined, but which is reasonably estimated to exceed $50,000

## COUNT IV

### Fraud/Misrepresentation By Omission

(As to Jani-King of Minnesota)

Plaintiffs incorporate paragraphs 1-160 as if fully set forth herein.

161.     The representations, omissions, and conduct of Defendants, including but not limited to those set forth in Plaintiffs' statement of facts above, were made with the intention that Plaintiffs rely on them in making their decision as to whether they should become and remain Jani-King franchisees, operate Jani-King franchises, and pay considerable franchise and other fees to Jani-King of Minnesota.

162.     In reliance on the various representations made to them by Defendants and the material facts omitted from disclosure, as described in the Plaintiffs' statement of facts, Plaintiffs became Jani-King franchisees, paid initial and ongoing franchise and other fees to Jani-King of Minnesota, expended significant sums of money to purchase equipment and other required items

57

to operate their franchises, and expended significant time, money and effort in opening and operating their Jani-King franchise.

163.     The representations made by or on behalf of Defendants as set forth above were false, or omitted to state information necessary to not make them misleading.

164.     Plaintiffs were deceived by the misrepresentations and omissions of Defendants set forth above.  For example, Jani-King of Minnesota and its representatives, including Sue Swenson, Steve Schmidt and George Selman, represented to Plaintiffs that they would provide them with monthly business ($7,000 per month for Kua and Maiku, and $2,000 per month for the Martinezes) based on the amount of franchise fees paid.  However, Jani-King of Minnesota and its representatives knew or should have known that they did not have a sufficient amount of business to satisfy those obligations to Plaintiffs and all other franchisees.  Many of the other Plaintiffs experienced similar, if not identical problems and could only have received far less than what they were promised in guaranteed income.  Jani-King of Minnesota did not disclose these material facts to Plaintiffs.

165.     Additionally, Jani-King of Minnesota and its representatives, including Sue Swenson, George Selman and Steve Schmidt, represented to the Plaintiffs that Plaintiffs would have an opportunity to cure any flaws in their cleaning within a certain time period, but instead, Jani-King of Minnesota and its representatives would specifically point out flaws to the account people and remove that account from the Plaintiffs without giving them the promised opportunity to cure.  Jani-King of Minnesota did not disclose these material facts to Plaintiffs.

166.     Jani-King of Minnesota and its representatives, including Sue Swenson, Steve Schmidt and George Selman, represented that income potential for Plaintiffs was limited only by Plaintiffs' desire and ability to work hard.  By way of the terms of the UFOC and the Franchise

58

Agreements, Jani-King of Minnesota and their representatives represented to Plaintiffs that they would provide account support to Plaintiffs, such support to include periodic inspection, account referrals, account bidding services, and opportunities to cure alleged defective cleaning, among other things. Jani-King of Minnesota and its representatives, including Sue Swenson, Steve Schmidt and George Selman, represented to Plaintiffs that Jani-King of Minnesota and its representatives would refrain from offering accounts that they knew were not serviceable by the specific Plaintiffs for reasons such as time conflicts with other jobs, distance from Plaintiff's home/other work cites, or due to religious beliefs. All of these representations were made to induce the Plaintiffs into purchasing a Jani-King franchise. No one from Jani-King of Minnesota disclosed the material facts necessary to prevent these statements from being misleading.

167.    Plaintiffs reasonably relied upon the statements, the omissions, and representations of Jani-King of Minnesota in making their decision as to whether they should become and remain Jani-King franchisees, operate Jani-King franchises, and pay considerable franchise fees, equipment fees and other fees to Jani-King of Minnesota.

168.    Jani-King of Minnesota has committed intentional and/or negligent misrepresentation in its representations and omissions to the Plaintiffs, as described above, in violation of the common law of Minnesota.

169.    As a direct and proximate result of Jani-King of Minnesota's misrepresentations and omissions, Plaintiffs have incurred substantial past and continuing damage, including, without limitation, the franchise, royalty and other fees paid to Jani-King of Minnesota, start-up and ongoing costs, and lost profits, among other damages. Plaintiffs are entitled to recover direct and consequential damages from Jani-King of Minnesota in an amount not yet determined, but which is reasonably estimated to be in excess of $50,000.

## COUNT V

### Unjust Enrichment

(As to Jani-King of Minnesota)

Plaintiffs incorporate paragraphs 1-169 as if fully set forth herein.

170.    Through the conduct described above, Jani-King of Minnesota has been unjustly enriched under the common law of Minnesota.

171.    In order to induce Plaintiffs to enter into a franchise relationship with Jani-King of Minnesota and to pay initial and ongoing franchise and other fees, Jani-King of Minnesota made representations and promises to Plaintiffs, including but not limited to those set forth in Plaintiffs' statement of facts above, and failed to disclose material information to Plaintiffs.

172.    Plaintiffs reasonably relied upon these promises, omissions, and conduct in deciding to become and remain Jani-King franchisees, and Plaintiffs would not have become and remained Jani-King franchisees and paid the franchise fees and other amounts to Jani-King of Minnesota, absent these above stated promises, misrepresentations and conduct.

173.    Jani-King of Minnesota has received a substantial financial benefit as a result of Plaintiffs becoming franchisees, and Plaintiffs would not have become and would not have remained Jani-King franchisees, and paid the franchise fees and other amounts to Jani-King of Minnesota, absent the above-stated untrue promises and other misconduct.

174.    Jani-King of Minnesota has received a substantial financial benefit as a result of Plaintiffs becoming and remaining Jani-King franchisees, including substantial and ongoing franchise and other fees, as well as receipt of all benefits arising out of Plaintiffs' investments to own and operate Jani-King franchises.