# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Teng Moua, Juan Martinez, Cheri Martinez, Kua
Vang Xiong, Maiku Thao, Cherpao Yang, Bee
Vang, Vang Pao Moua, Mailou Xiong Yang,
Vangxue Yang, Eng Thao, Choua Moua, Meshack
Balira, Ferdinand Nyambarya, VMS Inc., Richard
Chang, Lee Wong Chang, Khonekham Dejvongsa,
Nouphet Dejvongsa, Diego Cortez Dominguez,
Mohamud Egal, Mohamed Osable, Hussein Osable,
Ifran Jimale, Layla Jimale, Mohamed Jimale, Paul
Bel George, Chue Hang, Tong Thao Hang, Rexhep
Krasniqi, Tou Lor, Mai Moua Vue, Arif Metushi,
Wa Her Moua, Mee Yang, John Schroeder, Judy
Schroeder, Berhane Tesfai, Dual Cykao Thao,
Xong Thao Yang, Kou Thao, Yang Xiong, Kevin
Vilavong, Chong Xiong, Ko S. Xiong, Blia Yang,
Ying Cheng, Chang Yang, Choua Lor, Mai Blia
Yang, Pang Yang, Lue Her, for themselves and all
other persons similarly situated as franchisees of
Jani-King of Minnesota, Inc. and Jani-King
International, Inc.,

|  |  |
|---|---|
| Plaintiffs, | **MEMORANDUM OPINION AND ORDER** Civil No. 08-4942 ADM/TLN |
| v. |  |

Jani-King of Minnesota, Inc., a Texas Corporation,
Jani-King International, Inc., a Texas Corporation,
George Selman, a Minnesota resident, and Steve
Schmidt, a Minnesota resident,

Defendants.

_____

Michael W. Haag, Esq., Thomas W. Pahl, Esq., Jamie L. Habeck, Esq., and Christopher C.
Grecian, Esq., Foley & Mansfield, PLLP, Minneapolis, MN, on behalf of Plaintiffs Cherpao Yang,
Diego Cortez Dominguez, and Paul Bel George.

Kerry L. Bundy, Esq., Aaron D. Van Oort, Esq., William L. Killion, Esq., Christopher J.L.
Diedrich, Esq., Eileen M. Hunter, Esq., and Myriam Pierre Warren, Esq., Faegre & Benson,
LLP, Minneapolis, MN, on behalf of Defendants.

_____

## I.  INTRODUCTION

On July 7, 2011, the undersigned United States District Judge heard oral argument on Defendants Jani-King of Minnesota, Inc.'s, Jani-King International, Inc.'s (collectively "Jani-King"), and George Selman's ("Selman") Motion for Summary Judgment [Docket No. 148]. Plaintiffs Cherpao Yang ("Yang"), Diego Cortes[1] Dominguez ("Dominguez"), and Paul Bel George ("George") individually assert claims under the Minnesota Franchise Act, Minn. Stat. §§ 80C.01-30, and under the Minnesota False Statement in Advertisement Act, Minn. Stat. § 325F.67, as well as claims for fraud, breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, quantum meruit, and vicarious liability.  Defendants (Selman and Jani-King are collectively "Defendants") move for summary judgment on these claims as to each of the three individual Plaintiffs.  For the reasons set forth below, Defendants' motion is granted in part and denied in part.

## II.  BACKGROUND[2]

Jani-King sells franchises to perform cleaning or janitorial work.  Am. Compl. [Docket No. 54] ¶ 45.  Jani-King advertises the sale of its franchises and arranges in-person meetings with those interested in becoming franchisees.  See Selman Decl. [Docket No. 151] ¶ 6.  In Minnesota, during the times relevant to the claims here, potential franchisees typically met either

---

[1] The caption and Complaint in this matter list Diego Cortez Dominguez among the named Plaintiffs.  In their submissions, the parties refer to this individual as Diego Cortes Dominguez.  The Court will also refer to him as Diego Cortes Dominguez, notwithstanding the caption and Complaint.  To further avoid confusion, he will be referred to as "Dominguez" rather than his complete surname "Cortes Dominguez."  See Hunter Decl. Ex. 12 ("Dominguez Dep.") 53:20-22 (noting that Plaintiff's entire last name is Cortes Dominguez).

[2] On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party.  Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995).

with Jani-King employee Sue Swenson ("Swenson") or Regional Director Defendant George Selman ("Selman").  See id. ¶ 3.

Jani-King has a standard franchise agreement (the "Franchise Agreement") for its franchisees.  At the in-person meeting, Jani-King employees explain the Jani-King business model, sometimes with the assistance of a PowerPoint slide-show presentation.  Id. ¶ 6.  In Minnesota, as required by Minnesota law, Jani-King provides potential franchisees with a Uniform Franchise Offering Circular (the "UFOC").  See id.  The UFOC further explains the relationship between Jani-King as franchisor and its franchisees, and discloses pertinent information including past and pending litigation involving Jani-King.  See generally Hunter Decl. [Docket No. 152] Ex. 4 (the "UFOC").  The UFOC also states: "We do not furnish or authorize our salespersons or any employees to furnish any oral or written information concerning the actual or potential sales, costs, income or profits of a JANI-KING franchise." UFOC at JK Moua 001115.  Despite this written recitation, Plaintiffs allege that Jani-King employees did promise them a guaranteed monthly income.  See First Am. Compl. ¶ 49. Further, during the in-person meetings Jani-King personnel often make optimistic statements about the potential for success of franchisees. See, e.g., Yang Dep. 22:4 (attributing Swenson with saying "buying [a Jani-King franchise] is good"); Hunter Decl. Ex. 21 ("George Dep.") 49:16-17 (attributing Swenson with saying that "the sky would be [the] limit" for a Jani-King franchisee).

After paying the franchise fee, signing the Franchise Agreement, attending all required Jani-King training (which included business advise and teaching of the Jani-King cleaning methods), purchasing equipment, supplies, and insurance, and opening a business checking

account, Plaintiffs began operating their Jani-King franchises by servicing client accounts.  See

Selman Decl. ¶¶ 13, 22.

The Franchise Agreement obligates Jani-King to offer franchisees the right to service

client accounts.  E.g., Hunter Decl. Ex. 10 ("Yang Franchise Agreement") § 6.1.1.  Jani-King's

obligation to offer accounts to franchisees is measured by the dollar amount billed to accounts

each month.  See id.  The size of Jani-King's obligation is determined by the franchise "plan"

purchased by franchisees.  For example, if a franchisee purchases "Plan B," Jani-King is

obligated to offer accounts with gross monthly billings of $1,000 within 120 days of the

franchisee obtaining necessary equipment and supplies, completing training, and providing Jani-

King with proof of insurance.  See id. at PL013146, § 6.1.1.

The parties refer to the obligation to offer these accounts as the Initial Business

Obligation ("IBO").  The IBO associated with the various plans increases as the price of each

plan increases.  UFOC at JK Moua 001063.  Jani-King must replace accounts offered as part of

the IBO if the client cancels the account through no fault of the franchisee before the franchisee

has serviced the account for twelve full months.  E.g., Yang Franchise Agreement § 4.17(2).

Under the Franchise Agreement, Jani-King is obligated only to *offer* accounts with total monthly

billings exceeding the IBO amount.  Id. §§ 6.1.1, 6.5.  Therefore, if a franchisee is offered an

account but declines to service that account, the monthly billings of that account are counted

against the IBO amount.

Plaintiffs in this action claim that this method of calculation of the IBO was not disclosed

to them, but rather that Jani-King personnel represented Jani-King would continue to offer

accounts until the franchisee had accepted accounts with gross monthly billings in excess of the

IBO amount.  Furthermore, while not contractually obligated to do so, Jani-King also offers, from time to time, the right to service accounts in addition to the IBO.  Selman Decl. ¶ 14.

The Franchise Agreement obligates Jani-King to offer accounts only in "the Territory," which is comprised of the Minnesota counties that are generally regarded as the Twin Cities metropolitan area.  See, e.g., Yang Franchise Agreement at PL013146, § 6.1.1.  However, Jani-King has franchisees designate a "preferred area" within the Territory.  See, e.g., Hunter Decl. Ex. 8 ("Yang Franchise Application").

In addition to the UFOC and Franchise Agreement, Jani-King publishes a "Policy and Procedures Manual" (the "Manual").  The Manual is incorporated, along with the UFOC, into the Franchise Agreement.  E.g., Yang Franchise Agreement § 12.3.  The Manual sets forth policies and procedures for both Jani-King as franchisor and its franchisees.  Among the topics discussed in the Manual are procedures for handling complaints by clients and the reassignment or transfer of accounts between franchisees.  Grecian Decl.[Docket No. 154] Ex. 4 ("the Manual") §§ 4.11-4.12, § 4.22.

Plaintiffs are each current or former franchisees of Jani-King that assert eight claims against Jani-King as franchisor.  This case was originally a putative class action, but Plaintiffs' Motion for Class Certification was denied by Order [Docket No. 101] dated March 12, 2010.  Plaintiffs then proceeded jointly through discovery.  The parties agreed that Jani-King would move for summary judgment on the claims of three representative Plaintiffs, Cherpao Yang, Diego Cortes Dominguez, and Paul Bel George, before further summary judgment motions are filed.

## III. DISCUSSION

### A.      Standard of Review

Federal Rule of Civil Procedure 56(a) provides that summary judgment shall issue "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing Fed. R. Civ. P. 56(c));[3] Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986) (same); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (same).  On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party.  Ludwig, 54 F.3d at 470.  The nonmoving party may not "rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial."  Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

### B.      Cherpao Yang

#### 1.      Facts Specific to Cherpao Yang

Plaintiff Cherpao Yang became interested in purchasing a Jani-King franchise in the summer of 2005.  See Hunter Decl. Ex. 7 ("Yang Dep.") 23:11-24:23.  He called Jani-King's Minnesota regional office and talked with Swenson.  Yang Dep. 20:13-18.  Swenson told Yang "[Jani-King] is a good business" and "If you buy more, you'll get more."  Yang Dep. 20:15-17.

Yang and Swenson then met in person on July 22, 2005.  Yang Dep. 24:22-23.  Yang was told that if he did a good job he would be in business "for a long time."  Yang Dep. 35:3-5. During the meeting, Yang was provided with the UFOC, which he had trouble understanding

---

[3] Federal Rule of Civil Procedure 56 was amended effective December 1, 2010; the summary judgment standard was previously located in Rule 56(c).

due to his limited proficiency in English, although he had brought his English-speaking son to the meeting to mitigate that problem.  Yang Dep. 30:40-32:14.

Yang signed his Franchise Agreement on September 12, 2005.  Yang Dep. 28:25-29:3. He purchased "Plan B," which cost $3,000 and was associated with a $1,000 per month IBO. Yang Franchise Agreement at PL013146.  When executing the Franchise Agreement, Yang wrote "none" on an acknowledgment form that asked if Jani-King made any representations about sales, income, or profit levels.  Diedrich Decl. [Docket No. 160] Ex. 1 at PL013099.  At his deposition, Yang agreed that no misrepresentations regarding expected profits were made. Yang Dep. 83:19-23.  However, in his Answers to Interrogatories, Yang avers that Jani-King orally guaranteed him $1,000 month in gross monthly billings.  Hunter Decl. Ex. 9 at 5.  At the time he signed the Franchise Agreement, Yang expressed a preference for accounts in the area of Brooklyn Center and Fridley, Minnesota.  Hunter Decl. Ex. 8.  Further, Yang claims that Swenson orally promised him that all his business would be in his preferred area.  Yang Dep. 42:9-15.

Jani-King's initial account offer to Yang was in Eagan, Minnesota, outside of his preferred area, and was declined.  Hunter Decl. Ex. 11.  Later, Yang was offered the Luther Group account in Brooklyn Park, Minnesota, and he accepted the account.  Id.  That account initially had gross monthly billings of $1,431, and later increased to $1,683.  Id.  Yang also accepted an account with an Applebee's restaurant in his preferred area with gross monthly billings of $1,200.  Id.

Sometime prior to December 2007, the Luther Group moved and Yang was instructed to stop servicing the account.  Yang Dep. 54:7-18.  After the Luther Group completed its move,

Yang went to the new location to resume servicing the account.  See Yang Dep. 55:20-23.  Upon

arriving at the new location, Yang learned that a non-Jani-King franchisee had begun servicing

the account.  Yang Dep. 55:23-56:11.  Yang claims that Jani-King promised him a replacement

account, but never provided him one.  Yang Dep. 68:5-13.  Yang continued servicing the

Applebee's, his only remaining account, until January 2009 when the restaurant canceled its

account.  Hunter Decl. Ex. 11.  With no remaining accounts, Yang took another job and ceased

operating a Jani-King franchise.  Yang Dep. 102:14-103:23.

## 2.      Common Law Fraud and Minnesota Franchise Act ("MFA") Claims

The parties agree that Minnesota law applies to Yang's common law fraud claim.  Under

the common law of Minnesota, the elements of fraud are: (1) a false representation of a past or

present material fact which was susceptible of knowledge, (2) the defendant knew the

representation was false or made it without knowing whether it was true or false, (3) an intention

to induce plaintiff to act in reliance on the misrepresentation, (4) the representation caused the

plaintiff to act in reliance thereon, and (5) and the plaintiff suffered pecuniary damage as a result

of the reliance. Hoyt Props., Inc. v. Prod. Res. Group, L.L.C., 736 N.W.2d 313, 318 (Minn.

2007) (quoting Specialized Tours, Inc. v. Hagen, 392 N.W.2d 520, 532 (Minn. 1986)).  Reliance

in common law fraud cases must be reasonable.  Hoyt Props., 736 N.W.2d at 321.  It is

unreasonable as a matter of law to rely on a representation that is "completely contradicted" by

the terms of a written agreement.  Crowell v. Campbell Soup Co., 264 F.3d 756, 762 (8th Cir.

2001).  Further, because fraud requires a misrepresentation concerning a past or present material

fact susceptible of knowledge, statements of prediction, opinion, or "puffery" cannot form the

basis of a fraud claim.  Minn. Forest Prods., Inc. v. Ligna Mach., Inc., 17 F. Supp. 2d 892, 909

(D. Minn. 1998) (citations omitted).

Yang also asserts a statutory claim sounding in fraud under the MFA.  The MFA prohibits communication of any "untrue statement of a material fact" or any omission that would be necessary to make a previously made statement not misleading.  Minn. Stat. § 80C.13. Yang's common law fraud and MFA claims fail because Jani-King made no untrue statements of material fact or misrepresentations.

First, the statement to Yang that "[i]f you buy more, you'll get more" is not untrue.  The undisputed facts are that Jani-King structures its franchising to correlate the amount of the IBO with the amount of initial investment by the franchisee.  See UFOC at JK Moua 001063. Therefore, the more the franchisee invests, the higher the IBO will be, and the monthly billings of accounts offered by Jani-King will be higher.  It is true, then, that the more a franchisee buys, the more he will receive in gross billings of offered accounts.  Of course, any franchisee is free to turn down offered accounts, but if he accepts the accounts he has received more gross account billings than if he had invested less.

The statements that: (1) owning a Jani-King franchise was a "good business" and (2) the business could continue for "a long time" are not untrue statements of material fact or fraudulent because they are puffery as a matter of law.  Generally speaking, puffery includes statements that are either exaggerated boasting or vague, subjective statements of product superiority.  Bernstein v. Extendicare Health Servs., Inc., 607 F. Supp. 2d 1027, 1031 (D. Minn. 2009) (citations omitted).  Statements that a franchise is a "good business" or will continue for a "long time" are vague statements of superiority.  These typical sales statements cannot be material to a serious business decision and do not form the basis of an actionable fraud or MFA claim.

9

Yang's counsel contends that Jani-King's puffery must be evaluated in the context of his lack of sophistication as a franchise consumer because he is an immigrant with limited proficiency in English and limited business acumen.  Immigrants, even those with limited English skills and no business experience, are not a group so gullible that they cannot recognize obvious puffery.  Yang cites <u>Hollerman v. F.H. Peavey & Co.</u>, 130 N.W.2d 534, 540 (Minn. 1964) and <u>Berryman v. Reigert</u>, 175 N.W.2d 438, 443 (Minn. 1970), to support the proposition that the "equality" of parties is a factor in determining what is puffery.  There the challenged statements were much more specific than those here.  Regardless of education or experience, consumers expect to hear *some* level of non-specific and optimistic references to a product's quality by its seller.  Here, the identified statements are obviously so vague and subjective that no reasonable juror could say that they were anything but puffery.

Yang also argues that Jani-King falsely represented a guarantee of $1,000 per month in account billings.  No genuine issue of material fact exists that such a statement was ever made.  During his deposition, Yang, with the assistance of an interpreter, responded "yes" to the question "nobody made any promises to you about the sales income or profit levels before you signed your Franchise Agreement; is that correct?"  Yang Dep. 83:19-23.  Further, Yang admitted that he had not read his Answers to Interrogatories.  Yang Dep. 118:8-10.  Therefore, there is no *genuine* fact issue; Yang admits that he was not promised any level of profits or income.  <u>See</u> <u>Canal Ins. Co. v. Kwik Kargo, Inc. Trucking</u>, Civil No. 08-439, 2009 WL 1086524, at *3 (D. Minn. April 21, 2009) (noting that party cannot create an issue of fact by relying on interrogatory answers contradicted by deposition testimony).

To counter this contradiction, Yang next argues his deposition must be read in the

context of the leading questions being asked of him.  The deposition transcript, while

occasionally muddled, clearly shows that Yang testified that he truthfully wrote "none" on the

line about profit representations and reaffirmed that no promises regarding profit levels were

made to him.  Yang Dep. 83:11-23.  No objection was noted and Yang's counsel declined the

opportunity for redirect examination after that question was posed.  <u>See</u> Yang Dep. 83:19-23 (no

objection noted), 118:23 (declining to conduct redirect examination).

      Further, even if Yang's deposition could somehow be construed to be consistent with his

Answers to Interrogatories, any reliance on representations regarding profitability is

unreasonable as a matter of law because it is directly contradicted by the Franchise Agreement.

With respect to common law fraud, reasonable reliance is firmly entrenched as an element under

Minnesota law.  <u>See</u> <u>Hoyt</u> <u>Props.</u>, 736 N.W.2d at 321.  The parties dispute, however, whether

reasonable reliance is required under the MFA.  The Court need not resolve this issue because no

genuine issue of material fact exists that any representations regarding income or profit levels

were made to Yang.

      Assuming for argument only that his deposition could be read to create a genuine issue of

material fact, the Court is convinced that reasonable reliance is an element of a claim under the

MFA.  The question of reliance under the MFA has been subject to a difference of opinion in

this District.  <u>Compare</u> <u>Kieland v. Rocky Mountain Chocolate Factory, Inc.</u>, Civil No. 05-150,

2006 WL 2990336, at *8 (D. Minn. Oct. 8. 2006) (Frank, J.) (rejecting MFA claim premised on

earnings representation where contract disclaimed any representations regarding earnings) <u>with</u>

<u>Randall v. Lady of Am. Franchise Corp.</u>, 532 F. Supp. 2d 1071, 1086 (D. Minn. 2007) (Schiltz,

J.) ("[T]he Court is not convinced that justifiable or reasonable reliance is an element of a claim

for misrepresentation under the Minnesota Franchise Act."); <u>see also</u> <u>Ellering v. Sellstate Realty</u>

<u>Sys. Network, Inc.</u>, — F. Supp. 2d —, 2011 WL 2730919, at *10 n.13 (D. Minn. 2011) (Kyle, J.)

("To the extent <u>Randall</u> suggests that a plaintiff may succeed on an MFA claim with evidence

that he unreasonably relied upon the franchisor's representations, the Court declines to follow

it."). Yang relies entirely on <u>Randall</u> to support his contention that unreasonable reliance is

sufficient under the MFA.  <u>Randall</u>, however, merely suggested, without holding, that

unreasonable reliance could be sufficient under the MFA because that statute is remedial and

requires broad construction.  <u>Randall</u>, 532 F. Supp. 2d at 1087.  On the other hand, in <u>Kieland</u>

and <u>Ellering</u> the absence of reasonable reliance was essential to the holding of each case.  <u>See</u>

<u>Kieland</u>, 2006 WL 2990336, at *8; <u>Ellering</u>, 2011WL 2730919, at *9-10.  On that basis, this

Court would require reasonable reliance for a viable MFA claim.  Reliance is unreasonable as a

matter of law where an oral representation is completely contradicted by a governing written

instrument.  <u>Crowell</u>, 264 F.3d at 762.  Therefore, even if Yang's deposition could be read as he

urges, he has no cognizable MFA claim or common law fraud claim.

Finally, Yang argues that Jani-King had a duty to disclose that it did not have "sufficient"

business for him.  No genuine issue of material fact, however, exists to show that Jani-King did

not have enough business for Yang.  To the contrary, all evidence of record indicates that Jani-

King met its IBO within the contractual time period, and continued to do so as long as

contractually required.  Indeed, Yang serviced accounts for over two years with monthly billings

beyond the amount of the IBO.  <u>See</u> Hunter Decl. Ex. 11 (Yang Franchisee Account History

Sheet).

Given that no untrue statements of material fact or misrepresentations were made to Yang

as a matter of law, Jani-King is entitled to summary judgment on his common law fraud and MFA claims.

### 3.     Minnesota False Statement in Advertising Claim

The Minnesota False Statement in Advertisement Act ("MFSAA") prohibits the dissemination of an advertisement that "contains any material assertion, representation, or statement of fact which is untrue, deceptive, or misleading."  Minn. Stat. § 325F.67.  Because Yang contends Swenson guaranteed him $1,000 a month in business, he argues Item 19 of the UFOC falsely states "we [Jani-King] do not furnish or authorize our salesperson or any employees to furnish any oral or written information concerning the actual or potential sales, costs, income or profits of a JANI-KING franchise."  As discussed above, there is no genuine issue of material fact that Yang was ever made such a promise, the evidence of record indicates that he was not.  As such, no false statement was made, and Jani-King is entitled to summary judgment on Yang's MFSAA claim.

### 4.     Breach of Contract

Because § 12.3 of the Franchise Agreement incorporates the UFOC, Yang argues that Item 19 of the UFOC, the basis of his MFSAA claim, also forms the basis of his breach of contract claim.  Because no genuine issue of material fact exists that Yang was guaranteed he would have $1,000 monthly gross billings, a breach of contract cannot have occurred as a matter of law.  Furthermore, even if he were told that he would have guaranteed billings, he places the timing of the statement before the Franchise Agreement was signed and, "it is axiomatic that before there can be a breach of a contract there must be a contract."  Weissman v. Cole Prods. Corp., 269 F.2d 340, 341 (7th Cir. 1959).  Even if a contract-based claim could be asserted, and

even if a representation regarding profitability was made to him, his contract claim would fail because Yang would have known of the representation, should have read and known of the contradictory contract term, and yet executed the contract anyway.  See Thames v. Smith, 280 S.W. 859, 860 (Tex. Civ. App. 1926) ("A party who executes a contract cannot thereafter defeat or cancel same . . . if as a matter of fact at the time the representations were made and the contract was executed he knew that said representations were as a matter of fact false.").  Jani-King is entitled to summary judgment on this claim as well.

### 5.      Implied Covenant of Good Faith and Fair Dealing

"Under Minnesota law, every contract includes an implied covenant of good faith and fair dealing requiring that one party not 'unjustifiably hinder' the other party's performance of the contract." In re Hennepin Cnty. 1986 Recycling Bond Litig., 540 N.W.2d 494, 502 (Minn. 1995) (citations omitted).  The implied covenant of good faith and fair dealing serves only "to enforce existing contractual duties, and not to create new ones." Allen v. Thom, No. A07-2088, 2008 WL 2732218, at *5 (Minn. Ct. App. July 15, 2008).  Yang's claim fails because he seeks to vary the express terms of the contract by creating new duties for Jani-King.

Yang argues that Jani-King breached the implied covenant of good faith and fair dealing by (1) failing to offer him accounts in a convenient geographic location and (2) promising, but not finding, him a replacement account for the Luther Group. The record concerning Yang's preferred area is imprecise.  In his application he stated that his preferred area was the cities of Brooklyn Center and Fridley, Minnesota.  Hunter Decl. Ex. 8 at JK Moua 010126.  However, at his deposition, Yang admitted that in a questionnaire he stated that his preferred area consisted of the cities of Blaine, Minneapolis, Brooklyn Park, and Brooklyn Center, Minnesota.  Yang Dep.

43:21-44:15.  Further, he stated at his deposition that his first accepted account, the Luther

Group, was located in Brooklyn Park and that city was one in which he wished to work.  Id.

47:17-25.  Regardless, even if his preferred area did not include Brooklyn Park, Jani-King had

no contractual obligation to offer Yang only accounts in his preferred geographical area.  See

Yang Franchise Agreement § 6.1.1 (obligating Jani-King as franchisor to offer accounts in "the

Territory"); id. at PL013146 (defining "the Territory" to include Hennepin County, which

includes the city of Brooklyn Park).  Yang cannot use the implied covenant of good faith and fair

dealing to create an additional, narrower duty to offer accounts only in the preferred area.

Yang's theory of a promise to replace the Luther Group is similarly unavailing.  The

Franchise Agreement unambiguously creates no obligation on the part of Jani-King to replace

accounts after twelve months of servicing.  See Yang Franchise Agreement § 4.17(2) ("If an

account cancels at no fault of yours before you service the account for 12 full months . . . that

account will be replaced . . . .  Franchisor is not otherwise obligated to replace the accounts that

are serviced . . . .").  Yang serviced the Luther Group account for nearly two years.  Jani-King,

even if promises were made, had no contractual duty to replace it.  Yang cannot now rewrite that

agreement to create an ongoing obligation to replace accounts through the implied covenant of

good faith and fair dealing.

### 6.    Quasi-Contract

Yang also asserts claims under theories of unjust enrichment and quantum meruit.  Both

are equitable remedies commonly referred to as "quasi-contract" claims because they are

generally used in the absence of a contract between the parties.  See Taylor Inv. Corp. v. Weil,

169 F. Supp. 2d 1046, 1060 (D. Minn. 2001) ("The existence of an express contract between

parties precludes recovery under theories of quasi-contract . . . .").  However, where the claims

are outside the scope of the contract between the parties, unjust enrichment and quantum meruit

claims are nonetheless actionable.  See Ventura v. Titan Sports, Inc., 65 F.3d 725, 730 (8th Cir.

1995) ("[I]f an existing contract does not address the benefit for which recovery is sought,

quantum meruit is available regarding those items about which the contract is silent.").

Yang's quasi-contract claims fail because they address subject matter squarely in the

purview of the Franchise Agreement.  The sole basis identified by Yang for these claims is the

allegation that Jani-King promised to replace the Luther Group account and did not do so.  As

discussed above, § 4.17 of Yang's Franchise Agreement directly addressed replacement of

accounts by Jani-King, and therefore conduct regarding account replacement cannot serve as the

basis for quasi-contract claims here.  Jani-King is entitled to summary judgment in its favor on

these claims.

### 7.    Vicarious Liability

With summary judgment granted in Jani-King's favor on all of Yang's claims, there is no

basis for vicarious liability.  See Williams v. Nat'l Football League, 582 F.3d 863, 883 (8th Cir.

2009).

## C.    Diego Cortes Dominguez

### 1.    Facts Specific to Dominguez

In March 2005, Plaintiff Dominguez met with Swenson and received a UFOC.

Dominguez Dep. 17:15-17, 18:10-14.  On April 6, 2005, he purchased a "Plan B" franchise.

Corrected Exhibit 14 to Hunter Decl. [Docket No. 161] ("Dominguez Franchise Agreement") at

PL001806.  After the purchase, he attended the Jani-King training session.  See Dominguez Dep.

38:18-24.  At the session, Jani-King representatives told him that he would be able to earn as much money as a doctor or Ph.D. through operating his franchise.  Id.  Dominguez had monthly billings several times the $1,000 per month IBO associated with his franchise for nearly two years.  See Grecian Decl. Ex. 8.  But as early as December 2006, Dominguez became dissatisfied with Jani-King and informed them he would not accept additional accounts but would continue servicing his remaining clients.  See Hunter Decl. Ex. 15.  Dominguez presently services his remaining accounts as a Jani-King franchisee.  Hunter Decl. Ex. 13 ("2d Dominguez Dep.") 7:7-9.

Prior to December 2006, Dominguez had several large accounts that either were transferred to another Jani-King franchisee or cancelled their contract with Jani-King.  One of those was an account Dominguez serviced with Trailway Pond, an apartment complex.  In January 2007, Dominguez had a dispute with Trailway Pond's management over stained linoleum tile.  2d Dominguez Dep. 47:21-25.  On February 7, 2007, Jani-King transferred the account to a different franchisee.  Grecian Decl. Ex. 8.  Dominguez also serviced an account with Apache Animal Hospital.  That account had problems with a previous franchisee and cancelled its contract with Jani-King shortly after Dominguez accepted the account.  See Grecian Decl. Ex. 13.  Dominguez also serviced an account with Higher Ground Academy, a charter school.  That account was transferred to a different franchisee after Dominguez filled out an "Account Exchange Request Form" seeking to exchange the account for an equal or larger account.  See Grecian Decl. Exs. 9, 15.  The circumstances relating to each account are discussed further below as they relate to Domingeuz's claims.[4]

_____

[4] The parties also discuss an account with an entity called Max Steininger.  In his brief, however, Dominguez advances no theories of liability regarding that account.  Therefore, it will

2.        **Common Law Fraud and Minnesota Franchise Act ("MFA") Claims**

Under Minnesota law, the elements of fraud are: (1) a false representation of a past or present material fact which was susceptible of knowledge, (2) the defendant knew the representation was false or made it without knowing whether it was true or false, (3) an intention to induce plaintiff to act in reliance on the misrepresentation, (4) the representation caused the plaintiff to act in reliance thereon, and (5) and the plaintiff suffered pecuniary damage as a result of the reliance. Hoyt Props., 736 N.W.2d at 318 (quotation omitted). Reliance in common law fraud cases must be reasonable. Id. at 321. It is unreasonable as a matter of law to rely on a representation that is completely contradicted by a written agreement. Crowell, 264 F.3d at 762. The MFA prohibits offering or selling a franchise by means that include either "an untrue statement of a material fact" or an omission of a "material fact" that would be necessary prevent a previous statement from being misleading. Minn. Stat. § 80C.13, subd. 2.

Dominguez argues that Jani-King committed fraud by (1) representing that he could earn as much money as a medical doctor or Ph.D., and (2) by omitting to inform him that declined accounts would be counted against his IBO. With respect to his common law fraud claim, Dominguez could not have reasonably relied on the statement that he would earn as much as a doctor. He could not have relied on that statement in becoming a Jani-King franchisee because it was made to him *after* he had already signed the Franchise Agreement and agreed to its terms. See Dominguez Dep. 38:18-24 (stating that promise to earn as much as doctor or Ph.D. was made during training); 2d Dominguez Dep. 10:7-10 (stating that Jani-King employees promised he would earn as much as a doctor during training). Further, the statement would have directly

not be discussed further.

18

contradicted the UFOC, which disclaims any representations as to profitability or income level and is incorporated by § 12.3 of the Franchise Agreement.  Therefore, any reliance on the statement would have been unreasonable as a matter of law.  See Crowell, 264 F.3d at 762 (ruling that reliance on oral promises contradicted by written contract was unreasonable as a matter of law). Similarly, the MFA requires the statement to be made in the offering or selling of a franchise.  Here, because it was made after the franchise had been offered and sold, the claim fails.

Dominguez argues that Jani-King omitted material facts regarding the calculation of the IBO.  But, it is undisputed that Jani-King disclosed the IBO calculations prior to the contract by giving Dominguez the UFOC.  The UFOC explains that any declined account may be counted against the IBO.  UFOC at JK Moua 001102 ("All accounts offered will apply toward the Initial Finder's Fee Business as specified in the Franchise Agreement, whether or not you accept or decline the offered business.").  Therefore, there is no issue of fact that the information was disclosed in writing.  Dominguez cannot impose liability under either a common law fraud or MFA claim merely because he chose not to read the UFOC.  See, e.g., Haynes v. Kuder, 591 A.2d 1286, 1290-91 (D.C. 1991) (holding that arbitration clause in attorney retainer agreement could not be rescinded on fraudulent inducement theory where arbitration clause was disclosed in writing notwithstanding failure to orally disclose its presence in the retainer agreement).

### 3. Minnesota False Statement in Advertising Claim

As discussed above, the MFSAA prohibits the dissemination of an advertisement that "contains any material assertion, representation, or statement of fact which is untrue, deceptive, or misleading."  Minn. Stat. § 325F.67.  Dominguez argues that Item 19 of the UFOC which

states "we [Jani-King] do not furnish or authorize our salesperson or any employees to furnish any oral or written information concerning the actual or potential sales, costs, income or profits of a JANI-KING franchise," UFOC at JK Moua 001115, was false because Jani-King promised to "continuously" supply him with accounts and to "support" him.  Pls.' Mem. in Opp. to Defs.' Mots. for Summ. J. at 48.  Promises to supply accounts and provide support, however, are not tantamount to furnishing information about the actual or potential sales, costs, income, or profits of a franchise.  Therefore, no false statement was made to Dominguez, and a false statement must be made *to him* in order for any "causal nexus" to exist between a false statement and any damages he suffered.  See Group Health Plan, Inc. v. Phillip Morris Inc., 621 N.W.2d 2, 15 (requiring "causal nexus" between damages and false statements for claims under MFA).  Jani-King is entitled to summary judgment on this claim.

### 4.      Breach of Contract

Dominguez identifies four bases for his breach of contract claim.  He argues that Jani-King breached provisions of the Franchise Agreement in transferring the Trailway Ponds account, not disclosing the problematic account history of Apache Animal Hospital, not replacing the Higher Ground Academy account after Dominguez relinquished it, and violating Item 19 of the UFOC.  Each argument is considered in turn.

### a. Trailway Pond

Dominguez argues that Jani-King breached § 12.3 of the Franchise Agreement, which incorporates the Manual.  The Manual describes Jani-King's policies regarding client complaints.  The Manual states that: "The regional office has the responsibility to follow up all client concerns and complaints.  This follow up *may* include inspection of accounts being

serviced . . . ." Manual § 4.12(5) (emphasis added). The Manual further states: "If the franchisee fails to: (1) either respond to the notice or correct and resolve the client concern or complaint . . . or (2) if the client requests an immediate transfer . . . because of recurring problems or (3) states their intent to terminate the cleaning contract . . . the regional office will immediately begin providing service to the account or will immediately designate another franchisee to service the account . . . ." Manual § 4.12(6). Dominguez argues that Jani-King breached the contract by not inspecting the Trailway Pond premises and providing him a chance to cure the client's complaints.

Dominguez's argument is unavailing because Jani-King had no contractual duty to inspect, it merely had discretion to do so. Further, whether or not Jani-King exercises that discretion, Jani-King has the contractual right to transfer accounts immediately if clients so request or if the client states an intent to cancel its account. Manual § 4.12(6); § 4.22(1). Jani-King maintains that Trailway Pond requested transfer and Jani-King complied with that request pursuant to its contractual rights. Dominguez emphasizes that no document shows an unambiguous request for transfer. However, Jani-King is not bound to accept only written transfer requests, and the Manual expressly provides for reassignment requests to be made orally. Manual § 4.22(1). Further, a Trailway Pond email alludes to an intent to cancel its contract with Jani-King if its account was not transferred, and Jani-King's call log shows a call days after that email to request a transfer to a different franchisee. Grecian Decl. Ex. 10 (email); Diedrich Ex. 4 at JK Moua 004925 (call log). The only evidence that a transfer request was not made, therefore, is Dominguez's suspicion of wrongdoing, which cannot defeat summary judgment. See Krenik, 47 F.3d at 957.

### b.  Apache Animal Hospital

Dominguez next argues that Jani-King had an obligation to disclose the history of poor

relations between Apache Animal Hospital and the previous Jani-King franchisee that serviced

the account.  However, Dominguez identifies no express contractual provision that creates an

obligation to disclose such information by Jani-King.  Instead, Dominguez avers that it violated

Jani-King's own professed "moral obligation" and the "spirit" of the agreement between the

parties.  Where, as here, the relationship between the parties is governed by an express contract,

only express contractual provisions can form the basis of a breach of contract claim.  See Reese

Design, Inc. v. I-94 Highway 61 Eastview Ctr. P'Ship, 428 N.W.2d 441, 446 (Minn. Ct. App.

1988) ("Parties to an express contract are entitled to have their rights and obligations determined

exclusively by its terms.") (citing Schimmelpfenning v. Gaedke, 27 N.W.2d 416, 421 (Minn.

1947)).  Therefore, no breach of contract occurred with respect to the Apache Animal Hospital

account.

### c.  Higher Ground Academy

Dominguez also argues that Jani-King breached their contract by not replacing his Higher

Ground Academy account.  The undisputed facts are that Dominguez wished to exchange the

Higher Ground Academy account because it was "too dirty," Domingez Dep. 69:10-12,

Dominguez filled out an Account Exchange Request Form, Grecian Decl. Ex. 15, and Jani-King

then transferred the account to another franchisee without ever offering Dominguez another

account with equal or higher gross monthly billings, Dominguez Dep. 71:10-11.  Jani-King

insists Dominguez "turned in" the Higher Ground Academy account, voluntarily discontinuing

service.  Dominguez is equally adamant that his desire was only to stop servicing the account

once a suitable replacement, an account with equal or higher billings, had been secured. See, e.g., Dominguez Dep. 69:22, 70:7-12; 2d Dominguez Dep. 71:6-19.

The Manual provides several procedures for transferring an account from one franchisee to another.  For example, a client may request transfer, Manual §§ 4.12(6), 4.22(1), or Jani-King may transfer an account due to franchisee misconduct, Manual §§ 4.22(2)-(4).  A franchisee may also request that an account be transferred.  Manual §§ 4.22(5)-(6).  Section 4.22(5) of the Manual concerns the situation where a franchisee simply wishes to discontinue servicing an account.  In that situation, the franchisee notifies the regional office and is given credit for their Finder's Fees on the account after transfer.  Manual § 4.22(5).  Section 4.22(6) applies where a franchisee has a new account and wishes to turn in a lower billing account to focus on the larger account.  Manual § 4.22(6).  The provision states in relevant part: "A franchisee may elect to relinquish the right to service an account in order to accept the right to provide service to one or more larger accounts."  Id.  To effectuate the transfer, the franchisee notifies the regional office of the desire to relinquish the right to service the lower billing account and accept the rights to service the larger billing account.  Id.  Transfer at request of the franchisee, whether under § 4.22(5) or § 4.22(6), requires the approval of the regional office and that the franchisee continue servicing the account and that the client be satisfied with its service, along with other requirements.  Manual §§ 4.22(5)-(6).

To comply with the written notification requirements, Jani-King provides forms to franchisees.  See Grecian Decl. Ex. 15 (Dominguez's "Account Exchange Request Form").  Dominguez filled out an "Account Exchange Transfer Request Form," which expressly references § 4.22(6).  Id.  In filling out the form, however, instead of providing the name of a

larger account, Dominguez simply wrote "open" in the space calling for the name of the larger

account.  Id.  Further, Dominguez did not fully complete the form in other respects, leaving

spaces blank or adding additional language.  Id.  Importantly, Dominguez did not provide

corroboration that the client was satisfied with its service, a condition precedent to an account

exchange.  See Manual § 4.22(6)(1).  Jani-King could likely have refused to approve an

exchange on that basis.  However, Jani-King instead chose to transfer the account to another

franchisee, and offered Dominguez several lower billing accounts.  Grecian Decl. Ex. 8.

Jani-King argues that it did not breach its contract with Dominguez because neither the

Manual nor the Franchise Agreement can be read to create an affirmative duty to offer an equal

or larger account after Dominguez stated his desire to exchange the account. Jani-King's

argument misses the point.  The Manual clearly envisions two methods of turning in an account:

one where the franchisee simply relinquishes an account and another where the franchisee

relinquishes an account for the purpose of providing service to another.  Dominguez wished to

avail himself of the second method, but no larger account apparently existed for him to accept.

Nowhere does the contract authorize Jani-King to unilaterally deem the franchisee's wish to

exchange an account under § 4.22(6) as a voluntary relinquishment under § 4.22(5).  To the

contrary, the Manual divests Jani-King of any authority to unilaterally transfer accounts in the

absence of client complaints, only allowing them to "request" a transfer at the franchisee's

option. Manual § 4.22(7).  Because § 4.22(6) presupposes the existence of a larger account, the

relative rights of the contracting parties if no larger accounts exist is ambiguous.

The construction of ambiguous contractual provisions is a question of fact for the jury.

See Brookfield Trade Ctr., Inc. v. County of Ramsey, 584 N.W.2d 390, 394 (Minn. 1998) ("The

24

construction and effect of a contract presents a question of law, unless an ambiguity exists."). Here, § 4.22(6) is reasonably susceptible to the interpretation that Jani-King will transfer an account for an exchange if and only if an equal or larger account is available for acceptance, whether its availability is secured by the franchisee or franchisor.  See Manual § 4.22(6) ("A franchisee may elect to relinquish the right to service an account in order to accept the right to provide service to one or more larger accounts.").  If this provision were construed to allow Jani-King to transfer only in the event that an equal or larger account is available, Jani-King would have breached the contract in reassigning the Higher Ground Academy account.  Therefore, Jani-King's motion as it relates to Dominguez and the Higher Ground Academy account is denied.

### d.  Item 19

Finally, Dominguez argues that the provision incorporating the UFOC was breached because Item 19 of the UFOC was false, as discussed above regarding his MFSAA claim.  As with the MFSAA claim, because no evidence suggests information was provided to Dominguez in violation of Item 19, it was not breached as a matter of law.

In summary, Dominguez's theories of breach of contract against Jani-King are all unavailing except the reassignment of the Higher Ground Academy account claim.  A genuine issue of material fact exists as to whether Jani-King breached its contract with Dominguez by reassigning the Higher Ground Academy account when no equal or larger account existed to be assigned to Dominguez.

### 5.    Implied Covenant of Good Faith and Fair Dealing

"Under Minnesota law, every contract includes an implied covenant of good faith and fair dealing requiring that one party not 'unjustifiably hinder' the other party's performance of

the contract." In re Hennepin Cnty. 1986 Recycling Bond Litig., 540 N.W.2d 494, 502 (Minn.

1995) (citations omitted).  The implied covenant of good faith and fair dealing serves only "to

enforce existing contractual duties, and not to create new ones."  Allen v. Thom, No. A07-2088,

2008 WL 2732218, at *5 (Minn. Ct. App. July 15, 2008).

Dominguez asserts that Jani-King breached the implied covenant of good faith and fair

dealing by requiring unpaid extra work, underbidding the accounts it offered him, offering him

accounts that were about to cancel, and taking away accounts.  Dominguez is unable to produce

specific evidence to raise a genuine issue of material fact.

First, Dominguez has no evidence that he performed unpaid extra work.  At his first

deposition, Dominguez testified a payment dispute for extra work arose at Trailway Pond, but

that he never actually performed the extra work.  Dominguez Dep. 45:19-47:3.  Likewise, with

the Higher Ground Academy account, Dominguez testified that the account was transferred

before he performed the extra work.  See 2d Dominguez Dep. 73:4-7.  Like Plaintiff Yang,

Dominguez cannot defeat summary judgment by relying on Answers to Interrogatories in the

face of contrary sworn deposition testimony.  Canal Ins., 2009 WL 1086524, at *3.

Further, Dominguez has not identified any documentary evidence that Jani-King's

accounts were underbid.  Underbidding is a relative term suggesting a bid must be *under* some

objective standard.   Dominguez's only evidence of underbidding is his own subjective belief

that the account was underbid based on the length of time his franchise required to clean

Trailway Pond's dirtiest apartments.  Dominguez Dep. 104:23-106:22.  Dominguez's subjective

opinion of what is a fair price is not evidence of underbidding.  Indeed, because underbidding is

relative, the relevant evidence would be the market price for janitorial services for similar

26

spaces.  There is no such evidence of record.  Without evidence to suggest that accounts were

underbid to a severe degree so as to deprive Dominguez of the benefit of the bargain of the

Franchise Agreement, the claim fails.

Next, the implied covenant of good faith and fair dealing is not breached by Dominguez's

receipt of clients that were considering cancelling and in fact did cancel their relationship with

Jani-King.  The Franchise Agreement and the Manual specifically contemplate that clients may

be dissatisfied with their Jani-King franchisee and Jani-King may elect to transfer them to

another franchisee in an effort to maintain them as clients.  See Manual § 4.12(1).   No document

creates a duty to discuss the account history with the new franchisee.  Dominguez agreed to this

process and cannot now use the implied covenant of good faith and fair dealing to rewrite the

contract to enhance Jani-King's duties.  Furthermore, at the time Dominguez was offered and

accepted the Apache Animal Hospital account, Jani-King had met its IBO, having offered him

accounts with approximately $1,700 in gross monthly billings.  See Grecian Decl. Ex. 8.

Therefore, Dominguez was receiving the full benefit of Franchise Agreement, and the offer by

Jani-King beyond its contractual duties, even of a marginal account, cannot form the basis of

liability.  See In re Hennepin Cnty. 1986 Recycling Bond Litig., 540 N.W2d at 503 ("In

Minnesota, the implied covenant of good faith and fair dealing does not extend to actions beyond

the scope of the underlying contract.").

Finally, Dominguez's argument that taking away accounts violated the covenant of good

faith and fair dealing is also unavailing.  As discussed above, Apache Animal Hospital cancelled

its account with Jani-King and Trailway Pond requested a transfer to a different Jani-King

franchisee.  No evidence of record suggests that Jani-King induced either the cancellation or

transfer request, other than the bare suspicion.  Without an act, much less an act in bad faith, on

the part of Jani-King, no breach of the implied covenant of good faith and fair dealing occurred

with respect to Trailway Pond or Apache Animal Hospital.

The Court has already found that Jani-King is potentially liable for breach of contract for

transferring the Higher Ground Academy account.  Dominguez urges that the same facts be used

as a basis for liability under the implied covenant of good faith and fair dealing.  Under

Minnesota law, a plaintiff has no cause of action for breach of the implied covenant of good faith

and fair dealing if it arises from the same facts as a breach of contract claim.  Sports & Travel

Mktg., Inc. v. Chicago Cutlery Co., 811 F. Supp. 1372, 1383 (D. Minn. 1993) (citation omitted).

Jani-King is entitled to summary judgment on Dominguez's breach of the implied covenant of

good faith and fair dealing claim.

### 6.    Quasi-Contract

Dominguez, like Yang, asserts claims for recovery under theories of unjust enrichment

and quantum meruit.  Dominguez's claims fail because the Franchise Agreement addresses the

subject matter of his claims.  Specifically, the basis for Dominguez's quasi-contract claims is the

transferring of his accounts.  Transfer procedure is specifically addressed in the Franchise

Agreement and the Manual and therefore cannot form the basis of an action premised in either

unjust enrichment or quantum meruit.  See Ventura, 65 F.3d at 730 ("Minnesota law is clear that

'[w]here an express contract exists, there can be no implied [in law] contract with respect to the

same subject matter.'") (quoting Reese Design v. I-94 Highway 61 Eastview Ctr. P'Ship, 428

N.W.2d 441, 446 (Minn. Ct. App. 1988)) (alterations in original); see also Taylor Inv. Corp., 169

F. Supp. 2d at 1060 ("The existence of an express contract between parties precludes recovery

under theories of quasi-contract . . . .").

### 7. Vicarious Liability

Jani-King seeks summary judgment on Dominguez's vicarious liability claim arguing that vicarious liability is a secondary liability doctrine and Jani-King is entitled to summary judgment on all other claims.  See Williams, 582 F.3d at 883 ("Because we have concluded that each of the underlying tort claims is preempted by section 301, we need not further address vicarious liability.").  Having denied summary judgment on one of the underlying claims, the Court declines summary judgment on this claim as well.

### D. Paul Bel George

### 1. Facts specific to George

On May 13, 2002, Plaintiff George met with Swenson to discuss purchasing a Jani-King franchise.  See Hunter Decl. Ex. 21 ("George Dep.") 48:8-24.  At the meeting, Swenson explained the plans and associated IBO levels offered by Jani-King.  George Dep. 49:18-50:2. Swenson encouraged George to buy a high level plan, telling him that with a high level plan he did not "have" to do the work himself, but rather could hire employees.  George Dep. 52:3-5.  In May or June of 2002, George saw the Jani-King PowerPoint slide-show presentation.  George Dep. 81:13-24.  Further, during his discussions with Jani-King personnel, George mentioned his desire to service evening accounts because of his intent to work a day job in addition to operating his franchise.  See George Dep. 118:4-24, 120:14-24.  Jani-King assured George that most of its accounts were evening accounts, but stopped short of promising him only evening accounts.  George Dep. 120:24-121:22.

On December 18, 2002, George purchased "Plan E-4" for $12,550.  Hunter Decl. Ex. 3

("George Franchise Agreement") at JK Moua 007011.  Plan E-4 has an IBO level of $4,000 per

month, and an "Initial Offering Period" of 150 days.  Id.  George quickly became dissatisfied

with the way Jani-King offered accounts.  He was offered several daytime accounts and declined

them due to his need to service evening accounts.  George Dep. 118:9-11.  Further, he was

required to make a quick decision whether to accept an account after it was offered to him,

although he admits he did have an opportunity to ask questions over the phone and attend a

walk-through before making a final decision about accepting an account.  George Dep. 165:4-14,

169:22-170:8.  In June 2003, George was dissatisfied with Jani-King after correspondence

relating to the number of accounts he was offered.  See Hunter Decl. Ex. 20; Grecian Decl. Ex.

17.  George was surprised that Jani-King was counting accounts he declined against the IBO,

and expressed his opinion that doing so was contrary to the Franchise Agreement.  Grecian Decl.

Ex. 17.  George then ceased operation of his franchise and, after considering reviving it, his

franchise remains inactive.  George Dep. 203:23-204:12.

### 2.    Common law fraud

As discussed with the other Plaintiffs' claims, the elements of common law fraud under

Minnesota law are: (1) a false representation of a past or present material fact which was

susceptible of knowledge, (2) the defendant knew the representation was false or made it without

knowing whether it was true or false, (3) an intention to induce plaintiff to act in reliance on the

misrepresentation, (4) the representation caused the plaintiff to act in reliance thereon, and (5)

and the plaintiff suffered pecuniary damage as a result of the reliance.  Hoyt Props., 736 N.W.2d

at 318 (quoting Specialized Tours, 392 N.W.2d at 532).  George argues that Jani-King made

fraudulent misrepresentations, specifically that he would receive a certain level of monthly

earnings, he would be able to hire employees to do all the servicing of his accounts, and that he

would be offered only accounts to be serviced in the evening.  George also argues that Jani-King

failed to disclose that declined accounts would count against the IBO.  Each argument is

considered below.

### a.  Fraudulent misrepresentations

First, no evidence of record suggests that George was promised any level of monthly

earnings.  To the contrary, George testified that he was never promised any level of profits, but

merely discussed the various IBO levels associated with each plan available for purchase.  See

George Dep. 49:20-50:2 (stating that George dicussed various plans with Swenson); George

Dep. 71:13-18 (stating that Swenson never promised any specific level of profit). Therefore, to

the extent that his claim is premised on discussion of the IBO levels, no false representation was

made–the IBO levels were accurately disclosed.

Further, the representation that he would be able to hire employees to do work for him

was not false.  Nothing precluded him from hiring employees, the decision not to do so was his

own.  Furthermore, in the context of the discussion, the statement that he would be able to hire

employees is puffery.  The statement is vague as to how many employees, in what capacity

employees would be hired, when he would be able to begin hiring employees, and other details

susceptible of knowledge and measurement.  There is no specific factual representation as is

required for George's fraud claim to survive based on this statement.

George also argues that Jani-King defrauded him by promising to offer him accounts to

be serviced at night.  However, as George acknowledges, Jani-King never promised to offer him

*only* evening accounts.  George Dep. 121:174-22.  Jani-King is not responsible for George's

subjective belief that he would receive only evening accounts.  Given the admitted absence of a specific misrepresentation made to him about evening accounts, there is no actionable claim of fraud premised upon this statement either.

### b. Fraudulent nondisclosure

George asserts that Jani-King defrauded him by not disclosing that declined offers for accounts would count against his IBO.  Jani-King argues that there can be no fraud by omission because it disclosed that declined accounts count towards the IBO in the PowerPoint presentation that George admits he saw.  Not so.  The slides state only[5] that: "If any portion of the Initial Finder's Fee Business [referred to in this opinion as the "IBO"] that Jani-King offers your franchise the right to service be declined, Jani-King is relieved of the *time obligation* to fulfill that portion of the Initial Finder's Fee Business."  Diedrich Decl. Ex. 5 at JK Moua 013877 (emphasis added).  In other words, Jani-King disclosed that declining an offered account would excuse it of fulfilling the IBO within the "Initial Offering Period," 150 days in George's case, not that declined accounts would count against the dollar amount of the IBO.  Jani-King's time obligation in making IBO offers is not the same as the dollar value amount associated with the IBO.  George does not complain that he was not offered accounts in a timely manner, he complains that he was not offered sufficient suitable accounts to provide him with over $4,000 in monthly billings.  The presentation did not disclose that declined accounts would count against the dollar amount of the IBO.

_____

[5] Jani-King does not provide "pincite" citations to the slides in support of its argument. However, the quoted language is included in the portion of the slides referenced by Jani-King during George's deposition.  <u>See</u> George Dep. 83:17-84:2.  Further, the Court has reviewed the slides and no other applicable disclosures appear to have been made, although many of the slides provided are illegible.

Jani-King alternatively argues that the calculation of the IBO was disclosed in the UFOC. For his part, George does not dispute that such disclosures are in the UFOC but disputes that he ever received the UFOC, despite documentary evidence to the contrary.  See George Dep. 64:17-67:14 (testimony of George that he did not receive UFOC); Diedrich Decl. Ex. 7 (signed, written acknowledgment of receiving UFOC by George).  Because the UFOC that George would have seen is not a matter of record, the issue cannot yet be resolved.

The only complete copies of the UFOC submitted in connection with this motion are one dated April 30, 2004, Hunter Decl. Ex. 4, and another dated May 3, 2005, Diedrich Decl. Ex. 6. George became a franchisee in 2002.  Therefore, the contents of the UFOC as it existed in 2002, when George would have first seen it, are not a matter of record.  A "Corrected Exhibit 6 to Diedrich Declaration" [Docket No. 162] was submitted and purports to be a version of the UFOC effective May 28, 2002.  The document, however, is only two pages long and presumably cannot be the complete UFOC as it was on May 28, 2002.  To add to the confusion, at George's deposition the line of questioning regarding the UFOC revealed the existence of two versions, one dated May 21, 2002, and the other dated May 28, 2002, that George signed written acknowledgments of having received.  George Dep. 59:4-10 (May 21, 2002 UFOC), 74:12-75:2 (May 28, 2002 UFOC).  Given the large number of parties in this matter, the apparent attempts to correct the record, and the numerous copies of the UFOC in existence, it appears that the complete copy of the UFOC that Jani-King allegedly gave George may inadvertently not be in the record.  Because the contents of the UFOC, as it would have been given to George on either May 13, 2002 or June 4, 2002, may be germane to this discussion, the Court will continue to hold George's fraud by omission claim under advisement and give the parties ten days from the

33

issuance of this Order to supplement the record with a full copy of either the UFOC dated May 28, 2002, the UFOC dated May 21, 2002, or both.  This is the only supplementation to record that will be allowed.

### 3.      MFA

As dicussed above, the MFA prohibits offering or selling a franchise by means that include either "an untrue statement of a material fact" or an omission of a "material fact" that would be necessary prevent a previous statement from being misleading.  Minn. Stat. § 80C.13, subd. 2.   The MFA has a three-year statute of limitations.  Minn. Stat. § 80C.13, subd. 5.  The MFA, however, does not clearly state when a cause of action accrues, i.e. when the running of the statute of limitation begins.  The proper accrual rule is a matter of dispute between the parties.  The Court declines to decide what accrual rule applies to the MFA because even under the discovery rule, the rule urged by George and most favorable to him, George's claim is untimely.

Under the discovery rule of accrual, the statute of limitations for a cause of action begins running when the plaintiff knew, or should have known through the exercise of reasonable diligence, of the facts constituting the cause of action.  See Klehr v. A.O. Smith Corp., 87 F.3d 231, 235 (8th Cir. 1996) (discussing discovery rule for fraud claims).  George purchased his Jani-King franchise in December 2002.  George alleges Jani-King made misrepresentations regarding profitability, the availability of evening accounts, and the ability to hire employees at or around the time of his purchase.  Had Jani-King made these statements, and were they false, George would have become aware of the facts constituting his claim within months of purchasing his franchise as daytime accounts were offered to him, he failed to realize his

expected profits, and did not hire employees.  Therefore, George knew of all the facts

constituting his MFA claim under each theory in early 2003.  Further, assuming that Jani-King

did fail to disclose that declined accounts would count against his IBO, George became aware

that Jani-King was counting declined accounts against the IBO when the calculation became a

matter of dispute in June 2003.  <u>See</u> Grecian Decl. Ex. 17; Hunter Decl. Ex. 20.  At that time he

would have known of all the facts constituting his MFA claim under his omission theory.

Therefore, the latest date that all facts constituting his MFA claim were known to George, under

*any* of the theories he advances, is June 2003.   With a three-year statute of limitations, George's

MFA claim, commenced on July 18, 2008, is untimely.  Jani-King is entitled to summary

judgment on George's MFA claim.[6]

### 4.    MFSAA/Breach of Contract

Like Yang, George premises both his MFSAA claim and breach of contract claim on

Item 19 of the UFOC, which states that Jani-King does not furnish or authorize information

regarding actual or potential sales, costs, income or profits.  As discussed above, no genuine

issue of material fact exists as to whether Jani-King furnished or authorized information

regarding actual or potential sales, costs, income or profits.  George testified that Jani-King

discussed the IBO with him, and did not represent that George would have any particular level of

sales, costs, income, or profit. George Dep. 49:20-50:2, 71:13-18.

### 5.    Breach of Implied Covenant of Good Faith and Fair Dealing

George argues that Jani-King breached the covenant of good faith and fair dealing by

---

[6] Plaintiff George also asserts an MFA claim against Defendant George Selman.  This claim is also untimely and Selman is entitled to summary judgment.

failing to offer him evening accounts, failing to provide him $4,000 in monthly business, and underbidding accounts.  No genuine issue of material fact exists with respect to any of these claims.  As George acknowledges, Jani-King had no contractual duty to offer him only evening accounts.  Jani-King did not deprive George of the benefit of the franchise agreement by failing to exclusively offer him evening accounts when it had no contractual duty to do so.  See In re Hennepin Cnty. 1986 Recycling Bond Litig., 540 N.W2d at 503 ("In Minnesota, the implied covenant of good faith and fair dealing does not extend to actions beyond the scope of the underlying contract.").  Jani-King offered him sufficient business to meet the IBO, and George cannot use the covenant of good faith and fair dealing to redraft the contract to include an "evenings only" provision.

Similarly, George's argument that Jani-King failed to provide him with guaranteed $4,000 in monthly business is without merit because, as noted above, no evidence of record suggests that Jani-King made such a promise, and regardless such a promise would directly contradict the terms of the Franchise Agreement.

Further, no evidence of record suggests accounts were underbid.  The only evidence of underbidding provided by George is his own subjective belief that the Gray Bow account was underbid and that Jani-King lowered its bid for that account in order to secure the account.  George Dep. 192:21-195:23.  Rebidding is not evidence of underbidding nor is George's subjective feelings about the proper bid amount.  The only useful metric, market rates for janitorial services, is not a matter of record and therefore no genuine issue of material fact exists as to underbidding.  Further, George's argument that the time pressure surrounding acceptance of accounts is evidence of underbidding is unavailing.  As George acknowledges, he had the

36

ability to ask questions and attend a walk-through of the account before accepting an account. George Dep. 165:4-14, 169:22-170:8. Jani-King is entitled to summary judgment in its favor on George's claim for breach of the implied covenant of good faith and fair dealing.

### 6. Quasi-Contract

George premises his unjust enrichment and quantum meruit claims on the manner in which he was offered accounts (with time pressure and no paperwork) and the manner in which client complaints were handled (he claims complaints were fabricated). Offering of accounts and client complaints are subject matters squarely addressed by the Franchise Agreement, UFOC, and Manual. See Ventura, 65 F.3d at 730 ("Minnesota law is clear that '[w]here an express contract exists, there can be no implied [in law] contract with respect to the same subject matter.'") (quotation omitted) (alterations in original); see also Taylor Inv. Corp., 169 F. Supp. 2d at 1060 ("The existence of an express contract between parties precludes recovery under theories of quasi-contract . . . ."). As such, they cannot form the basis of George's quasi-contract claims. Jani-King is entitled to summary judgment on these claims as well.

### 7. Vicarious Liability

As with Dominguez, the sole grounds urged by Jani-King to grant judgment in its favor on George's vicarious liability claim is that vicarious liability is a secondary liability doctrine and Jani-King is entitled to summary judgment on all other claims as well. Having denied summary judgment with respect to George's common law fraud claim, the Court likewise denies summary judgment for this claim.

## IV. CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED** that:

1.     Defendants' Motion for Summary Judgment [Docket No. 148] is **GRANTED IN PART AND DENIED IN PART**;

2.     All claims asserted by Plaintiff Cherpao Yang are **DISMISSED WITH PREJUDICE**;

3.     Plaintiff Diego Cortes Dominguez's claims for breach of the implied covenant of good faith and fair dealing (Count II), violation of the Minnesota Franchise Act (Count III), fraud/misrepresentation by omission (Count IV), unjust enrichment (Count V), quantum meruit (Count VI), and false statements in advertising (Count VIII), are **DISMISSED WITH PREJUDICE**;

4.     Plaintiff Paul Bel George's claims for claims for breach of contract (Count I), breach of the implied covenant of good faith and fair dealing (Count II), violation of the Minnesota Franchise Act (Count III), unjust enrichment (Count V), quantum meruit (Count VI), and false statements in advertising (Count VIII) are **DISMISSED WITH PREJUDICE**;

5.     The parties may supplement the record in this matter with either the UFOC dated May 28, 2002, the UFOC dated May 21, 2002, or both, if done within ten days of the date of this Order.  The Court will continue to hold Plaintiff George's fraud claim under advisement; and

6.     The only triable issues that remain with respect to these Plaintiffs are Dominguez's breach of contract claim as it relates to the exchange of the Higher Ground Academy Account only, and any vicarious liability related thereto, and

George's fraud by omission claim as it relates to the disclosure of the calculation

of the IBO, and any vicarious liability related thereto.

BY THE COURT:


        s/Ann D. Montgomery
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  August 30, 2011.